**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ANGELA ROBERTS,<br><br>Plaintiff,<br><br>- against -<br><br>UNLOCK PARTNERSHIP SOLUTIONS AO1, INC., CLEAR EDGE TITLE INC., ABC INC 1 – 10, AND JOHN DOE 1-10,<br><br>Defendants. | Case No.: 1:24-cv-01374-CPO-AMD |

# DEFENDANT UNLOCK PARTNERSHIP SOLUTIONS AO1 INC.'S REPLY IN FURTHER SUPPORT OF ITS MOTION TO COMPEL ARBITRATION

Jason R. Lipkin, Esq.
McGlinchey Stafford PLLC
112 West 34th Street Suite 1515
New York, NY 10120
(646) 362-4048
jlipkin@mcglinchey.com

Andrew K. Stutzman, Esq.
Christopher A. Reese, Esq.
Stradley Ronon Stevens & Young, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103
(215) 564-8000
astutzman@stradley.com
creese@stradley.com

September 20, 2024

*Counsel for Defendant*

Unlock asks this Court to compel arbitration of the claims consistent with an arbitration provision in the operative Forward Sale and Exchange Agreement dated November 11, 2021 (the "FSEA"), that undisputedly bears Plaintiff's signature. (Ex. B [FSEA]). Plaintiff agreed to arbitrate "any and all controversies, claims, or disputes with [Unlock] . . . arising out of, relating to, or resulting from" the FSEA or the property located at 48 Buckeye Lane, Willingboro, New Jersey 08046 (the "Property"). (*Id.* at § 20.2). The FSEA is governed by the Federal Arbitration Act (FAA), and Plaintiff's claims fall within the scope of the arbitration provision. (*Id.*)

Plaintiff tries to evade the terms of the FSEA by first claiming that the FSEA constitutes a "residential mortgage loan" contract, or alternatively a "reverse mortgage," that is subject to the Truth in Lending Act ("TILA"), which prohibits compulsory arbitration. However, Plaintiff's argument is flawed. On one end, she misstates how TILA defines a "residential mortgage loan" contract and considerably misstates how TILA and regulators have defined a "reverse mortgage." On the other end, her description of the FSEA is at best disingenuous and at worst a misrepresentation. The FSEA is not a loan. (Ex's. B and C[1]). Unlock did not extend credit of any kind and Plaintiff is not personally liable for any debt. (*Id.*)

[1] The Declaration of Unlock CEO James Riccitelli is filed as Exhibit C in support of this Reply, attached to which as Exhibit 1 is an accurate copy of the 2021 product guide for the FSEA that was in place at the applicable time.

For similar reasons, Plaintiff's attempt to argue that the arbitration provision is unconscionable fails. Neither the nature of this transaction nor the circumstances leading to it can support the drastic measure of invalidating a term of an agreed-upon contractual requirement to arbitrate disputes. Finally, the FSEA's language is sufficiently broad to cover the claims asserted by Plaintiff.

## ARGUMENT

### I. THE FSEA IS NOT SUBJECT TO TILA.

Plaintiff's first argument against the enforceability of the FSEA's arbitration provision is a fruitless attempt to fit a square peg in a round hole. Ignoring the express language and structure of the FSEA, Plaintiff argues that the transaction constitutes a "residential mortgage loan" contract which cannot compel arbitration under TILA. (Dkt. No. 33 at p. 15). It is not. Rather, the FSEA is an investment agreement that grants Unlock rights, under certain circumstances, to participate in the Property's future value. (Ex. C).

#### A. The FSEA Is Not a "Residential Mortgage Loan".

TILA provides that "[n]o residential mortgage loan . . . may include terms which require arbitration or any other nonjudicial procedure as the method for resolving any controversy or settling any claims arising out of the transaction." 15 U.S.C. § 1639c(e)(1). Thus, as relevant here, TILA's restriction against arbitration only applies to "residential mortgage loans."

TILA defines a "residential mortgage loan" as "any consumer credit transaction . . . secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling." 15 U.S.C. § 1602(dd)(5). A transaction qualifies as "consumer credit" whenever (1) credit is offered or extended to (2) a natural person, and (3) the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes. 15 U.S.C. § 1602(i). TILA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f).

The FSEA does not satisfy the definition of a "consumer credit transaction" and thus cannot be considered a "residential mortgage loan." In reaching that conclusion, this Court must begin[2] – and if there is no ambiguity conclude[3] – its analysis with the agreement itself. In order to determine its nature, terms must be given their "plain and ordinary meaning." *Kaufman v. Provident Life and Cas. Ins. Co.*, 828 F.Supp. 275, 282 (D. N.J. 1992), *aff'd*, 993 F.2d 877 (3d Cir. 1993).

---

[2] *See A.D.L. v. Cinnaminson Twp. Bd. of Educ.*, 975 F. Supp. 2d 459, 464 (D.N.J. 2013) ("[c]ontract interpretation begins by looking at the terms of the contract").

[3] *See Foster v. Watson*, 2022 WL 3716573, at *4 (W.D. Pa. 2022) ("Where the contract's terms are subject only to one reasonable interpretation, the court interprets the unambiguous contract as a matter of law.") (citing *Pacitti v. Macy's*, 193 F.3d 766, 773 (3d Cir. 1999)).

Here, the very first words in the FSEA unequivocally state in capitalized bolded print: "**THIS EXCHANGE AGREEMENT IS NOT A LOAN**[.]" (Ex. B at p. 1). The FSEA then immediately describes the nature of the transaction:

> **THIS IS AN AGREEMENT PURSUANT TO WHICH UNLOCK PROVIDED OWNER A PAYMENT IN EXCHANGE FOR A RIGHT TO RECEIVE A SPECIFIED PERCENTAGE INTEREST IN THE VALUE OF THE OWNER'S HOME UPON THE OCCURRENCE OF CERTAIN EVENTS SET FORTH IN THIS EXCHANGE AGREEMENT**[.]

(*Id.*) It is also noteworthy that the agreement is titled "**FORWARD SALE AND EXCHANGE AGREEMENT**" and not titled as a loan. (*Id.*)[4]

The FSEA further explains that "[t]he Investment Payment is not a loan to You or indebtedness to Unlock, nor is it a principal amount which Unlock is entitled to recover at any time. You will not make any monthly interest or any other periodic payments to Unlock based upon the amount of the Investment Payment." (*Id.* at § 1.4). Indeed, the terms of the FSEA are elsewhere described as the "price" of the owner's "Unlock Agreement." (*Id.* at § 1.2). Later in the FSEA, the parties acknowledge the significant differences between the transaction and a loan:

> 21.5 Not a Loan. Unlock and Owner agree that the Unlock Agreement and the transaction contemplated thereunder, including payment of the Investment Payment and the sale of the Unlock Percentage, is not a loan

[4] When analyzing the substance of a transaction, courts have relied on a number of factors, including the "title of the document, the language of the document, the terms of the document, the characteristics of the parties, and the conduct of the parties." *Nolden v. Summit Fin. Corp.*, 244 So. 3d 322, 325 (Fla. App. 2018) (affirming a contract was not a loan because of its title in bold capital letters on the first page).

> or extension of credit. Owner does not have an obligation to repay the Investment Payment, and there are not any required periodic payments of principal, interest or any other finance charges. As set forth herein, Unlock may lose all or a portion of the Investment Payment. The Security Instrument secures Owner's performance and obligations under the Unlock Agreement and not in connection with a promissory note, loan or extension of credit. The Annualized Cost Limit is not an annual percentage rate limit, but rather a limit on Unlock's investment return. To the fullest extent possible, Unlock and Owner agree that the Unlock Agreement is not subject to any federal, state and/or local law concerning consumer credit, including without limitation, usury ceilings, disclosures, and any other requirements, restrictions, limitations or prohibitions set forth in such laws.

(*Id.* at § 21.5).

Significantly, the FSEA also cannot be considered a "loan" under any reading of New Jersey law, as defined by the State's highest court:

> A loan of money is a lending, on one side, and a borrowing on the other. The conception of loaning money is well understood and the incidents pertaining to an agreement for the loan of money are few and simple: an advancement of money by the lender at the time of agreement, and a stipulation or agreement to repay it and generally with interest, at a future date, by the borrower. . . .

*Tiernan v. Carasaljo Pines*, 143 A.2d 892, 898 (N.J. Super. Ct. App. Div. 1958). Notably, the FSEA does not create an obligation that Plaintiff repay the Investment Payment, nor is there a promissory note evidencing a promise to repay. (Ex. B at § 21.5; Ex. C at ¶ 16). It does not charge any interest. (*Id.*). There are no periodic payments of principal, interest, or any other finance charges. (*Id.*).

The rate of return on Unlock's investment is predicated upon several different, variable factors including the Property's future value. (Ex. B at § 1.8). That

return is also capped at the Annualized Cost Limit. (*Id.* at § 10). Moreover, that return is potentially offset by any significant improvements performed on the Property by the property owner. (*Id.* at § 7.1, 7.2).

In arguing that the FSEA is a "residential mortgage loan," Plaintiff mischaracterizes its terms. For instance, she claims that, "she must pay either 70% of the value of her home or the initial payment plus 18% annual interest" if she were to sell her home, pass away, move out, or upon the expiration of the 10-year term. (Opp. at p. 2). Not so. Under each "Settlement Event," Unlock can convert its percentage interest, entitling it to a percentage of proceeds from a sale of the Property. (Ex. B at §§ 2.2, 3.1, 4.4, 5.5). If such a sale were about to occur, then Unlock also has the right to "make an offer in writing to purchase the Property . . ." (*Id.* at § 2.1(i)). However, notwithstanding Unlock's rights, Plaintiff has the right to "settle" the FSEA by tendering a payment calculated based on the value of the Property and Unlock's percentage ownership interest. (*Id.* at § 2.4).

Consequently, the FSEA cannot be considered "credit" because Unlock has not granted Plaintiff "the right . . . to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). Significantly, there is no "Settlement Event" that requires Plaintiff to make a payment to Unlock to buy out Unlock's interest or settle with Unlock. Accordingly, the Court cannot consider the FSEA to be a "residential mortgage loan" because it does not meet TILA's definition.

## B. The FSEA Is Not a "Reverse Mortgage."

Plaintiff spends numerous pages in the Opposition referencing secondary sources and law journals espousing the purported risks of reverse mortgages, and then misrepresents Unlock's FSEA as a reverse mortgage loan. Plaintiff's reasoning, however, is fundamentally flawed. To be a reverse mortgage under TILA and Regulation Z, a transaction must first be a "credit" as defined under Regulation Z. Under Regulation Z, a reverse mortgage transaction means a nonrecourse consumer credit obligation in which:

> (1) A mortgage, deed of trust, or equivalent consensual security interest securing one or more advances is created in the **consumer's principal dwelling**; and
>
> (2) Any principal, interest, or shared appreciation or equity is due and payable (other than in the case of default) **only after**:
> (i) The consumer dies;
> (ii) The dwelling is transferred; or
> (iii) The consumer ceases to occupy the dwelling as a principal dwelling

12 C.F.R. § 1026.33(a) (emphasis added).

As made clear herein, Unlock's FSEA is not "credit." Additionally, as Plaintiff admits in her Opposition, the FSEA has a ten-year term. Thus, by definition, the FSEA cannot be considered a "reverse mortgage." *Id.*, at § 1026.33(a)(2).

In the Opposition, Plaintiff misleadingly claims that "[s]ome reverse mortgages also have a term of years," citing to certain comments from the Consumer Financial Protection Bureau (CFPB), but in doing so, she vastly overstates, if not

misrepresents, that commentary. (Opp. at p. 5). Specifically, the CFPB noted that "[a]n obligation may state a definite maturity date or term of repayment and still meet the definition of a reverse-mortgage transaction **if the maturity date or term of repayment used would not operate to cause maturity prior to the occurrence of any of the maturity events recognized in the regulation**." Requirements for Reverse Mortgages, CFPB, cmt. 33(a)(2)(2) (emphasis added). To that end, the example cited by the CFPB was a term that expired on the consumer's "150th birthday." *Id.* Therefore, according to the CFPB's commentary, cited by Plaintiff herself, the FSEA cannot be considered a "reverse mortgage."

Finally, while Plaintiff avers the Property is her home (which is a requirement for a reverse mortgage), FSEAs are available for primary residences, second homes, and even rental properties. (Ex. C at ¶12). Even if the property was originally identified as a primary residence, owners are free to use the property as a second home or even a rental property (Ex. B at § 14.8; Ex. C at ¶13), which would customarily constitute a default under a reverse mortgage. The FSEA, by its overall design, thus fails that portion of the definition of a reverse mortgage transaction under the TILA and Regulation Z. 12 C.F.R. § 1026.33(a)(1).

### C. The FSEA Is an "Investment" Which Is Excluded from TILA's scope.

It is well established that "TILA . . . does not apply to all transactions." *Foster v. Equitykey Real Est. Invs. L.P.*, 2017 WL 1862527, at *3 (N.D. Cal. 2017).

Significantly, even if the FSEA did fall within TILA's definition of a "residential mortgage loan" or "reverse mortgage," the transaction still falls within an exception to TILA. *See, e.g, Foster*, 2017 WL 1862527, at *3 (discussing one such exception for option contracts). The exception appears in the comments to TILA (which Plaintiff conveniently omits) as follows:

> Investment plans in which the party extending capital to the consumer risks the loss of the capital advanced. This includes, for example, an arrangement with a home purchaser in which the investor pays a portion of the downpayment and of the periodic mortgage payments in return for an ownership interest in the property, and shares in any gain or loss of property value.

12 C.F.R. Part 1026, Supp. 1, cmt. 2(a)(14)-1(vii), (viii).

Similar to an investment plan, multiple federal courts have recognized that option contracts lie outside of the scope of TILA's prohibition against arbitration provisions. *See, e.g., Foster*, 2017 WL 1862527, at *4-5; *see also, e.g., Olson v. Unison Agreement Corp.*, 2023 WL 5609251, at *2 (W.D. Wash. 2023) ("The Olsons' claim under the [state consumer protection act] for failure to comply with the Consumer Loan Act fails since the HomeOwner Agreement is not a loan."). Specifically, the *Foster* decision is instructive on the approach that this Court should adopt to the FSEA.

Somewhat similar to Unlock here, EquityKey paid $196,000 to purchase an option to participate in the property's appreciation, which was secured by a deed of trust securing performance obligations. 2017 WL 1862527, at *1-2. The plaintiff

sued under TILA arguing EquityKey concealed the fact that the agreement was actually a loan. *Id.* at *2. The court disagreed, pointing to the lack of creation of a debt and that "there [was] no guarantee that the payment received by [plaintiff] need ever be returned," considering EquityKey "[was] not obliged to exercise its option." *Id.* at *4-5. Because the plaintiff "did not agree to 'repay absolutely,' " the option was "not a loan." *Id.* at *4 (quoting *In re Grand Union Co.*, 219 F.353, 356 (2d Cir. 1914)). The court further reasoned that EquityKey "risked the loss of the capital it advanced," since a decrease in property value could cause it to lose money. *Id.* ("The agreement has all the features of an option contract described above . . . Since the agreement was not subject to TILA's disclosure requirements, EquityKey did not violate the statute . . . "). That same reasoning applies here.

The express terms of the FSEA also establish the nature of the transaction as having elements of an "investment" – but does not (as discussed above) share several material elements of a "residential mortgage loan" or "reverse mortgage."

Here, the FSEA repeatedly and consistently refers to its payment as an "Investment Payment" which is calculated as a percentage interest in the property. (Ex. B at *passim*). More importantly, the substance of the FSEA makes clear that Unlock's investment is at risk and contingent on the Property's future, albeit speculative, future value. In no uncertain terms, the parties agree that, "[a]s set forth herein, Unlock may lose all or a portion of the Investment Payment." (*Id.* at § 21.5).

As defined by the comments to TILA's implementing regulation, Regulation Z, it does not cover an investment plan "in which the party extending capital to the consumer risks the loss of the capital advanced." 12 C.F.R. Part 1026, Supp. 1, cmt. 2(a)(14)-1(viii). 12 C.F.R. Part 1026, Supp. 1, cmt. 2(a)(14)-1(viii).

The FSEA is at risk because it is contingent on the local housing market's success and other macroeconomic forces. *See generally L'Arbalete*, 474 F.Supp.2d at 1325 (holding a transaction was not usurious where it "represented a very speculative risk"). Within the ten-year period set forth in the FSEA, Plaintiff – and not Unlock – controls the timing of any settlement. Plaintiff could elect to sell the Property at any time, including when the housing market is in decline. Within the ten-year period, the owner can decide when to settle the FSEA, and based on the variation in real estate prices, Unlock's return is not certain.

In Plaintiff's case, the FSEA came with significant risks – even if Plaintiff refuses to acknowledge them. *See, e.g., Saralegui v. Sacher, Zelman, Van Sant Paul, Beily, Hartman & Waldman, P.A.*, 19 So. 3d 1048, 1051 (Fla. 3d DCA 2009) (reasoning a transaction is not indicative of a loan where repayment obligations are not absolute, but rather contingent upon the success of the underlying venture). Through the FSEA, Unlock essentially invested $115,062 in 2021 in exchange for an up-to 70% interest in a piece of property that was currently the subject of a tax

foreclosure sale.[5] That risk is borne by Unlock given that it is dependent upon the future value of a residence over which Unlock has no control. For these reasons, the FSEA cannot be considered a "residential mortgage loan" or a "reverse mortgage" subject to TILA's prohibition against arbitration.

## II. THE ARBITRATION PROVISION IS NOT UNCONSCIONABLE.

A contract of adhesion is "a contract where one party … must accept or reject the contract." *Rudbart v. N. Jersey Dist. Water Supply Com'n*, 127 N.J. 344, 353 (1992). In evaluating whether a contract is one of adhesion (and hence, unconscionable), New Jersey courts consider the following factors: (1) the subject matter of the contract, (2) the parties' relative bargaining positions, (3) the degree of economic compulsion motivating the adhering party, and (4) the public interests affected by the contract. *See Pace v. Hamilton Cove*, 258 N.J. 82, 103 (2024).

First, as shown in Section I, the FSEA is neither a "residential mortgage loan" nor a "reverse mortgage;" thus, it does not require protections like those afforded by TILA. Indeed, by the very nature of the 10-year expiration period, Plaintiff had more than ample time to evaluate the best way for her to settle the FSEA. (Ex. B.)

---

[5] Plaintiff concedes that she fell behind on her property taxes because she "did not realize how property taxes worked and how much money [she] would have to pay in property taxes." (Decl. of Angela Roberts at ¶ 4). While the cost to redeem her property was $54,062, Plaintiff opted to receive an additional $61,000 in funds for a total of $115,062 from Unlock – effectively receiving 43.75% of the value of the Property immediately in exchange for Unlock's right to a 70% interest in the Property after a 10-year period, capped by the Annualized Cost Limit.

Thus, there is nothing about the subject matter of the FSEA that could be compared to the proverbial "gun to the head" situation; the hallmark of adhesion contracts.

Second, Plaintiff has presented no evidence that the parties did not have equal bargaining power. There is no evidence (a) that Unlock was her only option for raising the funds needed to redeem the tax sale certificate, (b) that she did not have the opportunity to ask questions about the FSEA and/or consult with a third party, (c) that she was prevented from accepting a different Investment Payment, or (d) that she had a deadline to accept the FSEA. In fact, in addition to the FSEA itself, Unlock provides product guides to its customers outlining the details of its product. (Ex. C at ¶11 and Ex. 1 attached thereto). Moreover, in the FSEA, Plaintiff confirms that Unlock "urged" her to seek "independent tax, legal and financial advisors to ensure an understanding of the risks and benefits of the Unlock Agreement with respect to [Plaintiff's] particular situation" and that she was afforded an opportunity before signing. (Ex. B at § 11.8).

Third, Plaintiff failed to show that she was under a "high degree of economic compulsion" or that she faced "a monopolistic market." There is no evidence that Unlock pressured her to enter into the FSEA, much less by a specific date. Any perceived urgency with entering into the 2021 FSEA was of her own accord by failing to pay her taxes since 2016. She also has not pled that her Property is in danger of being foreclosed or that an imminent Settlement Event is causing her harm.

And, as previously noted, she has not alleged that Unlock was her only option – a dubious claim since the Property was otherwise unencumbered. (Am. Compl. at ¶ 2).

Fourth, she cannot prove the public interest (known as substantive unconscionability) would be adversely affected because she cannot prove "the exchange of obligations [in the FSEA was] so one-sided as to shock the court's conscience." *B & S Ltd., Inc. v. Elephant & Castle Int'l, Inc.*, 906 A.2d 511, 521 (N.J. Super. Ct. 2006). For one, the waiver of consequential and punitive damages in the arbitration clause of the FSEA applies equally to Plaintiff and Unlock (Ex. B at § 20.4), and is therefore not unconscionable. *See Johnson v. Wynn's Extended Care, Inc.*, 2014 WL 5292318, at *6, (D.N.J. Oct. 15, 2014) (upholding an arbitration clause which barred punitive damages). Moreover, a party can voluntarily waive its rights to punitive damages. *See*, *e.g.*, *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1994) (noting that parties could agree to include punitive damages among the issues to be arbitrated although state law precludes arbitrators from awarding such damages); *see also CDK Glob., LLC v. Tulley Auto. Grp., Inc.*, 489 F. Supp. 3d 282, 314 (D.N.J. 2020) (finding that "damages would be limited pursuant to the limitation of liability clause found in the [contract]"). The FSEA also does not prevent Plaintiff from recovering under federal and state statutes or consumer protection laws as the arbitration clause states that "remedies that would otherwise be available to owner under applicable federal, state or local laws shall

remain available." (Ex. B at § 20.4). Furthermore, a lack of mutuality of obligations without any further indicia of unfairness is insufficient to demonstrate substantive unconscionability. *See Pyo v. Wicked Fashions, Inc.*, 2010 WL 1380982, *6 (D.N.J. 2010) ("a contract may confer rights and obligations on one party that it does not confer on the other[ and t]he . . . Third Circuit has specifically affirmed that principle in the context of arbitration agreements").[6] Finally, it is well-settled that "[w]here there is a contract between the parties that provides for arbitration . . . '[a]ny doubt concerning the scope of arbitrability should be resolved in favor of arbitration.' " *BP Auto Grp., LLC v. Reynolds & Reynolds Co.*, 2018 WL 6600223, at *2 (D.N.J. Dec. 17, 2018) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)).[7]

## III. PLAINTIFF'S CLAIMS ARE WITHIN THE SCOPE OF THE ARBITRATION PROVISION.

Plaintiff's final argument in Opposition alleges that the arbitration provision

[6] Plaintiff's reliance on *NAACP of Camden Cnty. East v. Foulke Mgmt. Corp.*, 24 A.3d 777, 797-798 (N.J. Super. Ct. App. Div. 2011), is misplaced. Here, unlike in *NAACP*, there are no multiple, contradictory, or inconsistent variations of the arbitration clause.

[7] Should this Court find that any of the provisions of the FSEA are unconscionable, the severability clause in the FSEA and binding authority from the New Jersey Supreme Court expressly state that the remainder of the arbitration clause must be enforced after severing unconscionable terms. *See Delta Funding Corp. v. Harris*, 189 N.J. 28, 46 (2006) (unconscionable provisions could be severed and remainder of the arbitration agreement would be capable of enforcement[, and t]he arbitration agreement's broad severability clause supports that result").

does not clearly and unambiguously cover her statutory claims as allegedly required under New Jersey law. (*See* Opp. at III.A). To cover a statutory right under New Jersey law, an arbitration clause must do three things. *Moon v. Breathless, Inc.,* 868 F.3d 209 (3d. Cir. 2017). First, it must identify the general substantive area that the arbitration clause covers. *Martindale v. Sandvik, Inc.*, 173 N.J. 76, 800 A.2d 872, 883 (2002) Second, it must reference the types of claims waived by the provision, although it need not specifically mention the statutory rights at issue. *Moon,* 868 F.3d 214. Third, the arbitration provision must explain the difference between arbitration and litigation. *Id.* at 315.

In *Martindale*, an employee sued her employer under the Law Against Discrimination and New Jersey's Family Leave Act. The Court first found that the arbitration provision covered the statutory claims because it was sufficiently broad and because there were no limiting references to the contract. Second, the Court held that the arbitration provision was appropriately clear because it specifically referenced the type of claims covered. *Martindale*, 800 A.2d at 883.

The arbitration provision in the FSEA is sufficiently broad as to encompass the statutory claims. Unlike *Moon*, the arbitration provision herein is not limited to claims arising only from contractual disputes. *Moon*, 868 F.3d at 209 (limiting claims to any "dispute between Dancer and Club under this Agreement."). Here, the provision explicitly covers claims beyond just contractual disputes, stating that it

includes "any and all controversies, claims, or disputes…arising out of, relating to, or resulting from the Unlock Agreement *or the Property*." (*See* Ex. B [Doc 26-2] at § 20.2 (emphasis added)). Further, it states at § 20.3 that the "arbitrator shall have the power to award any remedies…available *under applicable federal law*…." (*Id.* at § 20.3 (emphasis added). Further still, § 20.4 states that "arbitration shall be the sole, exclusive and final remedy for any dispute" between the parties and that "remedies that would be available to owner under *applicable federal, state or local laws shall remain available*." (*Id.* at § 20.4 (emphasis added)). Lastly, like in *Martindale*, the arbitration provision herein includes a clear jury waiver, which states that the parties "waive any and all rights each may have to a trial by jury in any litigation based on, or arising out of, under, or in connection with, the Unlock Agreement, or any other documents and instruments executed in connection herewith." (*Id*. at § 21.16).

As a final aside comment, Plaintiff also argues that her purported "request" for equitable relief is not covered by the arbitration provision because the parties were allegedly able to petition a court for injunctive relief. (Opp. at p. 40).This argument is based on nothing more than the boilerplate language included in the "Wherefore" clause in each of Plaintiff's causes of action stating that in addition to damages, Plaintiff seeks "such other relief as is equitable and just." (*See* Am. Compl.). Nowhere in the Amended Complaint has Plaintiff actually sought

injunctive relief. Moreover, to the extent Plaintiff actually intends to seek equitable relief, the arbitration provision explicitly states that the arbitrator "shall have the power to award *any remedies*" and that all "remedies that would otherwise be available to owner . . . shall remain available." (Ex. B at § 20.3). Such broad language would necessarily include equitable relief.

In sum, the arbitration provision is enforceable because it specifically references statutory claims and remedies (including equitable) available under federal, state and local statutes, while further making clear that arbitration was the *sole* remedy for seeking resolution of any disputes between the parties.

## IV. IF THE COURT FINDS ANY RELEVANT TERM OF THE FSEA TO BE AMBIGUOUS, UNLOCK REQUESTS LIMITED DISCOVERY TO AID IN THE INTERPRETATION OF THE CONTRACT.

It is Unlock's position that each and every relevant provision of the FSEA is unambiguous rendering any review of extrinsic materials unnecessary. However, should this Court disagree, or prefer to defer a decision so that it may review both the FSEA and any extrinsic materials the parties would like to set forth, Unlock respectfully requests discovery to obtain additional evidence to aid in the Court's interpretation of the agreement.

Indeed, contract interpretation begins by looking at the terms of the contract. "The court makes the determination whether a contractual term is clear or ambiguous." *Schor v. FMS Fin. Corp.*, 814 A.2d 1108, 1112 (N.J. 2002). "If the

terms of the contract are susceptible to at least two reasonable alternative interpretations, an ambiguity exists. In that case, a court may look to extrinsic evidence as an aid to interpretation." *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285 (N.J. 2008) (citation omitted). "In the quest for the common intention of the parties to a contract, the court must consider the relations of the parties, the attendant circumstances, and the objects they were trying to attain." *Nester v. O'Donnell*, 693 A.2d 1214, 1220 (N.J. Super. 1997) (citation omitted).

Should this Court rule that certain terms of the FSEA are ambiguous, or should it want to consider such an argument without yet ruling, the information provided to Plaintiff as well as other information and communications within Plaintiff's control would be crucial to understanding the "attendant circumstances" here. Additionally, even if the FSEA were ambiguous as to whether it sufficiently qualifies as a "residential mortgage loan" under TILA (and to be clear, Unlock contends that it clearly does not qualify), additional discovery would be required to determine whether the transaction could fairly be considered "consumer" in nature.

## **CONCLUSION**

For the reasons stated above, it is respectfully submitted that this Court grant Unlock's motion to compel arbitration as between Plaintiff and Unlock.[8]

---

[8] In light of recent guidance provided by the United States Supreme Court, this Court should stay this action (not dismiss it) upon entry of an order compelling the matter to arbitration. *See Smith v. Spizzirri*, 144 S.Ct. 1173 (May 16, 2024).

September 20, 2024

**UNLOCK PARTNERSHIP SOLUTIONS AO1 INC.,**
*By Counsel*,

*/s/ Jason R. Lipkin, Esq.*

Jason R. Lipkin, Esquire
MCGLINCHEY STAFFORD PLLC
112 West 34th Street, Suite 1515
New York, NY 10120
T: (646) 362-4048
F: (646) 224-9487
E: jlipkin@mcglinchey.com

Andrew K. Stutzman, Esquire
Christopher A. Reese, Esquire
STRADLEY RONON STEVENS & YOUNG, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103
T: (215) 564-8000
F: (215) 564-8120
E: astutzman@stradley.com
creese@stradley.com

*Attorneys for Defendant Unlock Partnership Solutions AO1 Inc.*