UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANGELA ROBERTS, <br><br> *Plaintiff,* <br><br> -against- <br><br> UNLOCK PARTERNSHIP SOLUTIONS AOI, INC., CLEAR EDGE TITLE INC., ABC INC 1-10, AND JOHN DOE 1-10, <br><br> *Defendants.* | Case No.: 24-cv-01374-CPO-AMD <br><br> SECOND AMENDED COMPLAINT |

## INTRODUCTION

For many Americans, their home is their financial anchor. A person's home is often the product of years of savings, a source of security and stability when times get tough, and the primary legacy they will leave to their children. For that reason, state and federal law create strong protections for homeowners in the field of mortgage lending, where people's homes are on the line. And these laws were further strengthened after the 2008 financial crisis wrought devastation across the country, exposing the dangers of increasingly complex mortgage products with risks that homeowners did not adequately understand until it was too late. These laws now include caps on interest rates, disclosure rules, licensing requirements, and the right to seek recourse in court, rather than being forced into mandatory arbitration.

1

These safeguards are crucial for homeowners. But some companies would prefer not to follow these rules. Unlock, a defendant here, is one such company. Unlock has designed a complex mortgage product that poses greater risks than more traditional mortgages, but purports to be exempt from laws protecting homeowners.

All across the country, thousands of homeowners have been ensnared by this complex and confusing product, and they are now in serious risk of losing their homes. That is the situation for Angela Roberts, a single mother caring for a son with a disability. Several years ago, she was facing imminent foreclosure and desperate to save her home. To prevent this, she accepted a lump sum payment from Unlock. In exchange, Unlock got a mortgage on her home.

What Ms. Roberts didn't realize is that within 10 years or less, she will need to pay Unlock far more money than she received at an interest rate three times the legal limit. And even though the whole point of the transaction was to save her home for herself and her son, Unlock will force her to sell her home unless she can come up with hundreds of thousands of dollars that she doesn't have. At the time of sale, Unlock will take much of the sale proceeds while Ms. Roberts will have to cover all of the sale costs, making her situation even more precarious and making it even harder for her to buy a home for herself and her son. And in the meantime, even though Unlock will get up to 70% of the value of Ms. Roberts's home, she must cover

100% of the cost of maintaining Unlock's future payment by paying taxes, insurance, repairs—on pain of foreclosure.

While Unlock's product and business practices violate multiple state and federal mortgage laws, Unlock claims that it doesn't have to follow any of these laws because its product is not a mortgage loan. And Unlock's contract even tries to make homeowners agree that these laws don't apply.

Unlock is wrong. No matter what label Unlock affixes to its product, it is a mortgage loan. Unlock's product works by providing homeowners with an advance of money, receiving security through a mortgage on their home, and then requiring payment within 10 years or less. That is a mortgage loan.

Ms. Roberts brings this suit to protect her family from a financial disaster and to vindicate her rights under state and federal law.

## JURISDICTION AND VENUE

1.    This lawsuit was originally filed in the Superior Court of the State of New Jersey, Burlington County. Jurisdiction and venue over this matter are proper there because the actions complained of occurred in Burlington County, New Jersey, and Ms. Roberts is and was a New Jersey resident. Unlock removed the lawsuit to this court pursuant to 28 U.S.C. §§ 1331, 1441, and 1446.

**PARTIES**

2.      Angela Roberts is a 59-year-old resident of Willingboro, New Jersey, where she lives with her son.

3.      Upon information and belief, Defendant Unlock Partnership Solutions AOI Inc., is a Delaware corporation with its principal place of business at either 1 Rockefeller Plaza, Suite 1280, New York, NY, 10020, or 548 Market St., Suite 31036, San Francisco, CA, 94104.

4.      Upon information and belief, Defendant Clear Edge Title Inc., is a Florida corporation located at 2605 Enterprise Road East, Suite 270, Clearwater, FL, 33750.

5.      Does 1-10 and ABC Inc. 1-10 are fictitious persons or entities that discovery may reveal as having liability in this matter.

**ALLEGATIONS**

A. ***In a moment of financial desperation, Ms. Roberts is locked into Unlock's product.***

6.      In 2015, Ms. Roberts purchased a home for herself and her young son at 48 Buckeye Lane, Willingboro, NJ.

7.      She used her savings to purchase her home free and clear, without any mortgage.

8.    This was the first time she had ever owned her own home, and she was proud to have become a homeowner. She hoped that homeownership would provide financial security for herself and her son.

9.    But in 2016, Ms. Roberts was unable to keep up with her property taxes. Because she had never owned a home before, she had not realized how high her property tax obligations would be. She was working in customer service, and she did not have enough income to cover the thousands of dollars in property taxes on top of the costs of providing for herself and her son.

10.    After she fell behind on property taxes, the Township of Willingboro sold her tax certificate (akin to a tax lien) to a third party. The third party subsequently started a foreclosure proceeding against her home.

11.    Ms. Roberts needed to come up with $54,062 to redeem the tax certificate and stop the foreclosure.

12.    Ms. Roberts was desperate to find a way to save her home for herself and her son.

13.    Foreclosure would have been especially devastating because, under New Jersey law at the time, any excess proceeds from a sale of the house would have

gone to the township, rather than Ms. Roberts.[1] Losing her home would therefore have meant losing all the money she had invested in the home.

14.     Ms. Roberts reached out to either the township or the holder of the tax certificate. The person she spoke with said that if she did not have the money herself, she should take out a loan on the home.

15.     Ms. Roberts had never taken out a loan on a home before, so she did not know where to start. She did a Google search for equity loans and came across Unlock's product.

16.      She contacted Unlock and sent it the information it requested about her home.

17.     An appraiser selected by Unlock appraised her home at $263,000. Ex. A at 2.

18.     Once Unlock said Ms. Roberts was approved, it sent her documents to sign. These included a 59-page Unlock contract entitled "Forward Sale and Exchange Agreement." Ex. A at 1.

19.     Ms. Roberts never met in person with anyone from Unlock. When she signed the contract on November 13, 2021, only an agent from the title company— not Unlock—was present.

_____

[1] *See* The Working Grp., Report of the New Jersey Judiciary Working Group on Tax Sale Foreclosures 3 (2024), https://perma.cc/TJW2-DMSV (summarizing prior law).

20.     She was also required to grant Unlock a mortgage on her home, which secured her obligations under the contract on penalty of foreclosure. Ex. B at 5 § C, 11–12 § 7.

21.     Ms. Roberts did not have any opportunity to negotiate the terms of the contract.

22.     The positions of the parties were also highly unequal. Ms. Roberts is a single-parent caring for a disabled son, while Unlock is a multi-million dollar financial technology company.

23.     Under Unlock's contract, the company gave her an advance payment of $111,610. Ex. A at 2. This was equivalent to 43.75% of the appraised value of the home minus a $3,451.86 "Origination Fee." *Id.*

24.     What Ms. Roberts did not realize was that when a "Settlement Event" occurs in 10 years or less, she will be forced to pay Unlock far more money than she received.

25.     These Settlement Events include principally: (1) Ms. Roberts selling her home; (2) her buying Unlock out; (3) her passing away; or (4) the expiration of a 10-year term—whichever comes first. *Id.* at 5 § 1.8.2(a).

26.     In other words, in 10 years or less, Ms. Roberts will be forced to pay Unlock 70% of the value of her home, subject to an "Annualized Cost Limit" cap of

18% annual compound interest.[2] *Id.* at 2, 5 § 1.8(c), 21 § 10.1. This dollar amount is called the "Unlock Share." *Id.* at 5 § 1.8.1(c).

27.     To illustrate, if a Settlement Event happened today, Ms. Roberts would owe Unlock approximately $195,000. That is because, as of March 20, 2025, the value of Ms. Roberts's home is approximately $430,000. A 70% share of that amount is $301,000. Because Unlock's return is capped at 18% annual compound interest, the company would receive around $195,000. *Id.* at 5 § 1.8.1(c).

28.     That is far higher than the applicable maximum rate permitted under New Jersey law, which is 6%. *See* N.J.S.A. § 31:1-1(a); N.J.A.C § 3:1-1.1

29.     This is far more money than Ms. Roberts expected. She cannot afford to repay that amount of money without either selling her home or sinking deeper into debt.

30.     The contract's 10-year "Expiration Date" makes it especially dangerous. After 10 years or less, Ms. Roberts must either buy out Unlock for hundreds of thousands of dollars that she doesn't have, or the company will force the sale of her home. Ex. A at 13 § 5.5(c).

---

[2] While Unlock claims there is no interest on its product, the formula for calculating the "Annualized Cost Limit" is just a formula for compound interest. Ex. A at 21–22 § 10.1.

31.    Ms. Roberts did not understand that Unlock could force her to sell her home in 10 years. She does not want to leave her home. The whole reason she took out this loan was because she wanted to keep her home.

32.    Ms. Roberts is very worried about being forced out of her home. This would be a personal and financial disaster for her.

33.    She would have to pay thousands of dollars in costs and fees from selling her home and having to find a new home, while Unlock would be getting a large amount of the money from her home.

34.    She would likely have to move into a much smaller house or move to a neighborhood where she and her son would be less safe, or both.

35.    Ms. Roberts did not understand that this would be the result of signing this contract with Unlock, and if she had known she never would have done it.

36.    Ms. Roberts also did not understand Unlock's contract purported to take away her right to sue in court.

## B. *Federal and state laws protect homeowners from complex and confusing mortgage products like Unlock's that threaten to take people's homes.*

37.    Congress and the New Jersey legislature have both passed laws to protect homeowners like Ms. Roberts from complex and confusing financial products that can cause people to lose their homes.

38.     While the federal Truth in Lending Act protects all borrowers, residential mortgages have special protections. Congress passed these protections to "assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect their ability to repay the loans and that are understandable and not unfair, deceptive or abusive." 15 U.S.C. § 1639b(a)(2).

39.     For example, mortgage lenders must ensure that homeowners have the ability to repay the loan. *Id.* § 1639c(a)(1).

40.     Companies originating mortgages must also be licensed under applicable federal and state laws. *Id.* § 1639b(b)(1)(A).

41.     Congress also sought to ensure that homeowners can vindicate these and other rights in court by prohibiting mandatory arbitration clauses in any "residential mortgage loan." *Id.* § 1639c(e)(1).

42.     In addition to these protections for residential mortgage loans generally, TILA includes even further protections for "high-cost mortgage[s]." *Id.* § 1602(bb). These include pre-loan counseling and additional disclosures. *Id.* § 1639(a), (h), (u).

43.     New Jersey law provides additional protections for homeowners.

44.     New Jersey requires disclosures and protections for mortgages generally, *see generally* N.J.S.A. § 17:11C-75, as well as special requirements for high-cost mortgages, *see* N.J.S.A. § 46:10B-26.

45.    A lender cannot charge more than 6% interest if the rate is not specified in the contract (as is the case here, where Unlock's contract falsely claims there is no interest rate, Ex. A at 37 § 21.5). N.J.S.A. § 31:1-1(a); N.J.A.C § 3:1-1.1.

46.    New Jersey also requires that only licensed mortgage lenders can offer these products. N.J.S.A. § 46:10B-18.

### C. *Unlock incorrectly claims that it does not need to comply with any of these laws.*

47.    Unlock, however, does not follow these laws. Instead, the company claims that it is entirely exempt from any federal and state lending laws because its product is not a mortgage loan.

48.    But no matter how Unlock labels its product, it is a mortgage loan. Unlock provides homeowners with an advance of money, receives security through a mortgage on their home, and then requires payment within 10 years or less. That is a mortgage loan.

49.    Unlock's primary contention is that its product is not a loan because the company is not explicitly guaranteed to be paid back its initial advance.

50.    But both federal and state courts look to substance over form to ensure that mortgage laws will protect homeowners from an ever-evolving world of complex financial products. *See, e.g.*, *Rossman v. Fleet Bank (R.I.) Nat'l Ass'n*, 280 F.3d 384, 394 (3d Cir. 2002); *Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993); *Merck & Co. v. United States*, 652 F.3d 475, 483 (3d Cir. 2011); *Zaman v. Felton*, 98 A.3d 503, 513

(N.J. 2014). And these relevant laws cover a broad range of products with many different forms of payment obligations, not all of which require the borrower to personally pay the lender back in full in all instances. *See, e.g.*, 15 U.S.C. § 1602(cc) (including "nonrecourse transaction[s]"); *Burnett*, 3 F.3d at 1262; *Zaman*, 98 A.3d at 513.

51.    In any event, Unlock *does* ensure that, in practice, it will obtain repayment (plus interest) of its initial advance payment.

52.    That is because all of Unlock's "Settlement Events" require Ms. Roberts to pay Unlock. *See, e.g.*, Ex. A at 5 §§ 1.8.1(e), 1.8.2 ("On the Settlement Date, Unlock will receive the 'Settlement Payment.'").

53.    Both Unlock's own contract and its own CEO's description of the Settlement Events reflect this:

    a.    **Sale.** If Ms. Roberts sells her home, Unlock gets 70% of the "proceeds from such sale" (capped at 18% annual compound interest) or Ms. Roberts must buy out Unlock for that amount. Ex. C ¶ 15; *see also* Ex. A at 9 §§ 2.3, 2.4.

    b.    **Buyout.** If Ms. Roberts exercises her right to an owner buyout, she must pay Unlock 70% of "the value of the Property" (capped at 18% annual compound interest). Ex. C ¶ 15; Ex. A at 10–11 § 3.

    c.    **Death.** If Ms. Roberts were to pass away, this would trigger payment through "essentially the same methods" as a sale or buyout—i.e., her

estate must pay Unlock 70% of "the value of the Property" (capped at 18% annual compound interest) or Unlock will force the sale of the home to receive its payment. Ex. C ¶ 15; Ex. A at 11–12 § 4.7.

d. **10-year term.** If the 10-year term expires, this again triggers payment through "essentially the same methods." Ex. C ¶ 15; Ex. A at 12–13 § 5.

e. **Default.** To further ensure that it will be paid back in practice, if Ms. Roberts defaults on *any* of her obligations under the contract, Unlock can foreclose on the home in order to receive its payment. Ex. A at 6 § 1.8.2(b)(i); *id.* at 28–30 § 17.

54.     To ensure that the future payment it receives is greater than its advance, Unlock structures its product so that it will receive a far greater share of the value of the home than it pays the homeowner.

55.     In this case, Unlock paid Ms. Roberts less than 44% of the value of her home and Unlock will receive up to 70% (capped at 18% annual compound interest). Ex. A at 2.

56.     The "Exchange Rate" is the ratio of the percentage of the home value Unlock pays up front (under 44%) and the percentage of the home value that Unlock can ultimately receive (70%). Ex. A at 2. Unlock refers to this as "the price of your Unlock agreement." *Id.*

57.     While Unlock claims to be the homeowner's "partner," Ex. D at 17, if the home loses in value, the company does not actually share in a homeowner's losses. The large discrepancy between how much Unlock pays at the outset and how much it will receive means that Unlock will get paid even if the home drops dramatically in value. And that is without even accounting for the thousands of dollars in opaque fees that Unlock requires at the outset.

58.     Instead, Unlock only loses money if 70% of the final value of Ms. Roberts's home is worth less than Unlock's advance of under 44% of the initial appraised value of the home. For this to happen, Ms. Roberts' home—initially appraised at $263,000—would need to drop in value to less than $159,442. That would be a 39% drop from the initial appraised value.

59.     A 39% drop in home value is far greater than average home prices in New Jersey have ever fallen in the past half-century. The worst period was during the 2008 financial crisis, where from the peak to trough average home prices in New Jersey still only fell by 22%.[3] In Burlington County, where Ms. Roberts lives, average

---

[3] Between the peak of the market in Q1 2007 and the trough in Q2 2012, New Jersey home prices dropped by 22%. *All-Transactions House Price Index for New Jersey*, Federal Reserve of St. Louis, (last updated Feb. 25, 2025), https://perma.cc/3L9K-GZK4.

prices similarly dropped about 24%.[4] The same thing is true for the United States as a whole, where average prices only dropped 19%.[5]

60.     In other words, Unlock only risks not being *fully* repaid in the event of a catastrophic housing market crash that is nearly twice as bad as the worst crash in modern history. And even then, Unlock would still receive most of its advance back because 70% of the home's value would still be worth a lot of money.

61.     During such a crash many other mortgage lenders would lose money, and often even more money. During the 2008 crash, for example, many mortgages defaulted, mortgage lenders and associated companies faced huge losses, and government bailouts were necessary. *See, e.g.*, John V. Duca, *Subprime Mortgage Crisis*, Fed. Reserve History, https://perma.cc/DZG6-XJSS.

62.     The large discrepancy in percentages between the amount paid (less than 44%) and amount received (up to 70%) is not the only way that Unlock ensures it will be paid back (with interest).

63.     To ensure that Unlock will receive only upside, at the time the home is sold, Ms. Roberts is required to cover 100% of what will often be tens of thousands

---

[4] *See, e.g.*, *All-Transactions House Price Index for Burlington County, NJ,* Federal Reserve of St. Louis, (last updated Mar. 26, 2024), https://perma.cc/FF3T-TT3R.

[5] *See, e.g.*, *All-Transaction House Price Index for the United States*, Federal Reserve of St. Louis, (last updated Feb. 25 2025), https://perma.cc/2B2S-56MG.

of dollars of closing costs, appraisal expenses, and inspection expenses. Ex. A at 6 § 1.8.3.

64.    On information and belief, Unlock also uses sophisticated models to target specific regions, areas, neighborhoods, and even homes to ensure that it picks homes that are most likely to rise significantly in value.

65.    As a result, the data on New Jersey and U.S. average house prices likely understate the extent to which Unlock has ensured that it will be paid back.

66.    For instance, Ms. Roberts lives in Willingboro, in Burlington County, which has seen consistent and dramatic rises in property values both before and after she entered into the contract with Unlock. This local housing market further ensured that Ms. Roberts's home would not experience a catastrophic fall of 39% in value during the 10-year term of Unlock's contract. That has been borne out, since the value of Ms. Roberts's home has risen tens of thousands of dollars since she entered into her contract.

67.    To further ensure that nothing will decrease the value of the home or jeopardize its future payment, Unlock requires Ms. Roberts to pay for all of the taxes, insurance, and repairs on the home. *See, e.g.*, Ex. A at 6–7 § 1.9.  Otherwise, Unlock can foreclose on the home to get its payment or make "protective advances," which themselves accrue interest and have to be paid back. *Id.* at 30–31 § 17.12.

68.     Despite the fact that Ms. Roberts must make these payments or face foreclosure, Unlock misleadingly advertises its product as being "without payments" and requiring "no monthly payments" until one of the triggering events occurs. Ex. D at 5, 7.

69.     Another way in which Unlock is protected is that homeowners will also have the least incentive to sell their homes during a massive fall in housing prices.

70.     Unlock also ensures that it will get sufficient money from the sale of the home by giving itself significant power over the sale. If Unlock determines that the sale price is too low, Unlock can "in its sole discretion" calculate the value of the "Unlock Share" based on appraisal instead of the sale price. Ex. A at 8 § 2.1(i). Unlock can also effectively delay the sale by requiring sworn documentation from both the owner and buyer. *Id.*

71.     In sum, Unlock has structured its product from top to bottom to ensure that as a practical matter it will receive repayment of its advance plus interest.

72.     And while Unlock argues in court that it faces a risk of not being paid back if there is a drop in the housing market, the company presents a different face to investors.

73.     Unlock touts that: "Embedded downside protection in [the home equity agreement] product structure allows for stable returns across various housing cycles." *Investors*, Unlock Partnership Solutions, https://perma.cc/Y9EH-Q3T9.

74.     Unlock also tells investors that its "investment returns are uncorrelated with broader markets and inflation-protected." *Id.*

**D. *Despite its best efforts to portray its product as not a loan, Unlock's own documentation refers to it as a mortgage loan.***

75.     While Unlock has gone to great lengths to present its product as not a mortgage loan, its own contract states that Unlock has a mortgage on Ms. Roberts's home. Ex. A at 1.

76.     Unlock also recorded this mortgage on Ms. Roberts's home. Ex. B at 1. That mortgage states that it "IS A SECURITY AGREEMENT AND FINANCING STATEMENT UNDER THE NEW JERSEY UNIFORM COMMERCIAL CODE." *Id.* at 4. It also directs that the mortgage must be "INDEXED IN THE INDEX OF FINANCING STATEMENTS." *Id.*

77.     Under the New Jersey Uniform Commercial Code, a financing statement records the security provided by a "debtor." N.J.S.A § 12A:9-502. As the New Jersey Department of Treasury explains: "Uniform Commercial Code (UCC) financing statements record and protect a secured party's interest in *the collateral offered by a debtor for a loan*. The UCC system gives public notice of the *debtor*-secured party relationship and the collateral involved." *File UCC Financing Statements*, N.J. Dep't of Treasury, https://perma.cc/XDH7-Z5RS (emphases added).

78.     Among other things, a financing statement must include "the name of the debtor." N.J.S.A. § 12A:9-502(a)(1). Consistent with this, the mortgage refers to Ms. Roberts as "THE OWNER/DEBTOR." Ex. B at 4.

79.     Several of Unlock's other documents refer to Unlock as a "lender" and Ms. Roberts as a "borrower."

80.     As part of the transaction in this case, Unlock commissioned a title search from ClearEdge Title. This document refers to Unlock as the "Lender" and refers to Ms. Roberts as the "Borrower." Ex. E. at 2.

81.     Unlock also required Ms. Roberts to fill out a document called a "Title Borrowers Authorization." Ex. F at 1.

82.     Unlock also required Ms. Roberts to carry insurance that protects Unlock. On the insurance policy, Unlock is listed as the "First Mortgagee" and there is also a "Loan Number." Ex. G at 1.

**E.** ***Unlock tries to prevent homeowners like Ms. Roberts from vindicating their rights in court.***

83.     On information and belief, Unlock is aware of the serious harms that its product can cause, including forcing people to sell their homes or sink even further into debt. Unlock's acts or omissions in this case were actuated by actual malice or accompanied by a wanton and willful disregard for persons who foreseeably might be harmed by those acts or omissions. N.J.S.A. § 2A:15-5.12.

84.     On information and belief, Unlock has also been aware for years of the risk that its products will be considered loans under federal and state laws.

85.     Unlock's contract includes a provision that seeks to force homeowners to agree that "to the fullest extent possible … the Unlock Agreement is not subject to any federal, state and/or local law concerning consumer credit, including, without limitation, usury ceilings, disclosures, and any other requirements, restrictions, limitations or prohibitions set forth in such laws." Ex. A at 37 § 21.5.

86.     While such a provision is unenforceable, it misleads homeowners about their rights and so can deter them from invoking their rights.

87.     Unlock's contract also contains a number of provisions designed to limit the ability of homeowners to vindicate their rights in court.

88.     The contract includes a mandatory arbitration clause. *Id.* at 34–35 § 20. Yet federal law prohibits arbitration clauses in residential mortgages, precisely because it is so important that homeowners can get before a court to save their home. 15 U.S.C. § 1639c(e)(1). New Jersey law also contains a limit on non-judicial forums for high-cost mortgage contracts. N.J.S.A. § 46:10B-26(e).

89.     The contract also seeks to strip Ms. Roberts of her right to statutory remedies, including punitive and consequential damages. Ex. A at 35 § 20.4. No matter how much harm the company causes Ms. Roberts or how many laws it violates, the contract provides that "in no event will Unlock's aggregate liability

arising out of or related to the Unlock Agreement or the Property exceed the Investment Payment." *Id.* at 39 § 21.12.

90.    The contract also seeks to immunize Unlock by stating that "Unlock may execute any of its duties under the Unlock Agreement by or through agents," yet "Unlock will not be responsible for the negligence or misconduct of any agent that Unlock selects." Ex. A at 39 § 21.23. Further, the contract purports to require Ms. Roberts to "expressly waive any claims against any of Unlock's agents, assignees, affiliates, employees, directors or funding sources." *Id.*

91.    The contract's indemnification clause also purports to put Ms. Roberts on the hook for Unlock's legal expenses for a wide range of claims, seemingly including claims brought by her, independent of the outcome of the litigation. *Id.* at 38–39 § 21.12.

92.    The contract also contains a definition of "Event of Default" that threatens to penalize homeowners for filing claims in court or challenging the enforceability of the dispute resolution terms. *Id.* at 27 § 16. And an "Event of Default" gives Unlock the power to seek damages, injunctive relief, specific performance, or force the sale of the property, among other "cumulative" remedies. *Id.* at 28–30 § 17.

93.    These provisions, though unenforceable, have the practical effect of deterring homeowners from realizing their rights and seeking to vindicate those rights.

**F.** ***Unlock's predatory business practices have allowed the company to expand rapidly.***

94.    Unlock is a rapidly growing company, and it now boasts that it has over 12,000 customers in 17 states. *About*, Unlock, (last updated Mar. 20, 2025) https://perma.cc/U7YX-QSNK.

95.    Getting homeowners to sign these mortgage loans is just the first step in Unlock's business model. The company then bundles and securitizes these residential mortgage contracts and sells them to investors.

96.    These offerings have sold for $197 million and $224 million apiece. *Unlock Technologies and Saluda Grade Announce Close of Second Rated Home Equity Agreement Securitization*, Unlock Technologies, (Apr. 5, 2024), https://perma.cc/Y9VY-UBAE; *Unlock Technologies, Saluda Grade Announce Close of First Rated Home Equity Agreement Securitization*, Unlock Technologies (Oct. 5, 2023), http://perma.cc/K8ST-TXXR.

97.    Unlock tells its investors that there is "$9+ Trillion" in home equity that is currently "untapped"—in other words, in the hands of homeowners who paid for it. *Investors*, Unlock Partnership Solutions, https://perma.cc/Y9EH-Q3T9.

98.    Despite Unlock's assertion that the company is not engaged in mortgage lending, its 2023 security offering was awarded the "Residential Mortgage Backed Security of the Year." *Saluda Grade Awarded both RMBS Issuer of the Year and RMBS Deal of the Year at the 2024 GlobalCapital US Securitization Awards*, Business Wire, (May 20, 2024), https://perma.cc/ZN6X-TTKY.

## COUNT 1 (Unlock)
## <u>Truth in Lending Act</u>

99.    The plaintiff incorporates by reference each allegation set forth above as if set forth at length herein.

100.    **Residential mortgage violations.** Under TILA, a "residential mortgage loan" is defined as "*any* consumer credit transaction … secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling." 15 U.S.C. § 1602(dd)(5) (emphasis added).

101.    Unlock's contract is secured by a mortgage. Ex. B at 1; Ex. A at 1.

102.    Unlock's loan to Ms. Roberts also counts as "any consumer credit transaction." A transaction qualifies whenever (1) "credit is offered or extended" to (2) "a natural person," and (3) "the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1602(i).

103.    Ms. Roberts is a natural person.

104.    Ms. Roberts's transaction was primarily for personal, family, and household purposes, including to pay back taxes on her family's residence.

105.    This transaction involves an offer of credit, defined as "the right granted by a creditor to a debtor to defer payment of debt." 15 U.S.C. § 1602(f). Unlock granted Ms. Roberts the right to defer payment of a debt when it gave her an advance of under 44% of the value of the home and then deferred repayment of that

debt until certain triggering events required her to pay the company 70% of the value of her home (capped at 18% annual compound interest).

106.    Unlock is also "a creditor." 15 U.S.C. § 1602(g).

107.    Unlock regularly extends "consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required." *Id.* § 1602(g). The contract in this case is subject to a finance charge and Unlock is the entity to whom the contract at issue in this matter is initially payable. *Id.*

108.    Unlock has entered into more than five similar contracts, secured by a dwelling, with consumers within the preceding calendar year. Alternatively, Unlock entered into at least two similar contracts secured by a dwelling, with consumers, and subject to additional requirements for high-cost mortgages within the preceding twelve months. *Id.*

109.    Because Unlock's product is a residential mortgage loan under TILA, it violates the statute several times over, including but not limited to the following:

    a. Unlock originated the mortgage loan in this case, in violation of 15 U.S.C. § 1639b(b)(1)(A). Unlock is not licensed to originate mortgages in New Jersey. In expectation of compensation or other monetary gain, Unlock, among other things, took a mortgage loan application, offered a mortgage loan, arranged a mortgage loan, assisted a consumer in

applying for a mortgage loan, or otherwise obtained or made a mortgage loan. Unlock also advertised or communicated that it could or would perform the mortgage lending activities at issue in this case.

b. Unlock's contract includes a mandatory arbitration clause. *Id.* § 1639c(e)(1), (3).

c. Unlock violated 15 U.S.C. § 1639c(a) by failing to make a reasonable and good faith determination that Ms. Roberts had the ability to repay this loan.

d. Unlock also failed to provide disclosures required for consumer credit transactions generally and mortgage transactions specifically. *See* 12 C.F.R. § 1026.1 *et seq.*

110.     These provisions are violated solely in virtue of the fact that Unlock's product is a residential mortgage loan—even if it is not *also* either a high-cost mortgage or a reverse mortgage.

111.     Additionally, however, Unlock's product also violates other provisions of TILA that regulate these specific kinds of residential mortgages.

112.     **High-cost mortgage violations.** A "high-cost mortgage" is defined as one with an annual percentage rate that is more than 6.5 percentage points above "the average prime offer rate … for a comparable transaction." 15 U.S.C. § 1602(bb)(1)(A)(i)(I).

113.    Unlock's 18% Annualized Cost Limit is an annual percentage rate, and the formula Unlock uses for the cost limit is simply a formula for calculating compound interest.

114.    Unlock's loan, therefore, is comparable to a variable-rate mortgage with an 18% interest rate cap and a ten-year term. However, no matter what comparable mortgage product is used (whether fixed or variable rate, 10 years or less), Unlock's 18% interest rate is far more than 6.5 percentage points above the average prime offer rate.

115.    Unlock does not comply with the requirements that TILA imposes on high-cost mortgages in numerous ways, including but not limited to the following:

a.  Unlock failed to provide disclosures expressly required by statute that, among other things, identify the product as "a loan." 15 U.S.C. § 1639(a).

b.  Unlock issued a high-cost mortgage "based on the consumers' collateral without regard to the consumers' repayment ability." *Id.* § 1639(h).

c.  Unlock failed to ensure that Ms. Roberts had received the required "[p]re-loan counseling" and pre-counseling disclosures. *Id.* § 1639(u).

d.  On information and belief, Unlock financed points and fees in connection with the transaction. *Id.* § 1639(m).

e.  Unlock gave Ms. Roberts a loan that included a "balloon payment[]," because the entirety of the loan is due all at once. *Id.* § 1639(e).

f.  Unlock structured the transaction to evade the provisions regulating high-cost mortgages. *Id.* § 1639(r).

116.  **Reverse mortgage violations.** In the alternative, Unlock's product is a reverse mortgage, which is another form of residential mortgage loan that poses particular risks for homeowners.

117.  Unlock's product meets the criteria for a reverse mortgage: (1) Unlock gave Ms. Roberts "one or more advances"; (2) Unlock received security through "[a] mortgage … against [Ms. Roberts's] principal dwelling"; and (3) any "any principal, interest, and shared appreciation or equity is due and payable" upon either a default or: "(A) the transfer of the dwelling; (B) the consumer ceases to occupy the dwelling as a principal dwelling; or (C) the death of the consumer." 15 U.S.C. § 1602(cc).

118.  Unlock does not comply with reverse mortgage protections, however, including but not limited to failing to make required disclosures such as the projected total cost of the mortgage, *id.* § 1648, and by imposing a 10-year term that will have the effect of forcing Ms. Roberts out of her home. *Comment for 1026.33 - Requirements for Reverse Mortgages*, Consumer Financial Protection Bureau, cmt. 33(a)(2)(2), https://perma.cc/7NEP-PMPK.

119.  Ms. Roberts seeks damages, costs, attorneys' fees, recission, and such other relief as is equitable and just.

## COUNT 2 (Unlock)
## New Jersey Home Ownership Security Act of 2002

120.    The plaintiff incorporates by reference each allegation set forth above as if set forth at length herein.

121.    The transaction here is subject to the New Jersey Home Ownership Security Act of 2002, N.J.S.A. § 46:10B-22 *et. seq.*

122.    The transaction at issue is a home loan. Unlock extended credit to Ms. Roberts. This extension of credit was primarily for personal, family, or household purposes. And the loan is secured by a mortgage on real estate in this State on which there is located a dwelling which is occupied by the borrower as the borrower's principal dwelling.

123.    The transaction at issue also meets the definition of an equitable mortgage under New Jersey law. *See, e.g.*, *Zaman*, 98 A.3d at 513–15.

124.    Unlock's product violates the statute by purporting to charge a fee for payoff information, including but not limited to charging a fee for processing a permitted sale or owner buyout. N.J.S.A. § 46:10b-25f; Ex. A at 54.

125.    Unlock's product is a high-cost home loan as defined in the statute due to its high fees and high interest rate. N.J.S.A. § 46:10B-24.

126.    Unlock failed to comply with the high-cost mortgage requirements of N.J.S.A. § 46:10B-26, including but not limited to failing to provide mandated notices

to the borrower, charging fees in excess of those permitted by the statute, and requiring arbitration.

127.    Ms. Roberts seeks damages, costs, attorneys' fees, and such other relief as is equitable and just.

## COUNT 3 (All defendants)
## New Jersey Consumer Fraud Act

128.    The plaintiff incorporates by reference each allegation set forth above as if set forth at length herein.

129.    The New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 *et seq.*, prohibits unfair, unconscionable, and deceptive conduct, and it provides remedies for violations of other statutes.

130.    Unlock engaged in unfair or deceptive practices, including but not limited to claiming that the product is not a loan, there is no interest, there are no payments or monthly payments, and that the company acts as a homeowner's partner. Unlock also either represented or implied by its conduct that it was authorized to engage in this transaction.

131.    The defendants engaged in unconscionable business practices, including but not limited to extending home loans, charging improper fees, failure to disclose or accurately represent fees charged the plaintiff, and failure to comply with applicable statutes and regulations.

132.    Unlock imposed an interest rate higher than the rate permitted by New Jersey usury law. N.J.A.C. § 3:15-10.1 (a); N.J.S.A. § 2C:21-19.

133.    The New Jersey Residential Mortgage Lending Act., N.J.S.A. § 17:11C-51 *et seq.*, requires mortgage lenders like Unlock to be licensed to make mortgage loans in New Jersey.

134.    Unlock made a residential mortgage loan to Ms. Roberts.

135.    Unlock secured repayment of that loan with a mortgage.

136.    Unlock was not authorized or licensed to make a loan, impose a mortgage, or charge fees or interest to the plaintiff.

137.    The transaction at issue also meets the definition of an equitable mortgage under New Jersey law. *See, e.g., Zaman*, 98 A.3d at 513–15.

138.    The New Jersey Administrative Code prohibits an entity that is licensed or should be licensed under the applicable law from imposing a mortgage that includes claims to personal property. N.J.A.C. § 3:15-10.3 The mortgage here unlawfully imposes a lien on personal goods. Ex. B at 6–7 § 1(g).

139.    The defendants, jointly and severally, violated the applicable section of the New Jersey Residential Mortgage Lending Act, N.J.S.A. § 17:11C-75, including, but not limited to:

> a.  Unlock engaged in unfair or deceptive practices relating to mortgage lending, including but not limited to claiming that the product is not a

loan, there is no interest, there are no payments or monthly payments, and that the company is the homeowner's partner. N.J.S.A. § 17:11C-75(d), (e).

b. Unlock failed to make disclosures required under federal and state law in connection with the transaction. N.J.S.A. § 17:11C-75(h).

c. Unlock extracted a fee not permitted by the applicable statute. N.J.S.A. § 17:11C-75(l).

d. ClearEdge unlawfully accepted a fee in return for its assistance in the transaction. N.J.S.A. § 17:11C-75(k)(1).

e. ClearEdge aided and abetted Unlock's unlawful conduct. N.J.S.A. § 17:11C-75(c).

140.    These violations caused Ms. Roberts an ascertainable loss of money or property, including but not limited to fees, improper encumbrance of title, and diminution of value of Ms. Roberts's interest in the property.

141.    Ms. Roberts seeks damages, costs, attorney fees, recission or voiding of the contract, and such other relief as is equitable and just.

## COUNT 4 (All defendants)
## New Jersey Truth in Consumer Contract Warranty and Notice Act

142.    The plaintiff incorporates by reference each allegation set forth above as if set forth at length herein.

143.    The defendants violated the New Jersey Truth in Consumer Contract Warranty and Notice Act, by offering and entering into consumer contracts that violate state and federal law, including as described above. N.J.S.A. § 56:12-15.

144.    Ms. Roberts is an aggrieved consumer under N.J.S.A. § 56:12-17, in that she acted or forbore from acting or suffered damages due to the improper terms provided in the contract or notice provided by defendants.

145.    She suffered an ascertainable loss of money or property due to the improper terms provided in the contract or notice provided by defendants, including but not limited to fees, improper encumbrance of title, and diminution of value of Ms. Roberts's interest in the property.

146.    Ms. Roberts seeks damages, costs, attorney fees, injunctive relief, termination or voiding of the contract, and such other relief as is equitable and just.

## COUNT 5 (**Clear Edge Title**)
### Aiding and Abetting

147.    The plaintiff incorporates by reference each allegation set forth above as if set forth at length herein.

148.    Clear Edge Title knowingly and willingly provided assistance to Unlock including but not limited to assisting with the underwriting, origination, and consummation of this mortgage loan. Clear Edge Title therefore aided Defendant Unlock in engaging in the foregoing wrongful acts, which injured the plaintiff in the

form of deprivation of money and/or diminution of the value of Ms. Roberts's interest in the property.

149.    Defendant Clear Edge Title Inc. was aware, or reasonably should have been aware, of the nature of the transaction and the damage being done to the plaintiff.

150.    Ms. Roberts seeks damages, costs, attorney fees and such other relief as is equitable and just.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Roberts respectfully requests that the Court enter judgment against the defendants as follows:

A.    An Order providing for any and all injunctive, equitable, or declaratory relief the Court deems appropriate, including but not limited to rescinding, terminating, or voiding the contract;

B.    An Order awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

C.    An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

D.    An Order awarding punitive damages under N.J.S.A. § 2A:15-5.12 in an amount to be determined by the Court or jury;

E.    An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

F.    An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees;

G.    Such further relief as this Court may deem just and proper.

## JURY DEMAND

151.    Pursuant to Fed. R. Civ. P. 38(b), Ms. Roberts hereby demands trial by jury as to all issues in the above matter.

Respectfully submitted,

*s/ Edward Hanratty*
EDWARD HANRATTY
LAW OFFICE OF EDWARD HANRATTY
57 W. Main Street
Freehold, NK 07728
(732) 866-6655
*thanratty@centralnewjerseybankruptcylawyer.com*

THOMAS SCOTT-RAILTON*
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*thomas@guptawessler.com*

March 20, 2025                    *Counsel for Plaintiff*

---

*\* Admitted pro hac vice. Admitted in New York; practicing under direct supervision of members of the District of Columbia Bar under Rule 49(c)(8).*

## NOTICE TO ATTORNEY GENERAL OF ACTION

A copy of the Complaint will be mailed to the Attorney General of the State of New Jersey within ten days after filing with the Court, pursuant to N.J.S.A. § 56:8-20.

Dated: March 20, 2025                    *s/ Edward Hanratty*
                                         EDWARD HANRATTY

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2025, I electronically filed the foregoing complaint with the Clerk of the Court for the United States District Court in the Court of New Jersey by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*s/ Edward Hanratty*
EDWARD HANRATTY
