# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

ANGELA ROBERTS,

    Plaintiff,

  - against -

UNLOCK PARTNERSHIP SOLUTIONS
AO1, INC., CLEAR EDGE TITLE INC.,
ABC INC 1 – 10, AND JOHN DOE 1-10,

    Defendants.

Case No.: 24-cv-01374-CPO-AMD

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT UNLOCK PARTNERSHIP SOLUTIONS AO1 INC.'S MOTION TO COMPEL ARBITRATION

---

Jason R. Lipkin, Esq.
Alexander R. Green, Esq.
  (admitted *pro hac vice*)
MCGLINCHEY STAFFORD PLLC
112 West 34th Street Suite 1515
New York, NY 10120
(646) 362-4048
jlipkin@mcglinchey.com
agreen@mcglinchey.com

Andrew K. Stutzman, Esq.
Christopher A. Reese, Esq.
STRADLEY RONON STEVENS & YOUNG, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103
(215) 564-8000
astutzman@stradley.com
creese@stradley.com

May 5, 2025

*Counsel for Defendant Unlock Partnership Solutions AO1, Inc.*

i

# **TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION ..................................................................................................1

SUMMARY OF PLAINTIFF'S ALLEGATIONS ..................................................3

DESCRIPTION OF FSEA…………………….……………………………....…....6

ARGUMENT…………………………………..……….....................10

I.     THE FSEA IS NOT SUBJECT TO TILA …………….............................10

     A.     The FSEA Is Not a "Residential Mortgage Loan" Subject to TILA Because It Is Not a "Debt" …………………………………...…..11

     B.     The FSEA Is Not a "Loan" By Any Definition ………….……..14

     C.     The FSEA Is Not a "High-Cost Mortgage" …………………....20

     D.     The FSEA Is Not a "Reverse Mortgage" …………………….……23

     E.     The FSEA Is Both an "Option" Contract and an "Investment Plan" – Neither of Which Are Forms of "Credit" Subject to TILA …...……25

          (i)     The FSEA Is an "Option" Contract …………………...……..28

          (ii)     The FSEA Is an "Investment" Contract ……………….……..29

II.     THE FSEA'S MANDATORY ARBITRATION CLAUSE IS ENFORCEABLE …………………………………………………...…..31

     A.     Law Regarding the FAA ……………………………………33

     B.     The FSEA Contains a Valid, Enforceable Agreement to Arbitrate ...35

     C.     The Claims in the SAC Fall within the Scope of the Parties' Arbitration Agreement …………………………..………………36

CONCLUSION…………………………………………………………..38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.D.L. v. Cinnaminson Twp. Bd. of Educ.*,
  975 F. Supp. 2d 459 (D.N.J. 2013) .......................................................................12

*Aetrex Worldwide, Inc. v. Sourcing for You Ltd.*,
  555 F. App'x 153 (3d Cir. 2014) ...............................................................33, 36

*Allied-Bruce Terminix Cos. v. Dobson*,
  513 U.S. 265 (1995).......................................................................................35, 36

*Baum v. County of Rockland*,
  337 F.Supp.2d 454 (S.D.N.Y. 2004) ...............................................................13

*Bradford v. Terry*,
  2021 WL 6210714 (Tenn. Ct. App. 2021) ..................................................14, 27

*Curtis v. Cellco Partnership*,
  413 N.J. Super. 26 (App.Div. 2010) .....................................................................37

*Foster v. Equitykey Real Est. Invs. L.P.*,
  2017 WL 1862527 (N.D. Cal. 2017) ...........................................21, 25, 26, 29

*Foster v. Watson*,
  2022 WL 3716573 (W.D. Pa. 2022).............................................13, 26, 27, 28

*Guidotti v. Legal Helpers Debt Resolution, L.L.C.*,
  716 F.3d 764 (3d Cir. 2013) ...........................................................12, 34, 36

*John Hancock Mut. Life Ins. Co. v. Olick*,
  151 F.3d 132 (3d Cir. 1998) .......................................................................33

*Johnson v. Washington*,
  559 F.3d 238 (4th Cir. 2009) ...................................................................14, 27

*Karns Prime & Fancy Food, Ltd. v. Comm'r*
  494 F.3d 404 (3d Cir. 2007) ...................................................................13, 15

*Kaufman v. Provident Life and Cas. Ins. Co.*,
  828 F. Supp. 275 (D.N.J. 1992), *aff'd*, 993 F.2d 877 (3d Cir. 1993) .................12

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
  560 F.3d 156 (3d Cir. 2009) ..................................................................33

*L'Arbalete, Inc. v. Zaczac*,
  474 F. Supp. 2d 1314 (S.D. Fla. 2007) ..................................................30

*Nolden v. Summit Fin. Corp.*,
  244 So. 3d 322 (Fla. App. 2018) ..........................................................16

*Noonan v. Comcast Corp*,
  Civ. 2017 WL 4799795 (D.N.J. 2017) ...................................................34

*Olson v. Unison Agreement Corp.*,
  2023 WL 5609251 (W.D. Wash. 2023) ..................................................29

*Palm Court NH, L.L.C. v. Dowe*,
  336 So. 3d 735 (Fla. 4th DCA 2022) ....................................................36

*Rent-A-Center, W., Inc. v. Jackson*,
  561 U.S. 63 (2010) ..............................................................................33

*Ross v. CACH, LLC*,
  2015 WL 1499282 (D.N.J. 2015) ..........................................................34

*Saadia Square LLC v. SM Logistics Member LLC*,
  2022 WL 17844283 (N.J. Super. Ct. App. Div. 2022) ...........................28

*Sanford v. Bracewell & Guiliani, LLP*,
  618 F. App'x 114 (3d Cir. 2015) ...........................................................34

*Saralegui v. Sacher, Zelman, Van Sant Paul, Beily, Hartman &
  Waldman, P.A.*,
  19 So. 3d 1048 (Fla. 3d DCA 2009) .............................................29, 31

*Schering-Plough Corp. v. United States*,
  651 F. Supp. 2d 219 (D.N.J. 2009) (Hayden, J.), *aff'd sub nom.
  Merck & Co. v. United States*, 652 F.3d 475 (3d Cir. 2011) ..............15

*Schor v. FMS Fin. Corp.*,
  814 A.2d 1108 (N.J. App. Div. 2002) ...................................................12

*Smith v. Spizzirri*,
    144 S.Ct. 1173 (May 16, 2024) ........................................................................35

*Tiernan v. Carasaljo Pines*,
    143 A.2d 892 (N.J. Super. Ct. App. Div. 1958) ..................................................17

**Statutes**

12 C.F.R. Pt. 1026, Supp. 1, Subpt. A at cmt. 2(a)(14)(1)(vii), (viii) ..............26, 30

12 C.F.R. § 1026.33(a) .............................................................................................23

12 C.F.R. § 1026.33(a)(1) .........................................................................................25

12 C.F.R. § 1026.36 .................................................................................................11

9 U.S.C. § 2 ............................................................................................................35

15 U.S.C. ................................................................................................................20

15 U.S.C. § 1602(i) ..................................................................................................11

15 U.S.C. § 1602(bb)(1)(A) .....................................................................................20

15 U.S.C. § 1602(bb)(1)(A)(i)(I) .................................................................21, 22, 23

15 U.S.C. § 1602(bb)(1)(A)(i)(II) .............................................................................20

15 U.S.C. § 1602(bb)(A)(i)(I) ...................................................................................21

15 U.S.C. § 1602(dd)(5) ...........................................................................................11

15 U.S.C. § 1602(f) .............................................................................................12, 19

15 U.S.C. § 1639c(e)(1) ...........................................................................................11

15 U.S.C. § (b)(2)(B) ...............................................................................................22

FAA .......................................................................................................2, 33, 35, 36

FAA Section 3 ..........................................................................................................33

FAA Section 4, 9 U.S.C. §§ 1, *et seq.* ...............................................................32, 33

**Other Authorities**

FSEA ...................................................................................................*passim*

BLACK'S LAW DICTIONARY (12th ed. 2024)......................................................12, 15

New Jersey Consumer Fraud Act ...................................................................2

New Jersey Homeowners Security Act of 2002 .......................................................2

New Jersey Truth in Consumer Contract Warranty and Notice Act ........................2

Rule 12(b)(6)..........................................................................................34, 36

Rule 56 ..................................................................................................34

TILA......................................................................................................*passim*

U.S. Const. art. I, § 8................................................................................35

## INTRODUCTION

This action centers around the "Forward Sale and Exchange Agreement" (the "FSEA") consummated on November 11, 2021, between Plaintiff and Unlock Partnership Solutions AO1, Inc. ("Unlock"). Through that contract, Plaintiff sold Unlock the option to claim a fractional ownership interest in the property located at 48 Buckeye Lane, Willingboro, New Jersey 08046 (the "Property"), upon certain triggering events and subject to certain restrictions, as set forth in the FSEA. While the parties dispute how to label the contract, the FSEA's terms speak for themselves, including its mandatory arbitration clause.

For Plaintiff, the FSEA was not a mortgage loan, but an alternative – a means to "unlock" the potential future equity in the Property immediately without debt, interest, or monthly payments. After failing to make local property tax payments for years, Plaintiff was about to lose the Property in a foreclosure proceeding and needed $54,062 to payoff the tax lien. Plaintiff, of her own volition and choosing, obtained an amount from Unlock far greater than what she needed to redeem the Property.

For Unlock, the FSEA is an investment in the Property with the hope that it appreciates in value. If Unlock decides to exercise its option under the FSEA, it may, alongside the owner, eventually recognize a gain (or a loss) in connection with its investment – though, it is not guaranteed to do so.

Over two years after agreeing to the FSEA and accepting $111,610 from Unlock under those terms, Plaintiff initiates this action. She now claims to have not understood the nature of the FSEA. Though she has not incurred any debt, she owes no repayment of any specified amount subject to an interest charge, and has no monthly payments to make, she repeatedly mischaracterizes the FSEA as a "residential mortgage loan" that is subject to federal and state law. On that premise, Plaintiff maintains that Unlock violated the statutes: (1) the Truth-In-Lending Act ("TILA"); (2) the New Jersey Homeowners Security Act of 2002; (3) the New Jersey Consumer Fraud Act; and (4) the New Jersey Truth in Consumer Contract Warranty and Notice Act.

Unlock asks this Court to compel arbitration of the claims consistent with the mandatory arbitration clause in the FSEA, that undisputedly bears Plaintiff's signature. Plaintiff agreed to arbitrate "any and all controversies, claims, or disputes with [Unlock] . . . arising out of, relating to, or resulting from" the FSEA or the Property. Overall, the FSEA's arbitration clause is governed by the Federal Arbitration Act ("FAA"), and Plaintiff's claims fall within its scope.

Plaintiff will attempt to circumvent the express terms of the FSEA by arguing that the exchange is governed by TILA – either as a "residential mortgage loan," "reverse mortgage," or "high-cost mortgage" – and that the Act prohibits

compulsory arbitration provisions for these extensions of credit. For multiple reasons, Plaintiff is mistaken.

Critically, the FSEA is not a form of "credit" at all. When Plaintiff agreed to the exchange, she was not obliged to pay a specific sum of money by a specific date. She still is not. As such, she did not incur any "debt" in connection with the FSEA. Rather, under that agreement, Unlock agrees to pay a certain, negotiated amount, known as the "Investment Payment," in exchange for a contractual right – that is, the option to claim a negotiated investment interest in the property upon a triggering event as set forth in the FSEA (a decision by Plaintiff to sell or repurchase the agreement, the death of Plaintiff, the expiration of the ten-year term, or a significant and uncured event of default by Plaintiff). Upon such a triggering event, Unlock has the option to convert its investment into a fractional ownership interest but could also elect to take no further action concerning the Property.

As TILA does not apply, the FSEA's mandatory arbitration clause is enforceable. By way of this Motion, Unlock requests that the Court compel the parties to arbitrate their dispute over the FSEA, as required by that contract.

### SUMMARY OF PLAINTIFF'S ALLEGATIONS

In 2015, Plaintiff purchased the Property for cash, without relying on any mortgage loan. (SAC ¶¶ 6-7). The next year, Plaintiff began having difficulty keeping up with her property taxes and fell significantly behind. (*Id.* at ¶¶ 9-10). By

2021, a third party had purchased the tax sale certificate and commenced a foreclosure action, identifiable as Docket No. BUR-F-4648-21 (the "Foreclosure Action"). To redeem the Property, Plaintiff needed $54,062 immediately to stop the foreclosure proceedings. (*Id.* at ¶ 11).

Eventually, she sought to obtain a loan to redeem the Property. (*Id.* at ¶¶ 12-15). Rather than obtain a loan, Plaintiff contacted Unlock. (*Id.* at ¶ 16). She admits that she received a copy of the FSEA and that, on November 13, 2021, signed the agreement with Unlock. (*Id.* at ¶¶ 18-19). "Under Unlock's contract, the company gave her an advance payment of $111,610[]" the equivalent of over 40% of the appraised value of the Property. (*Id.* at ¶ 23). Though she claims to have satisfied the tax lien and redeemed the Property, she does not identify what she did with the remaining $57,548 in funds she personally received from Unlock.

Years later, Plaintiff claims that she did not realize the impact of certain terms in the FSEA that she signed. Specifically, Plaintiff "did not understand" that, assuming she did not buy out Unlock's option to claim an interest in the Property beforehand, or decide to sell her property beforehand, Unlock could elect to convert its option into a fractional ownership interest in the Property after ten years and in turn could elect to jointly market and otherwise facilitate a sale of the Property. (*Id.* at ¶¶ 30-33). Though the agreement is titled a "Forward Sale and Exchange Agreement," Plaintiff alleges that she did not understand that a sale of the Property

could result. (*Id.* at ¶ 35). Likewise, she also alleges that she did not understand that the FSEA contained a mandatory arbitration provision. (*Id.* at ¶ 36).

Overall, Plaintiff complains that Unlock violated several provisions of federal and state law relating to the offering and extending of residential mortgage loans. Under Count 1, she complains, among other things, that Unlock violated TILA in the following ways:

➢ Originating a "residential mortgage loan" in New Jersey without a license;

➢ Including a mandatory arbitration clause in a "residential mortgage loan" agreement;

➢ Failing to make a reasonable and good faith determination of Plaintiff's ability to repay a "residential mortgage loan" and/or "high-cost mortgage;" and

➢ Failing to provide certain disclosures required for a "residential mortgage loan," "high-cost mortgage," and/or "reverse mortgage."

(*Id.* at ¶¶ 109, 115, 118). Under the remaining counts, Plaintiff asserts violations of various provisions of New Jersey governing the extension of residential mortgage loans. (*See id.* at ¶¶ 124, 126, 139, 143).

## <u>DESCRIPTION OF FSEA</u>[1]

The FSEA offered by Unlock is an agreement by which an owner of a residential property is paid a certain amount in exchange for a right to receive a specified percentage ownership interest in that property. (*See* <u>Ex. A</u> [Unlock Decl.] at ¶ 6; <u>Ex. A-1</u> [FSEA] at p. 2). Effectively, Unlock is investing in a piece of property with the hope that it will increase in value. (*See* <u>Ex. A</u> [Unlock Decl.] at ¶ 7). However, if the property's value depreciates, stays the same, or appreciates at a slower rate than forecasted, Unlock would realize far less benefit in the transaction – and potentially no benefit at all. (*Id.*). In nearly every instance, during the term of the FSEA, Unlock exercises no control over the property. (*Id.* at ¶ 8; *see also, e.g.,* <u>Ex. A-1</u> [FSEA] at § 11.2). It trusts that the owner will take care of their joint investment. (*See* <u>Ex. A</u> [Unlock Decl.] at ¶ 8).

In several ways, the FSEA is quite flexible. (*Id.* at ¶ 9). The amount paid by Unlock in exchange for the contractual option, referred to as the "Investment Payment," can vary. (*Id.*). In 2021, when Plaintiff signed her FSEA, the highest Investment Payment that Unlock offered was a payment equal to 43.75% of the property's current value. (*Id.* at ¶ 10). In that instance, Unlock would have a right to

---

[1]    The Declaration of James Riccitelli, on behalf of Unlock (the "Unlock Declaration"), is attached as <u>Exhibit A</u>, with true and accurate copies of the FSEA, the Performance Mortgage securing certain non-debt obligations, and the 2021 product guide for the FSEA that was in place at the applicable time attached thereto as <u>Exhibits A-1</u>, <u>A-2</u>, and <u>A-3</u>, respectively.

exercise an option, upon a triggering event as set forth in the FSEA (a decision by Plaintiff to sell or repurchase the agreement, the death of Plaintiff, the expiration of the ten-year term, or a significant and uncured event of default by Plaintiff), to claim a 70% interest in the property. (*Id.*). Should that property appreciate a great deal in value, both the owner and Unlock would benefit jointly from their investment, and notably, Unlock's return is, at all times, limited by an agreed-upon Annualized Cost Limit. (*See id.* at ¶¶ 7, 10).

Notably, Unlock did not require that Plaintiff use the property as her primary residence. (*Id.* at ¶ 14). At the time Unlock offered the FSEA to Plaintiff, the exchanges were available for primary residences, second homes, and even rental properties. (*Id.*). During the period of time covered by the FSEA, the owner enjoys the "sole right of occupancy" of the property. (Ex. A-1 [FSEA] at § 14.1). Even if the property was originally identified as a primary residence, owners are free to use the property as a second home or even a rental property. (*Id.* at § 14.8).

Under the FSEA, Unlock has several options to exercise its right to receive a specified percentage interest in the value of that property. In turn, the owner also has the option to buy out Unlock's interest in the property at any time. Their respective options are triggered by a "Settlement Event." Indeed, the agreement defines four "Settlement Events" through which Unlock may realize a return on its investment in the Property:

<u>Permitted Sale</u>:  Plaintiff is permitted to sell the Property at any time prior to the expiration of the 10-year period, assuming certain conditions have been met, such as the sale being at arm's length. (<u>Ex. A-1</u> [FSEA] at § 2.1). If notified of a permitted sale, then Unlock has two options under the FSEA. Unlock can elect to "make an offer in writing to purchase the Property from [Plaintiff] on the same terms and conditions as the proposed offer from the third-party buyer." (*Id.* at § 2.1(i)). Alternatively, Unlock can exercise its right to a "Conversion" of its percentage interest in the Property, entitling it to a percentage of proceeds of such sale. (*Id.* at § 2.2). However, notwithstanding Unlock's options, Plaintiff has the option to "settle" the Unlock Agreement by tendering a payment calculated based on the value of the Property and Unlock's percentage ownership interest. (*Id.* at § 2.4).

<u>Owner Buyout</u>:  Plaintiff is permitted to buy out Unlock's interest in the Property at any time prior to the expiration of the 10-year period, assuming certain conditions have been met, such as an independent appraisal being conducted. (*Id.* at § 3.1). Under those circumstances, the "Settlement Payment" would be calculated based on the independently determined value of the Property at the time of the buyout and Unlock's percentage ownership interest, and further subject to the annualized cost limit. (*Id.*)

<u>Death of Last Surviving Signatory</u>:  Upon the death of the last surviving person to sign the FSEA, the estate is required to settle with Unlock through essentially the same methods outlined in the "Permitted Sale" and "Owner Buyout" Settlement Events. (<u>*Id.*</u> at § 4).

<u>Expiration of the Unlock Agreement</u>:  Upon the expiration of the 10-year term outlined in the FSEA, the owner is required to settle with Unlock through essentially the same methods outlined in the "Permitted Sale" and "Owner Buyout" Settlement Events. (<u>*Id.*</u> at § 5).

Together with the FSEA, Unlock and Plaintiff also executed a Performance Mortgage as a security for Unlock's contractual rights (the "Security Instrument"). (*Id.* at ¶ 11; <u>Ex. A-2</u> [Security Instrument]). However, the Security Instrument does not secure any specific payments owed to Unlock at the time the FSEA was consummated. (*See* <u>Ex. A</u> [Unlock Decl.] at ¶ 12; *see* <u>Ex. A-2</u> [Security Instrument]

at § 2). Rather, the Security Instrument secures a series of non-debt obligations, including:

(1)     The "Settlement Payment," which, pursuant to the FSEA's express terms, Unlock would receive from a purchaser (or an escrow agent) upon the closing of a sale of the Property at a later date, (*see* Ex. A-1 [FSEA] at § 1.8.4, 2.3(d));[2]

(2)     All other obligations of Plaintiff contained in the Security Instrument itself, including her promise "[t]o appear in and defend any action or proceeding purporting to affect the [Security Instrument][,]" (*see* Ex. A-2 [Security Instrument] at § 5(c));

(3)     The payment and/or performance of all other obligations of Plaintiff contained in the FSEA, including, for instance, her promise not to "transfer or attempt to transfer the Property, any interest [therein], other than in accordance with the [FSEA][,]" (Ex. A-1 [FSEA] at § 16.1(c));

(4)     Each obligation of Plaintiff contained in any renewal, extension, amendment, or modification of the FSEA;

(5)     Any expenditures made by Unlock pursuant to, or under, the Security Instrument, including, without limitations, any "Protective Advances," as that term is defined in the Security Instrument;[3] and

(6)     Payment of all fees and expenses that may be incurred by Unlock to which it is entitled to reimbursement under the FSEA.

---

[2]  As previously stated, the owner may elect to – but is not obligated to – tender to Unlock the "Settlement Payment" to release Unlock's contractual rights to the Property, including any lien. (*See* Ex. A-1 [FSEA] at §§ 2.4, 3.1(c), 4.6, 5.1).

[3]  For instance, under certain circumstances detailed in the FSEA, Unlock can make a Protective Advance for the placement of appropriate insurance, payment of taxes, making of necessary repairs, curing any defaulted loans secured by the Property, and the removal of a receiver appointed for the Property. (*See* Ex. A-1 [FSEA] at § 17.12).

(*See* Ex. A-2 [Security Instrument] at § 2(a)). Significant here, the Security Instrument does not secure the repayment of the Investment Payment. (Ex. A [Unlock Decl.] at ¶ 12; Ex. A-2 [Security Instrument] at § 2(b) ("Investment Payment. Owner shall not be obligated to repay any part of the Investment Payment; and therefore, such item shall not be including within the Obligations.")). The Security Instrument does not secure any specific sum of money due to Unlock at the time the FSEA and Security Instrument were executed. (Ex. A [Unlock Decl.] at ¶ 12).

Under the FSEA's terms, there are no circumstances where the owner would be obligated to pay back the Investment Payment. (*See* Ex. A [Unlock Decl.] at ¶ 18). There are not any required periodic payments of principal or interest. (*Id.*). As such, for various reasons, the FSEA is not a loan or an extension of credit. (*Id.* at ¶ 19). The owner's obligations under the FSEA are contractual and not accompanied by an express promise of repayment as would be typically evidenced through a promissory note.

## ARGUMENT

## I.    THE FSEA IS NOT SUBJECT TO TILA.

Plaintiff's primary argument against compelling arbitration has been to insist that the FSEA is a "residential mortgage loan" subject to TILA. (SAC ¶¶ 95, 100-11). In relevant part, that Act provides that that "[n]o residential mortgage loan . . .

may include terms which require arbitration or any other nonjudicial procedure as the method for resolving any controversy or settling any claims arising out of the transaction." 15 U.S.C. § 1639c(e)(1); *see also* 12 C.F.R. § 1026.36 (prohibiting mandatory arbitration for "[a] contract or other agreement for a consumer credit transaction secured by a dwelling . . ."). For a myriad of reasons, the FSEA is not a "residential mortgage loan" or any other form of "credit" that is subject to TILA. Rather, the FSEA is both an investment agreement and option contract that grants Unlock the option, upon a "Settlement Event" as set forth in the FSEA and subject to certain other restrictions, to claim a negotiated fractional interest in the Property's future value.

### A.    The FSEA Is Not a "Residential Mortgage Loan" Subject to TILA Because It Is Not a "Debt."

The FSEA does not fall within the statutory definition of a "residential mortgage loan." Indeed, TILA defines that term broadly as "any consumer credit transaction . . . secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling." 15 U.S.C. § 1602(dd)(5). A transaction qualifies as "consumer credit" whenever (1) credit is offered or extended to (2) a natural person, and (3) the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes. 15 U.S.C. § 1602(i). In turn, the Act defines "credit" as "the right granted by a creditor to a debtor to defer

payment of **debt** or to incur **debt** and defer its payment." 15 U.S.C. § 1602(f) (emphasis added).

Importantly, to be a form of "credit" subject to the TILA, a transaction must constitute "debt." *See* 15 U.S.C. § 1602(f). While the Act does not define the term, Black's Law Dictionary provides that the term "debt" represents a "liability" or "a specific sum of money due by agreement." *Debt*, BLACK'S LAW DICTIONARY (12th ed. 2024).

At the outset, to assess whether or not the FSEA constitutes a "debt" or is otherwise subject to TILA, the starting point is the express terms of the agreement itself. *See A.D.L. v. Cinnaminson Twp. Bd. of Educ.*, 975 F. Supp. 2d 459, 464 (D.N.J. 2013) ("Contract interpretation begins by looking at the terms of the contract"). In order to determine the meaning of an agreement, the terms must be given their "plain and ordinary meaning." *Kaufman v. Provident Life and Cas. Ins. Co.*, 828 F. Supp. 275, 282 (D.N.J. 1992), *aff'd*, 993 F.2d 877 (3d Cir. 1993).[4]

---

[4]  Unlock submits that the relevant terms of the FSEA are subject only to one reasonable interpretation and thus should be afforded their "plain and ordinary" meaning. When previously opposing arbitration, Plaintiff improperly directed the Court's attention to several issues outside of the four corners of the contract – including correspondence from a title agent, the county clerk's labeling the FSEA security agreement as a "mortgage," and Google search terms Plaintiff purportedly used to locate Unlock's products. (*See* Dkt. No. 33-1 [Decl. of Pl.] at ¶¶ 9, 12-13, 23). Even if true, such issues are irrelevant where the terms of a contract are unambiguous. *See Schor v. FMS Fin. Corp.*, 814 A.2d 1108, 1113–14 (N.J. App. Div. 2002) ("The construction of a written contract is usually a legal question for the court, but where there is uncertainty, ambiguity or the need for parole evidence in

Neither Plaintiff nor the Court may rewrite the contract's terms; both must "accord the words of the contract their fair meaning" and not let "form swallow substance." *Baum v. County of Rockland,* 337 F.Supp.2d 454, 466 (S.D.N.Y. 2004) (citations omitted).[5]

Here, the substance of the FSEA demonstrates that the agreement does not create a "debt." At the time Plaintiff signed the agreement, she was not liable for a specific sum of money. Specifically, she does not have an obligation to repay the initial Investment Payment. Nor is she required to make any predetermined or scheduled payments to Unlock at a later date.

In some rare circumstances, the FSEA may impose obligations on a property owner,[6] but those obligations are not incurred upon signing the agreement. Rather,

_____

aid of interpretation, then the doubtful provision should be left to the jury.") (citations omitted). If the Court should find that the FSEA is ambiguous as to its terms in such a way that it cannot conclude whether the transaction is a "residential mortgage loan" or not, then Unlock respectfully requests the opportunity to conduct limited discovery as the record before the Court would be insufficient to adjudicate that issue.

[5] *See also Karns Prime & Fancy Food, Ltd. v. Comm'r* 494 F.3d 404, 408 (3d Cir. 2007) ("To determine whether a given transaction constitutes a loan, the substance, rather than the form, of the transaction is controlling.") (citing *Knetsch v. United States*, 364 U.S. 361, 365–66 (1960)); *Foster v. Watson*, 2022 WL 3716573, at *4 (W.D. Pa. 2022) ("Where the contract's terms are subject only to one reasonable interpretation, the court interprets the unambiguous contract as a matter of law.") (citing *Pacitti v. Macy's*, 193 F.3d 766, 773 (3d Cir. 1999)).

[6] As an obvious example, the property owner would be in default under the FSEA if she/he/they attempted to transfer the property without Unlock's approval or knowledge.

they are contingent, optional, and otherwise insufficient to justify the characterization of the FSEA as an instrument of "debt." As a matter of law, if an obligation is contingent or optional, it is not a debt. In holding that a sale agreement with an option to repurchase was not a debt, one court explained that "[a]n obligation [to repay] must be absolute. That is its nature." *Bradford v. Terry*, 2021 WL 6210714, at *5 (Tenn. Ct. App. 2021); *see also id.* ("Without a debt, there could [] be no claim under TILA."); *see also, e.g., Johnson v. Washington*, 559 F.3d 238, 243 (4th Cir. 2009) (applying Virginia law, holding that "an option to repurchase is not an obligation to repurchase, and therefore does not constitute a debt . . . ").

What Unlock purchased through the FSEA was the option to claim a negotiated investment interest in the property upon a "Settlement Event." (Ex. A-1 [FSEA] at p. 2). Specifically, Unlock made an Investment Payment of $115,062 to Plaintiff in 2021 in exchange for the option to claim ownership interest of up-to 70% in the property. (*Id.*). At the time Plaintiff signed the FSEA, she did not have an "absolute" obligation to pay any specific amount to Unlock. Therefore, the FSEA is not an instrument of "debt" and by extension cannot be considered a form of "credit" or a "residential mortgage loan" subject to TILA.

### B.    The FSEA Is Not a "Loan" By Any Definition.

For many of the same reasons why the FSEA is not a "debt," the agreement also cannot be considered a "loan" because it does not create an obligation to repay.

Turning to Black's Law Dictionary in the absence of clear guidance from TILA or Reg. Z, "to lend" means (i) "to allow the temporary use of something . . . on condition that the thing or its equivalent be returned," or (ii) "to provide (money) temporarily on condition of repayment, usually with interest." *Lend*, BLACK'S LAW DICTIONARY (12th ed. 2024).

Reaching a similar standard though in a different context, this Court has previously recognized that, "[f]or a given transaction to 'constitute [a] true loan [ ] there must have been, at the time the funds were transferred, an unconditional obligation on the part of the transferee to repay the money, and an unconditional intention on the part of the transferor to secure repayment.' " *Schering-Plough Corp. v. United States*, 651 F. Supp. 2d 219, 244 (D.N.J. 2009) (Hayden, J.), *aff'd sub nom. Merck & Co. v. United States*, 652 F.3d 475 (3d Cir. 2011) (quoting *Geftman v. Comm'r,* 154 F.3d 61, 68 (3d Cir. 1998)). Likewise, in *Karns Prime & Fancy Food, Ltd. v. Comm'r*, an opinion previously cited by Plaintiff, but removed in the Second Amended Complaint, the U.S. Court of Appeal for the Third Circuit recognized that the "key question" in determining whether a transaction constitutes a loan was "whether, at the time of receipt of the funds, the recipient of the loan was unconditionally obligated to make repayment." 494 F.3d 404, 408 (3d Cir. 2007) (considering whether an involved transaction constituted a loan for tax purposes).

Here, at the time she signed the FSEA, Plaintiff was not "unconditionally obligated" to repay the Investment Payment, or any other specific amount, to Unlock. The FSEA correctly states that "[t]he Investment Payment is not a loan to You or indebtedness to Unlock, nor is it a principal amount which Unlock is entitled to recover at any time." (Ex. A-1 [FSEA] at § 4). The FSEA further explains that Plaintiff "will not make any monthly interest or any other periodic payments to Unlock based upon the amount of the Investment Payment." (*Id.* at § 1.4).

The very first words in the FSEA unequivocally state in capitalized bolded print: "**THIS EXCHANGE AGREEMENT IS NOT A LOAN**[.]" (*Id.* at p. 1). The FSEA then immediately describes the nature of the transaction:

> **THIS IS AN AGREEMENT PURSUANT TO WHICH UNLOCK PROVIDED OWNER A PAYMENT IN EXCHANGE FOR A RIGHT TO RECEIVE A SPECIFIED PERCENTAGE INTEREST IN THE VALUE OF THE OWNER'S HOME UPON THE OCCURRENCE OF CERTAIN EVENTS SET FORTH IN THIS EXCHANGE AGREEMENT**[.]

(*Id.*) It is also noteworthy that the agreement is titled "**FORWARD SALE AND EXCHANGE AGREEMENT**" and not titled as a loan. (*Id.*)[7]

Later in the FSEA, the parties acknowledge the significant differences

---

[7] When analyzing the substance of a transaction, courts have relied on a number of factors, including the "title of the document, the language of the document, the terms of the document, the characteristics of the parties, and the conduct of the parties." *Nolden v. Summit Fin. Corp.*, 244 So. 3d 322, 325 (Fla. App. 2018) (affirming a contract was not a loan because of its title in bold capital letters on the first page).

between the transaction and a loan:

> 21.5   <u>Not a Loan</u>.  Unlock and Owner agree that the Unlock Agreement and the transaction contemplated thereunder, including payment of the Investment Payment and the sale of the Unlock Percentage, is not a loan or extension of credit. Owner does not have an obligation to repay the Investment Payment, and there are not any required periodic payments of principal, interest or any other finance charges. As set forth herein, Unlock may lose all or a portion of the Investment Payment. The Security Instrument secures Owner's performance and obligations under the Unlock Agreement and not in connection with a promissory note, loan or extension of credit. The Annualized Cost Limit is not an annual percentage rate limit, but rather a limit on Unlock's investment return. To the fullest extent possible, Unlock and Owner agree that the Unlock Agreement is not subject to any federal, state and/or local law concerning consumer credit, including without limitation, usury ceilings, disclosures, and any other requirements, restrictions, limitations or prohibitions set forth in such laws.

(*Id.* at § 21.5). To that end, the terms of the FSEA are elsewhere described as the "price" of the owner's "Unlock Agreement." (*Id.* at § 1.2).

Significantly, the FSEA also cannot be considered a "loan" under any reading of New Jersey law, as defined by the State's highest court:

> A loan of money is a lending, on one side, and a borrowing on the other. The conception of loaning money is well understood and the incidents pertaining to an agreement for the loan of money are few and simple: an advancement of money by the lender at the time of agreement, and a stipulation or agreement to repay it and generally with interest, at a future date, by the borrower. . . .

*Tiernan v. Carasaljo Pines*, 143 A.2d 892, 898 (N.J. Super. Ct. App. Div. 1958).

Notably, the FSEA does not create an obligation that Plaintiff repay the Investment Payment, nor is there a promissory note evidencing a promise to repay. (<u>Ex. A-1</u>

[FSEA] at § 21.5; Ex. A [Unlock Decl.] at ¶ 18). It does not charge any interest. (*Id.*). There are no periodic payments of principal or interest. (*Id.*).

The return on Unlock's investment is predicated upon several different, variable factors including the Property's future value. (Ex. A-1 [FSEA] at § 1.8). That return is also capped at the Annualized Cost Limit. (*Id.* at § 10). Moreover, that return is potentially offset by any significant improvements performed on the Property by the property owner. (*Id.* at § 7.1, 7.2).

In arguing that the FSEA is a "residential mortgage loan," Plaintiff mischaracterizes several of its terms. For instance, she claims that, Unlock charged an "annual compound interest" rate of 18% upon the occurrence of a Settlement Event – that is, were she to sell her home, pass away, move out, or upon the expiration of the 10-year term. (SAC ¶¶ 26-27, 51, 53, 55, 62, 67, 71, 105, 113-14, 125, 132). Not so. Under each "Settlement Event," Unlock can convert its percentage interest, entitling it to a percentage of proceeds from a sale of the Property. (Ex. A-1 [FSEA] at §§ 2.2, 3.1, 4.4, 5.5). If such a sale were about to occur, then Unlock also has the right to "make an offer in writing to purchase the Property . . ." (*Id.* at § 2.1(i)). However, notwithstanding Unlock's rights, Plaintiff has the right to "settle" the FSEA by tendering a payment calculated based on the value of the Property and Unlock's percentage ownership interest. (*Id.* at § 2.4).

Finally, Plaintiff suggests that the existence of the Security Instrument, which is title a "Performance Mortgage," supports her position that the FSEA is a "residential mortgage loan." (*See generally* SAC ¶ 48). Not so, because a mortgage does not necessarily mean that there is an underlying loan. *See* RESTATEMENT (THIRD) OF PROPERTY (MORTGAGES) § 1.1 cmt. ("Unless it secures an obligation, a mortgage is a nullity. Most often the obligation is the payment of money under the terms of a promissory note or other debt instrument, **although many other forms of obligation may also be secured**.") (emphasis added). An important aspect of the Security Instrument here, it does not secure the repayment of the Investment Payment. (Ex. A [Unlock Decl.] at ¶ 12; Ex. A-2 [Security Instrument] at § 2(b)). In fact, it does not secure any debt or specific sum of money due to Unlock at the time the FSEA and Security Instrument were executed. (Ex. A [Unlock Decl.] at ¶ 12). Nor does the Security Instrument change the nature of the underlying FSEA.

Overall, the FSEA is not ambiguous. It is subject to only one reasonable interpretation. Analyzing the "plain and ordinary" meaning of the agreement, the FSEA cannot be considered a "loan." Likewise, it cannot be considered any extension of "credit" because Unlock has not granted Plaintiff "the right . . . to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). Significantly, there is no "Settlement Event" that requires Plaintiff to make a payment to Unlock to buy out Unlock's interest or settle with Unlock. Accordingly,

the Court cannot consider the FSEA to be a "residential mortgage loan" because it does not meet TILA's definition.

## C.    The FSEA Is Not a "High-Cost Mortgage."

In addition to and largely derivative of her argument that the FSEA is a "residential mortgage loan," which is false for the reasons discussed above, Plaintiff also claims that the exchange is a "high-cost mortgage" subject to TILA. (SAC ¶ 42 ("In addition to these protections for residential mortgage loans generally, TILA includes even further protections for 'high-cost mortgage[s].' " [15 U.S.C.] § 1602(bb); *see also id.* at ¶¶ 108, 112-15). Under TILA, and as relevant here,[8] the term "high-cost mortgage" means a "consumer credit transaction that is secured by the consumer's principal dwelling, other than a reverse mortgage transaction"[9] that is secured "by a first mortgage on the consumer's principal dwelling, the annual percentage rate at consummation of the transaction will exceed by more than 6.5

---

[8]  Pursuant to TILA, residential mortgage loans can be "high-cost" in several different ways. The FSEA is flexible enough that the performance mortgage securing certain obligations in the FSEA could be "subordinate or junior" to another lien, in which case the "annual percentage rate at consummation of the transaction" must exceed the "average prime offer rate" for a "comparable transaction" by more than 8.5 percentage points to be considered "high-cost." *See* 15 U.S.C. § 1602(bb)(1)(A)(i)(II).

[9]  As a matter of law, Plaintiff's contention that the FSEA is a "high-cost mortgage" is inconsistent with her theory that the agreement constitutes a "reverse mortgage." Because TILA's definition of a "high-cost mortgage" expressly excludes reverse mortgages, *see* 15 U.S.C. § 1602(bb)(1)(A), the FSEA cannot be both.

percentage points . . . the average prime offer rate, as defined in section 1639c(b)(2)(B) of this title, for a comparable transaction[.]" 15 U.S.C. § 1602(bb)(1)(A)(i)(I). Engaging in a much more obvious analysis, it is clear that, even if the FSEA were a "residential mortgage loan," which it clearly is not, the agreement is certainly not a "high-cost mortgage."

The FSEA is not a form of "credit" at all, as discussed above. But even if it were, there is no interest, let alone interest at a rate 6.5 percentage points higher than the "average prime offer rate" – particularly at the time of consummation. 15 U.S.C. § 1602(bb)(A)(i)(I). The FSEA is not a "high-cost mortgage" for at least three reasons.

First, and contrary to Plaintiff's assertion otherwise, the FSEA does not impose an 18% interest rate accruing on the amount of Unlock's investment. That is simply not how the transaction works. What Plaintiff mischaracterizes as an "interest rate" is the "Annualized Cost Limit" – which operates as a cap on the return of Unlock's investment and, in fact, is a benefit for the owner in the transaction. (*See* Ex. A-1 [FSEA] at § 10). In analyzing a similar product, one federal court explained that "[t]he return—based on the increase, if any, in value of the homes in [the property's area]—is more akin to a **capital gain**, like the gain one would realize upon the sale of a stock that has increased in value." *Foster v. Equitykey Real Est. Invs. L.P.*, 2017 WL 1862527, at *4 (N.D. Cal. 2017) (emphasis added). Unlock may

eventually recognize a gain (or a loss) in connection with its investment – though, it is not guaranteed to do so – but it does not impose any interest that accumulates over time at any particular rate.

Second, the Consumer Financial Protection Bureau (the "CFPB") has not set an "average prime offer rate" for any transaction "comparable" to the FSEA. 15 U.S.C. § (b)(2)(B). Specifically, in computing the "average prime offer rate" for eight other transactions, the CFPB assumes that the transaction is "comparable" to a "fully amortizing loan" with monthly compounding interest.[10] The FSEA is not a "full amortizing loan" and Plaintiff does not contend otherwise. Without an "average prime offer rate" to serve as a guidepost, then the transaction cannot be considered a "high-cost" mortgage under TILA.

Third, assuming *arguendo* that, under the FSEA, Unlock was extending credit and charging interest, Plaintiff still cannot demonstrate that this transaction is a "high-cost" mortgage. As defined under TILA, a "high-cost" mortgage exists where "the annual percentage rate **at consummation of the transaction** will exceed by more than 6.5 percentage points . . . the average prime offer rate . . . for a comparable transaction[.]" 15 U.S.C. § 1602(bb)(1)(A)(i)(I) (emphasis added). Unlock's return

---

[10] *See generally* CFPB Announces Revised Methodology for Determining Average Prime Offer Rates | Consumer Financial Protection Bureau, https://www.consumerfinance.gov/about-us/newsroom/cfpb-announces-revised-methodology-for-determining-average-prime-offer-rates/, April 14, 2023.

on its investment, if any, is contingent on the future value of the Property at the time of a Settlement Event. In other words, even if Plaintiff's characterization of the FSEA was correct, she still cannot convincingly argue that the FSEA imposes an interest rate "at the time of consummation" in excess of the threshold in 15 U.S.C. § 1602(bb)(1)(A)(i)(I).

For at least these reasons, the FSEA cannot constitute a "high-cost" mortgage under TILA.

### D. The FSEA Is Not a "Reverse Mortgage."

In a final attempt to case the FSEA as being subject to TILA, Plaintiff takes a position that is inconsistent with her other arguments and argues that the exchange should be considered a "reverse mortgage." (SAC ¶¶ 116-18). To be a reverse mortgage under TILA and Reg. Z, a transaction must first be a form of "credit." Specifically, under Reg. Z, a reverse mortgage transaction means a nonrecourse consumer credit obligation in which:

> (1) A mortgage, deed of trust, or equivalent consensual security interest securing one or more advances is created in the consumer's principal dwelling; and
>
> (2) Any principal, interest, or shared appreciation or equity is due and payable (other than in the case of default) **only after**:
> > (i)    The consumer dies;
> > (ii)   The dwelling is transferred; or
> > (iii)  The consumer ceases to occupy the dwelling as a principal dwelling

12 C.F.R. § 1026.33(a) (emphasis added).

When previously opposing arbitration, Plaintiffs portrayed the FSEA as a "non-recourse reverse mortgage loan" in disguise. (*See* Dkt. No. 33 at p. 21). It is not. As made clear herein, Unlock's FSEA is not a debt, nor an extension of "credit." And that is a significant distinction, even if Plaintiffs refuse to acknowledge it. In a non-recourse reverse mortgage loan, a borrower still incurs a "debt" – meaning, she has agreed to pay back "a specific sum of money due by agreement." *See supra*. The fact that the debt is "non-recourse" merely means that a lender's remedy for non-payment is limited to foreclosure. *See* Restatement (Third) of Property (Mortgages) § 1.1 cmt. ("If personal liability is entirely excluded by the parties' agreement [under a non-recourse mortgage loan], the effect is to restrict the mortgagee's remedy for nonperformance to foreclosure of the mortgage."). Distinguishing the present exchange from a non-recourse reverse mortgage loan is the fact that Plaintiff has not incurred any "debt" by signing the FSEA.

An additional distinction, which Plaintiff appears to admit, the agreement has a ten-year term. Attempting to side-step the flaw in her argument, Plaintiff mistakenly claims that the FSEA's ten-year period constitutes a violation of TILA. (SAC ¶ 118). Not so. By definition, the FSEA cannot be considered a "reverse mortgage" **because** it has a ten-year period. *Id*., at § 1026.33(a)(2).

Finally, while Plaintiff avers the Property is her home (which is a requirement for a reverse mortgage), FSEAs were available for primary residences, second

homes, and even rental properties. (Ex. A [Unlock Decl.] at ¶ 14). Even if the property was originally identified as a primary residence, owners are free to use the property as a second home or even a rental property (Ex. A-1 [FSEA] at § 14.8; Ex. A [Unlock Decl.] at ¶ 15), which would customarily constitute a default under a reverse mortgage. The FSEA, by its overall design, thus fails that portion of the definition of a reverse mortgage transaction under the TILA and Reg. Z. 12 C.F.R. § 1026.33(a)(1).

### E. The FSEA Is Both an "Option" Contract and an "Investment Plan" – Neither of Which Are Forms of "Credit" Subject to TILA.

It is well established that "TILA . . . does not apply to all transactions." *Foster v. Equitykey Real Est. Invs. L.P.*, 2017 WL 1862527, at *3 (N.D. Cal. 2017). Even if Plaintiff could establish some characteristics of the FSEA that resemble a "residential mortgage loan" or "reverse mortgage," the transaction would still excluded from the definition of credit under TILA. In the comments to Reg. Z, the CFPB expressly observed, in relevant part, as follows:

> 1. **Exclusions**. The following situations are not considered credit for purposes of the regulation:
>
> * * * *
>
> vii. **The execution of option contracts**. However, there may be an extension of credit when the option is exercised, if there is an agreement at that time to defer payment of a debt.
>
> viii. **Investment plans in which the party extending capital to the consumer risks the loss of the capital advanced**. This includes, for example, an arrangement with a home purchaser in which the

> investor pays a portion of the downpayment and of the periodic mortgage payments in return for an ownership interest in the property, and shares in any gain or loss of property value.

12 C.F.R. Pt. 1026, Supp. 1, Subpt. A at cmt. 2(a)(14)(1)(vii), (viii) (emphasis added).

The court's treatment of the home equity contract at issue in *Foster v. Equitykey Real Est. Invs. L.P.*, 2017 WL 1862527 (N.D. Cal. 2017), is instructive. Somewhat similar to Unlock here, EquityKey paid $196,000 to purchase an option to participate in the property's appreciation, which was secured by a deed of trust securing performance obligations. 2017 WL 1862527, at *1-2. The plaintiff sued under TILA arguing EquityKey concealed the fact that the agreement was actually a loan. *Id.* at *2. Ultimately, the court disagreed.

In *Foster*, the court concluded that the home equity contract was "not a loan[,]" explaining that "Mr. Foster and Plaintiff (should he decide not to sell or transfer the property or otherwise breach the agreement) do not currently owe EquityKey any debt." *Id.* at *4. The court noted that "there [was] no guarantee that the payment received by [plaintiff] need ever be returned," considering EquityKey "[was] not obliged to exercise its option." *Id.* at *4-5. Analyzing EquityKey's options under the home equity contract, the court explained:

> In fact, if home prices decrease, it would have little reason to do so. If home values increase, but at a rate that is slower than inflation (or at a slower rate than the rate of return one could receive from a prudent investment of the option premium), then even if EquityKey calls the

> option, it would ultimately lose money on the deal. On the other hand, if Plaintiff elects to sell the Property, and home values in the area have increased, EquityKey can call its option and oblige Plaintiff to perform his duties under the terms of the agreement.

*Id.* at *5. Because the plaintiff "did not agree to 'repay **absolutely**,' " the option was "not a loan." *Id.* at *4 (quoting *In re Grand Union Co.*, 219 F.353, 356 (2d Cir. 1914)) (emphasis added).[11]

Additionally in *Foster*, the court noted that the contract also shared elements of an "investment plan" because the defendant "risked the loss of the capital it advanced," since a decrease in property value could cause it to lose money. *Id.* at *5. Though it would appear unlikely that EquityKey would lose money in the transaction, the court focused instead on the possibility, not the likelihood, that the investor would lose money:

> In the present transaction, EquityKey risked the loss of the capital it advanced. Though property values in the Bay Area have increased since 2010 in a manner that at times has seemed inevitable, the real estate market could have stagnated or declined (and indeed, the painful lessons of the recent economic past warn against assuming that housing prices will only increase). While a decrease in home values would not help Plaintiff today (as he would owe an early termination charge if he transferred the property before 2020), if housing prices are down in four

---

[11]   The need for an "absolute" obligation to pay echoes how other courts have analyzed whether a transaction constitutes a loan. *See Bradford v. Terry*, 2021 WL 6210714, at *5 (Tenn. Ct. App. 2021) (explaining that an agreement with an option to repurchase was not a debt because the obligation to repay was not "absolute" and observing that "[w]ithout a debt, there could [] be no claim under TILA"); *Johnson v. Washington*, 559 F.3d 238, 243 (4th Cir. 2009) (applying Virginia law, holding that "an option to repurchase is not an obligation to repurchase, and therefore does not constitute a debt . . . ").

years and Plaintiff sells the property at that time, then EquityKey would lose money on the deal.

*Id.* at *5. As explained by the court "there is no way to know **for certain** whether calling the option at the end of the 50-year term will be profitable for EquityKey, there is no way to know whether Plaintiff will **ever** be required to pay." *Id.* at *4.

Like the home equity contract in *Foster*, the FSEA is structured as both an "option" and "investment" contract. Accordingly, applying the CFPB's interpretations and commentary, the exchange cannot be treated as a form of "credit" subject to TILA.

   (i)  The FSEA Is an "Option" Contract.

The express terms of the FSEA establish the nature of the transaction as being an "option" contract. Turning to the Restatements, in the absence of a clear definition by the CFPB, an option contract is defined as "a promise which meets the requirements for the formation of a contract and limits the promisor's power to revoke an offer." RESTATEMENT (SECOND) OF CONTRACTS § 25. As explained by one New Jersey appellate court, "[a]n option contract has two elements: the underlying offer and the collateral promise to keep the offer open for a certain time." *Saadia Square LLC v. SM Logistics Member LLC*, 2022 WL 17844283, at *5 (N.J. Super. Ct. App. Div. 2022) (citing 1 WILLISTON ON CONTRACTS § 5:15 (4th ed.); RESTATEMENT (SECOND) OF CONTRACTS § 25).

Under the FSEA, Unlock agrees to pay a certain, negotiated amount in exchange for a contractual right – that is, the option to claim a negotiated investment interest in the property at the time of a "Settlement Event." (Ex. A-1 [FSEA] at p. 2). Upon a "Settlement Event," Unlock has the option to convert its investment into an ownership interest – at which point, Unlock can, as a fractional co-owner, facilitate the sale of the property. (*See id.* at § 5.5). A significant trait of this transaction, Unlock could also elect to extend the period or even take no further action concerning the property. (*See id.*).[12]

Tellingly, Plaintiff ignores that the FSEA is an "option contract" in her Second Amended Complaint. Multiple other courts have agreed that an "option contract" is not a loan or some other form of credit.[13] For that reason, the FSEA cannot be subject to TILA as it is excluded from the Act's definition of "credit."

(ii)    The FSEA Is an "Investment" Contract.

Not only does the FSEA share the defining characteristics of an "option" contract, but it also satisfies the CFPB's description of an "investment plan" that is

---

[12]  The owner is also granted certain options under the FSEA. At any time prior to the expiration of the FSEA's ten-year period, the owner may opt to sell the property or buy out Unlock's contractual rights. (Ex. A-1 [FSEA] at §§ 2, 3).

[13]  *See Foster v. Equitykey Real Est. Invs. L.P.*, 2017 WL 1862527, at *4-5 (N.D. Cal. 2017); *Saralegui v. Sacher, Zelman, Van Sant Paul, Beily, Hartman & Waldman, P.A.*, 19 So. 3d 1048, 1051 (Fla. 3d DCA 2009); *Olson v. Unison Agreement Corp.*, 2023 WL 5609251, at *2 (W.D. Wash. 2023).

excluded from TILA. Notably, the FSEA repeatedly and consistently refers to its initial payment to the owners as an "Investment Payment" which then entitles Unlock to a percentage interest in the property (called the "Unlock Percentage"), if it elects to claim that interest. (Ex. A-1 [FSEA] at *passim*). More importantly, the substance of the FSEA makes clear that Unlock's investment is at risk and contingent on the Property's future, albeit speculative, future value. In no uncertain terms, the parties agree that, "[a]s set forth herein, Unlock may lose all or a portion of the Investment Payment." (*Id.* at § 21.5). As defined by the comments to TILA's implementing regulation, Regulation Z, it does not cover an investment plan "in which the party extending capital to the consumer risks the loss of the capital advanced." 12 C.F.R. Pt. 1026, Supp. 1, Subpt. A at cmt. 2(a)(14)(1)(viii).

The FSEA is at risk because it is contingent on the local housing market's success and other macroeconomic forces. *See generally L'Arbalete, Inc. v. Zaczac*, 474 F. Supp. 2d 1314, 1325 (S.D. Fla. 2007) (holding a transaction was not usurious where it "represented a very speculative risk"). Within the ten-year period set forth in the FSEA, Plaintiff – and not Unlock – controls the timing of any settlement. Plaintiff could elect to sell the Property at any time, including when the housing market is in decline. Within the ten-year period, the owner can decide when to settle the FSEA, and based on the variation in real estate prices, Unlock's return is not

certain. Indeed, by granting the owner such options, the FSEA differs from many other home equity contracts.

In Plaintiff's case, the FSEA came with significant risks – even if Plaintiff refuses to acknowledge them. *See, e.g., Saralegui v. Sacher, Zelman, Van Sant Paul, Beily, Hartman & Waldman, P.A.*, 19 So. 3d 1048, 1051 (Fla. 3d DCA 2009) (reasoning a transaction is not indicative of a loan where repayment obligations are not absolute, but rather contingent upon the success of the underlying venture). Through the FSEA, Unlock essentially invested $115,062 in 2021 in exchange for an up-to 70% interest in a residential property that was currently the subject of a tax foreclosure sale.[14] That risk is borne by Unlock given that it is dependent upon the future value of a residence over which Unlock has no control. For these reasons, the FSEA cannot be considered a "residential mortgage loan" or a "reverse mortgage" subject to TILA's prohibition against arbitration.

## II.    THE FSEA'S MANDATORY ARBITRATION CLAUSE IS ENFORCEABLE.

Unlock seeks an Order from this Court compelling Plaintiff to arbitrate her claims against Unlock in accordance with the written arbitration provision included

---

[14]  Plaintiff concedes that she fell behind on her property taxes because she "had not realized how high her property tax obligations would be." (SAC ¶ 4). While the cost to redeem her property was $54,062, Plaintiff opted to receive an additional $57,548 in funds for a total of $111,610 from Unlock – effectively receiving over 40% of the value of the Property immediately in exchange for Unlock's right to a 70% interest in the Property after a 10-year period, capped by the Annualized Cost Limit.

at paragraph 20 of the FSEA and Section 4 Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.* (the "FAA"). The dispute between the parties here arise from the FSEA. That agreement contains clear and unmistakable language wherein the parties agreed to arbitrate any claims or disputes arising out of the transaction. The FSEA states as follows:

> OWNER AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH BENEFICIARY (INCLUDING ANY AFFILIATE, EMPLOYEE, OFFICER, DIRECTOR OF BENEFICIARY IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO, OR RESULTING FROM THE UNLOCK AGREEMENT OR THE PROPERTY, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES OF JAMS, THE RESOLUTION EXPERTS (THE "RULES"), AND, BECAUSE THIS AGREEMENT SUBSTANTIALLY AFFECTS INTERSTATE COMMERCE THE PARTIES AGREE THIS AGREEMENT, INCLUDING ITS ENFORCEMENT IS TO BE GOVERNED BY THE FEDERAL ARBITRATION ACT, 9 U.S.C. § 1, ET SEQ.

(Ex. A-1 [FSEA] at § 20.2). The FSEA further provides;

> Remedy. EXCEPT AS PROVIDED BY THE RULES AND THE UNLOCK AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN THE OWNER AND BENEFICIARY. REMEDIES THAT WOULD OTHERWISE BE AVAILABLE TO OWNER UNDER APPLICABLE FEDERAL, STATE OR LOCAL LAWS SHALL REMAIN AVAILABLE. THE ARBITRATOR WILL HAVE NO AUTHORITY TO AWARD PUNITIVE DAMAGES OR CONSEQUENTIAL DAMAGES. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND THE UNLOCK AGREEMENT, NEITHER THE OWNER NOR BENEFICIARY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

(*Id.* at § 20.4).

## A.    Law Regarding the FAA.

"The FAA federalizes arbitration law and 'creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate. . . .' " *John Hancock Mut. Life Ins. Co. v. Olick,* 151 F.3d 132, 136 (3d Cir. 1998) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)). Courts are authorized to compel arbitration "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4. Additionally, under Section 3 of the FAA, parties may "apply to a federal court for a stay of the trial of an action 'upon any issue referable to arbitration under an agreement in writing for such arbitration.' " *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010) (quoting 9 U.S.C. § 3).

When deciding a motion to compel arbitration, a court must ascertain whether "(1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement." *Aetrex Worldwide, Inc. v. Sourcing for You Ltd.*, 555 F. App'x 153, 154 (3d Cir. 2014) (quoting *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009)). To conduct this inquiry, the court shall apply "ordinary state-law principles that govern the formation of contracts." *Kirleis*, 560 F.3d at 160 (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

In determining whether a valid arbitration agreement exists, a court must first decide whether to use the Rule 12(b)(6) or Rule 56 standard of review. *See Sanford v. Bracewell & Guiliani, LLP*, 618 F. App'x 114, 117 (3d Cir. 2015). The Rule 12(b)(6) standard applies when arbitrability is "apparent, based on the face of a complaint, and documents relied upon in the complaint[.]" *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013) (internal quotation marks omitted). However,

> [w]here the complaint does not establish with clarity that the parties have agreed to arbitrate, or when the party opposing arbitration has come forward with reliable evidence that it did not intend to be bound by an arbitration agreement, a Rule 12(b)(6) standard is not appropriate because the motion cannot be resolved without consideration of evidence outside the pleadings, and, if necessary, further development of the factual record.

*Noonan v. Comcast Corp*, Civ. 2017 WL 4799795, at *4 (D.N.J. 2017) (citations omitted). In such circumstances, "the non-movant must be given a limited opportunity to conduct discovery on the narrow issue of whether an arbitration agreement exists." *Ross v. CACH, LLC*, 2015 WL 1499282, at *2 (D.N.J. 2015). Afterwards, "the court may entertain a renewed motion to compel arbitration, this time judging the motion under a [Rule 56,] summary judgment standard." *Guidotti*, 716 F.3d at 776.

**B.      The FSEA Contains a Valid, Enforceable Agreement to Arbitrate.**

The FAA states that written arbitration agreements entered into in connection

with "a contract evidencing a transaction involving commerce . . . shall be valid,

irrevocable, and enforceable, save upon such grounds as exist at law or in equity for

the revocation of any contract[.]" 9 U.S.C. § 2. When a party seeks to enforce an

arbitration agreement, it may request from the court "an order directing the parties

to proceed to arbitration in accordance with the terms of the agreement." *Id.* at § 4.

Consequently, the FAA grants courts the power to compel arbitration and to stay or

dismiss claims subject to a valid arbitration agreement. *Id.* at § 3.[15]

The FAA governs the Agreement which applies to the Plaintiff's claims. The

FAA applies to any written arbitration provision in "a contract evidencing a

transaction involving commerce." 9 U.S.C. § 2. The reach of the FAA extends to the

outermost limits of Congress's constitutional powers under the Commerce Clause.

U.S. Const. art. I, § 8, *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277

(1995). An arbitration agreement falls under the FAA if it is executed in connection

---

[15]  In light of recent guidance provided by the United States Supreme Court, this Court should typically stay an action (rather than dismiss it) upon entry of an order compelling the matter to arbitration. *See Smith v. Spizzirri*, 144 S.Ct. 1173 (May 16, 2024). However, under these circumstances, the Court must determine whether TILA applies to the FSEA to conclude that the agreement contains an enforceable arbitration clause. If the Court compels the parties to arbitration but also concludes that it lacks subject matter jurisdiction over the dispute, Unlock respectfully submits that it would be appropriate to dismiss this action (or possibly, remand), rather than impose a stay, while the parties arbitrate.

with a transaction that involves interstate commerce in any way, "even if the parties did not contemplate an interstate commerce connection." *Allied-Bruce Terminix Cos.*, 513 U.S. at 281.

The Agreement in this case is clearly in writing. The FSEA contains a clear and unambiguous arbitration provision entitled "Arbitration." (Ex. A-1 [FSEA] at § 20). Thus, the Court should apply a Rule 12(b)(6) standard in determining whether a valid arbitration agreement exists. *Guidotti*, 716 F.3d at 776.

In addition, the transaction in this case "involves interstate commerce" within the meaning of the FAA for several reasons. First, as Plaintiff acknowledges in her allegations, she is a citizen of the State of New Jersey and Unlock is a foreign corporation authorized to conduct business in New Jersey. Second, the Arbitration Provision itself provides that it is governed exclusively by the FAA. (*See* Ex. A-1 [FSEA] at § 20). *See Palm Court NH, L.L.C. v. Dowe*, 336 So. 3d 735, 738 (Fla. 4th DCA 2022) ("[T]he parties clearly contemplated governance by the FAA because the arbitration agreement explicitly stated the FAA applied."). The parties' agreement that the FAA controls is binding.

## C. The Claims in the SAC Fall within the Scope of the Parties' Arbitration Agreement.

Once it is established that the parties have entered into an arbitration agreement, the next question is whether the dispute falls within the parties' agreement. *Aetrex Worldwide, Inc. v. Sourcing for You Ltd.*, 555 F. App'x 153, 154

(3d Cir. 2014). New Jersey courts favor arbitration as a means of resolving disputes, embracing the federal policy preferring this method of alternative dispute resolution. *Curtis v. Cellco Partnership,* 413 N.J. Super. 26, 34 (App.Div. 2010). Because of the favored status afforded to arbitration, "[a]n agreement to arbitrate should be read liberally in favor of arbitration." *Id.*

Arbitration of statutory claims is enforceable when the contract provisions "(1) contain language reflecting a general understanding of the type of claims included in the waiver; or (2) provide that, by signing, the consumer agrees to arbitrate all statutory claims arising out of the relationship, or any claim or dispute based on a federal or state statute." *Id* at 35 – 36 (internal quotations omitted).

Here, the arbitration agreement is valid and binding insofar as it is "sufficiently clear, unambiguously worded, satisfactorily distinguished from the other Agreement terms, and drawn in suitably broad language to provide a consumer with reasonable notice of the requirement to arbitrate all possible claims arising under the contract. *Curtis,* 413 N.J. Super. at 33. The arbitration agreement is included in a separate header within the FSEA and is the only provision in ALL CAPS. (*See* Ex. A-1 [FSEA] at § 20). The provision is quite broad in scope, applying to "ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES . . . ARISING OUT OF, RELATING TO, OR RESULTING FROM THE UNLOCK AGREEMENT OR THE PROPERTY . . . " (*Id.*)

The statutory claims asserted in the Amended Complaint all arise out of, relate to or result from the FSEA. Plaintiff's claims assert direct challenges to some of the provisions of the FSEA, its enforceability and validity and whether Unlock's offering of the exchange violated state and federal law. Thus, the claims arise out of, relate to or result from the FSEA and fall within the broad scope of the arbitration provision contained therein.

CONCLUSION

For the reasons stated above, Defendant Unlock Partnership Solutions AO1, Inc., respectfully requests that the Court grant its Motion to Compel Arbitration and grant such other and further relief, including without limitation granting a stay of the present action or dismissing the action in its entirety and without prejudice for lack of subject matter jurisdiction, as may be appropriate.

May 5, 2025

UNLOCK PARTNERSHIP SOLUTIONS
AO1 INC.,
*By Counsel*,

*/s/ Jason R. Lipkin, Esq.*
Jason R. Lipkin, Esquire
Alexander R. Green, Esquire
  (admitted *pro hac vice*)
MCGLINCHEY STAFFORD PLLC
112 West 34th Street, Suite 1515
New York, NY 10120
T: (646) 362-4048
F: (646) 224-9487
E: jlipkin@mcglinchey.com
agreen@mcglinchey.com

Andrew K. Stutzman, Esquire
Christopher A. Reese, Esquire
STRADLEY RONON STEVENS & YOUNG, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103
T: (215) 564-8000
F: (215) 564-8120
E:  astutzman@stradley.com
creese@stradley.com


*Attorneys for Defendant Unlock Partnership Solutions AO1 Inc.*