UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANGELA ROBERTS,<br>*Plaintiff*,<br>-against-<br>UNLOCK PARTERNSHIP SOLUTIONS AOI, INC., CLEAR EDGE TITLE INC., ABC INC 1-10, AND JOHN DOE 1-10,<br>*Defendants*. | ORAL ARGUMENT REQUESTED<br><br>Case No.: 24-cv-01374-CPO-AMD |

# CORRECTED MEMORANDUM OF LAW IN OPPOSITION TO UNLOCK'S MOTION TO COMPEL ARBITRATION

EDWARD HANRATTY
LAW OFFICE OF EDWARD HANRATTY
57 W. Main Street
Freehold, NJ 07728
(732) 866-6655
*thanratty@centralnewjerseybankruptcylawyer.com*

THOMAS SCOTT-RAILTON
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*thomas@guptawessler.com*

June 26, 2025

*Counsel for Plaintiff*

# TABLE OF CONTENTS

Table of authorities ..... iii

Introduction ..... 1

Statement of the case ..... 3

- A. Ms. Roberts, in a moment of financial distress, is trapped in Unlock's product ..... 3
- B. Unlock's product is an advance of money in exchange for a future payment obligation secured by a mortgage ..... 4
- C. Unlock structured its product to guarantee a profit, independent of the ups and downs of the housing market ..... 6
- D. Unlock touts its guaranteed returns to investors ..... 8
- E. Procedural background ..... 8

Legal standard ..... 9

Argument ..... 9

- I. The Truth in Lending Act prohibits the mandatory arbitration clause in Ms. Roberts's residential mortgage loan contract ..... 10
  - A. Unlock's product is a residential mortgage loan under the plain text of TILA ..... 10
  - B. Unlock's arguments about "loans" in other contexts can't supplant TILA's definition of "credit," nor are they correct ..... 20
  - C. Agency commentary doesn't trump statutory text, nor does it apply to Unlock ..... 26
- II. The arbitration clause is unconscionable under New Jersey law ..... 30
  - A. The subject matter increases unconscionability concerns ..... 31
  - B. There was severe procedural unconscionability ..... 31

C. The dispute resolution provisions are riddled with substantively unconscionable terms ........ 34

D. The arbitration clause is unenforceable as a whole ........ 37

III. Ms. Roberts's claims aren't covered by the arbitration clause ........ 38

Conclusion ........ 40

# TABLE OF AUTHORITIES

## Cases

*Achey v. Cellco Partnership*,
293 A.3d 551 (N.J. Super. Ct. App. Div. 2023) .......... 37, 38

*Alexander v. Anthony International, L.P.*,
341 F.3d 256 (3d Cir. 2003) .......... 37, 38

*Atalese v. U.S. Legal Services Group, L.P.*,
99 A.3d 306 (N.J. 2014) .......... 38, 39, 40

*Bank of America National Trust & Savings Association v. 203 North LaSalle Street Partnership*,
526 U.S. 434 (1999) .......... 15

*Block v. Longstreet*,
2007 WL 4472122 (N.J. Sup. Ct. App. Div. Dec. 24, 2007) .......... 31, 32

*Bradford v. Terry*,
2021 WL 6210714 (Tenn. Ct. App. 2021) .......... 20

*Burgess v. United States*,
553 U.S. 124 (2008) .......... 21

*Burnett v. Ala Moana Pawn Shop*,
3 F.3d 1261 (9th Cir. 1993) .......... *passim*

*Cole v. U.S. Capital*,
389 F.3d 719 (7th Cir. 2004) .......... 14

*Delta Funding Corp. v. Harris*,
912 A.2d 104 (N.J. 2006) .......... 34, 36

*Disabled in Action of Pennsylvania v. Southeastern Pennsylvania Transportation Authority*,
539 F.3d 199 (3d Cir. 2008) .......... 15

*Downey v. Pennsylvanie Department of Corrections*,
968 F.3d 299 (3d Cir. 2020) .......... 11

*Estate of Ruszala ex rel. Mizerak v. Brookdale Living Communities, Inc.*,
1 A.3d 806 (N.J. Sup. Ct. App. Div. 2010) .......................................... 31, 34, 35

*Ford Motor Credit Co. v. Cenance*,
452 U.S. 155 (1981) .......................................................................................... 14

*Foster v. Equitykey Real Estate Investments L.P.*,
2017 WL 1862527 (N.D. Cal. 2017) ................................................................... 28

*Fowler v. Equitable Trust Co.*,
141 U.S. 384 (1891) .......................................................................................... 22

*Garfinkel v. Morristown Obstetrics & Gynecology Associates, P.A.*,
773 A.2d 665 (N.J. 2001) ................................................................................... 39

*Hojnowski v. Vans Skate Park*,
901 A.2d 381 (N.J. 2006) ............................................................................. 35, 36

*Hughes v. TD Bank, N.A.*,
856 F. Supp. 2d 673 (D.N.J. 2012) ..................................................................... 17

*In re Hawaii Island Air, Inc.*,
2023 WL 4785508 (9th Cir. 2023) ..................................................................... 16

*Island Leasing, LLC v. Kane*,
2020 WL 6326101 (D. Haw. 2020) .................................................................... 16

*Johnson v. Novastar Mortgage, Inc.*,
698 F. Supp. 2d 463 (D.N.J. 2010) ..................................................................... 26

*Johnson v. Washington*,
559 F.3d 238 (4th Cir. 2009) .............................................................................. 20

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) .......................................................................................... 26

*Moon v. Breathless Inc.*,
868 F.3d 209 (3d Cir. 2017) ................................................................... 38, 39, 40

*Muhammad v. County Bank of Rehoboth Beach, Delaware*,
912 A.2d 88 (N.J. 2006) ....................................................................... 31, 32, 34

*NAACP of Camden County East v. Foulke Management Corp.*,
24 A.3d 777 (N.J. Sup. Ct. App. Div. 2011) .............................................. 34, 37

*Nino v. Jewelry Exchange, Inc.*,
609 F.3d 191 (3d Cir. 2010)..................................................................*passim*

*Pace v. Hamilton Cove*,
317 A.3d 477 (N.J. 2024) ................................................................31, 32, 34

*Parilla v. IAP Worldwide Services, VI, Inc.*,
368 F.3d 269 (3d Cir. 2004).......................................................... 35, 36, 37

*Roman v. Bergen Logistics, LLC*,
192 A.3d 1029 (N.J. Sup. Ct. App. Div. 2018)...........................................35

*Rossman v. Fleet Bank (R.I.) National Association*,
280 F.3d 384 (3d Cir. 2002) .........................................................12, 23, 30

*Scott v. Lloyd*,
34 U.S. 418 (1835) ......................................................................................... 22

*Singhal v. Unison Agreement Corp.*,
2023 WL 2734230 (S.D. Fla. 2023).............................................................. 30

*Smith v. Berryhill*,
587 U.S. 471 (2019) .......................................................................................... 11

*Vallies v. Sky Bank*,
2007 WL 2492730 (W.D. Penn. 2007).........................................14, 19, 21

*Zaman v. Felton*,
98 A.3d 503 (N.J. 2014).............................................................. 20, 25, 28

**Statutes**

15 U.S.C. § 1602 ...........................................................................................*passim*

15 U.S.C. § 1639c...........................................................................10, 17, 20

N.J.S.A. § 12A:9-502.......................................................................................... 4

N.J.S.A. § 17:11C-52......................................................................................... 31

N.J.S.A. § 2A:50-54 .......... 31

N.J.S.A. § 31:1-1(a) .......... 5

**Other authorities**

12 C.F.R. pt. 226, Supp. I, Subpt. A, cmt. 2 .......... 26, 29

48 Buckeye Lane,
*Redfin* (last accessed June 12, 2025) .......... 5

*Comment for 1026.33 - Requirements for Reverse Mortgages*,
CFPB, cmt. 33(a)(2)(2) .......... 18

Deborah Rankin, *Why Shared Mortgages Are Hard to Get*,
N.Y. Times, Apr. 18, 1982 .......... 29

Debt,
*American Heritage Dictionary* (5th ed. 2022) .......... 11, 13, 19

*Debt*,
Black's Law Dictionary (12th ed. 2024) .......... 12, 15, 19

Debt,
*Merriam-Webster* .......... 11

Debt,
*Oxford English Dictionary* (1980) .......... 11

*FAQ*,
Unlock .......... 20

Investment,
*American Heritage Dictionary* (5th ed. 2022) .......... 29

*Investment*,
Black's Law Dictionary (12th ed. 2024) .......... 29

N.J.A.C. § 3:1-1.1 .......... 5

Option,
*American Heritage Dictionary* (5th ed. 2022) .......... 27

Option,
*Merriam-Webster* .......................................................................................... 27

*Pecuniary*,
Black's Law Dictionary (12th ed. 2024) ..........................................................12

## INTRODUCTION

For many Americans, their home is their financial anchor. A person's home is often the product of years of savings, a source of stability when times get tough, and the primary legacy they will leave to their children. For that reason, state and federal laws create strong protections for homeowners when they use their homes as security for payment obligations. And these laws were further strengthened after the 2008 financial crisis, which exposed the dangers of complex mortgage products with risks that homeowners do not adequately understand. Such safeguards are crucial for homeowners. But they also limit some of the most lucrative predatory practices. As a result, some companies continually seek out ways to evade these rules, designing increasingly complex products that they claim are exempt from these legal protections for homeowners.

Unlock is one such company. It has designed a complex mortgage product that poses greater risks than more traditional mortgages, but purports to be exempt from laws protecting homeowners. Unlock then ensnares homeowners who managed to build up equity in their homes but are in financial distress.

That is the situation for Angela Roberts, a single mother caring for a son with a disability. Facing imminent foreclosure and desperate to save her home, she accepted an advance from Unlock. What Ms. Roberts didn't realize was that under

Unlock's contract, within 10 years or less of signing, she must pay Unlock far more money than she received, at an illegal rate of interest.

Unlock gave Ms. Roberts an advance of about 44% of the value of her home. In return, she must pay Unlock up to 70% of the value of her home within 10 years. The only limit is that Unlock can't get more than its initial payment plus 18% annual compound interest, which is still three times the legal rate. As a practical matter, this guarantees that Ms. Roberts will pay Unlock far more than she received. Just like any other mortgage loan, this contract is secured by a mortgage. And even though the whole point was to save her home, Unlock will force Ms. Roberts to sell her home unless she can come up with tens of thousands of dollars that she doesn't have.

To escape this financial straitjacket, Ms. Roberts brought this suit. Unlock, however, is now trying to force her into arbitration. That request should be denied for three independent reasons. *First*, under the Truth in Lending Act, a residential mortgage loan cannot include a mandatory arbitration requirement. And Unlock's product is a residential mortgage loan under the plain text of TILA. *Second*, the arbitration clause here is procedurally and substantively unconscionable. This was a take-it-or-leave-it contract of adhesion; the parties' bargaining positions were highly unequal; Ms. Roberts was under serious economic compulsion; and the arbitration provisions are convoluted, confusing, and full of substantively unconscionable terms. And *third*, Ms. Roberts's claims are not within the scope of the arbitration provisions.

## STATEMENT OF THE CASE

### A. Ms. Roberts, in a moment of financial distress, is trapped in Unlock's product.

In 2015, Ms. Roberts purchased a home in Willingboro, New Jersey. Dkt. 79 ¶ 6.[1] With her savings, Ms. Roberts was able to buy her home free and clear, without any mortgage. *Id.* ¶ 7. This was the first time she had ever owned her own home, and she was proud to have become a homeowner. *Id.* ¶ 8. As a single parent, she hoped that homeownership would provide financial security. *Id.* ¶¶ 8, 22. However, as a first-time homeowner, Ms. Roberts had not realized how much she would owe in property taxes. *Id.* ¶ 9. Her customer service job didn't pay enough to cover property taxes on top of providing for herself and her disabled son. *Id.* ¶¶ 9, 22.

As a result, by 2021, she was facing imminent foreclosure unless she could pay $54,062 dollars. *Id.* ¶¶ 11–13. Her situation was especially dire because under New Jersey law at the time, she would have forfeited all excess proceeds from the foreclosure sale. *Id.* ¶ 13. This would have been a financial catastrophe for her, resulting in the loss of all of the savings she had invested in her home. *Id.*

In desperate need of money, Ms. Roberts searched online for home equity loans and found Unlock's product. *Id.* ¶ 15. She applied and filled out the paperwork Unlock required. *Id.* ¶¶ 15–16. Several of these documents described Unlock as the

---

[1] Unless otherwise noted, all internal quotation marks, citations, alterations, brackets, and ellipses have been omitted from quotations throughout this brief.

"lender" and "First Mortgagee," Ms. Roberts as the "borrower," and the product as a "Loan." *Id.* ¶¶ 79–82. Unlock then required Ms. Roberts to sign a 59-page contract titled "Forward Sale and Exchange Agreement." Dkt. 79-1 at 1. Unlock also recorded a mortgage on Ms. Roberts's home. The mortgage states that it "is a security agreement and financing statement under the New Jersey Uniform Commercial Code." Dkt. 79-2 at 4.[2] Under the New Jersey Uniform Commercial Code, a financing statement records the security provided by a "debtor." N.J.S.A. § 12A:9-502. The mortgage thus refers to Ms. Roberts as "the owner/debtor." Dkt. 79-2 at 4.

Ms. Roberts accepted an advance of $111,610, which she thought was a loan she would be able to pay back in a few years. Dkt. 79 ¶ 23. What she didn't realize is that in the space of 10 years or less, she would be forced to pay Unlock tens of thousands of dollars more than it loaned her. *Id.* ¶¶ 8, 27–29. And if Ms. Roberts cannot come up with this money, Unlock will force her to sell her home to do so. *Id.* ¶ 30.

### B. Unlock's product is an advance of money in exchange for a future payment obligation secured by a mortgage.

Unlock gave Ms. Roberts an advance worth approximately 44% of the value of her home on the condition that in 10 years or less, she must pay Unlock 70% of the home's value. Here's how it worked:

*First,* Unlock gave Ms. Roberts an advance payment of $111,610. Dkt. 79-1 at 2.

---

[2] When text in documents is in all capital letters, capitalization is omitted from the quotation.

This was equivalent to approximately 44% of the appraised value of the home minus an opaque $3,451.86 "Origination Fee." *Id.*

*Second,* Unlock's contract requires Ms. Roberts to repay Unlock in 10 years or less. *Id.* at 5 § 1.8.2(a). The contract accomplishes this by mandating payment upon the first of four "Settlement Event[s]": (1) Ms. Roberts selling her home; (2) her choosing to repay Unlock; (3) her passing away; or (4) the expiration of a 10-year term. Upon a "Settlement Event," Unlock receives a 'Settlement Payment.'" *Id.* at 5 § 1.8.1(e). The "Settlement Payment" primarily consists of the "Unlock Share," which is 70% of the value of Ms. Roberts's home, capped at the initial advance amount plus 18% annual compound interest (along with any additional "Unpaid Owner Obligations"). *Id.* at 2; 5 §§ 1.8(c), 1.8.1(e); 20–21 § 10.1.[3] That's three times the rate permitted by New Jersey law. *See* N.J.S.A. § 31:1-1(a); N.J.A.C. § 3:1-1.1.

To illustrate, if a Settlement Event happened today, Ms. Roberts would be required to pay Unlock approximately $202,525. That is because, as of June 12, 2025, the value of Ms. Roberts's home is approximately $436,000.[4] A 70% share of that amount is $305,200. Because Unlock's return is capped at 18% annual compound interest, it would receive around $202,525—over $90,000 more than its advance.

[3] Unlock calls this the "Annualized Cost Limit" and claims it is not an interest rate, but the formula for the Annualized Cost Limit is just the formula for compound interest. Dkt. 79 ¶ 26 n.2.

[4] 48 Buckeye Lane, *Redfin* (last accessed June 12, 2025), https://www.redfin.com/NJ/Willingboro/48-Buckeye-Ln-08046/home/36042326.

That far exceeds what Ms. Roberts expected to pay or is able to pay without selling her home. Dkt. 79 ¶ 29. And, given that the payment will only increase, the same will be true in a little over six years from now, when it comes due. Being forced to sell her home would be a personal and financial disaster for Ms. Roberts. *Id.* ¶ 32. She did not understand that this would be the result of signing this contract with Unlock, and if she had known, she never would have done it. *Id.* ¶ 35.

*Third*, Unlock's future payment is secured by a mortgage on Ms. Roberts's home, giving Unlock the right to foreclose on Ms. Roberts's home if she fails to pay or violates any of the terms of its contract. Dkt. 79-2 at 7–8, 11–12. But in entering the contract, Unlock isn't becoming co-owner of the home, nor does it assume the responsibilities of co-ownership. Instead, Ms. Roberts must cover all such costs, including taxes, repairs, and an insurance policy that also covers Unlock. *See, e.g.*, Dkt. 79-1 at 6–7 § 1.9. Otherwise, Unlock can foreclose or make "protective advances," which accrue interest and must be paid back. *Id.* at 30–31 § 17.12.

### C. Unlock structured its product to guarantee a profit, independent of the ups and downs of the housing market.

Unlock has deliberately structured its product to ensure that its future payment will be far larger than the advance it paid, independent of the housing market. The primary way it did so is by requiring Ms. Roberts to pay Unlock a far greater percentage of the value of her home (70%) than it advanced (44%). Dkt. 79 ¶

55.[5] For Unlock's repayment to drop below its advance, Ms. Roberts's home would need to drop in value by 39% from its initial appraised value. *Id.*[6]

Federal data going back a half-century shows that the average home price in New Jersey has never fallen that far. *Id.* ¶ 59. The worst drop was during the 2008 financial crisis, where it still only fell 22%. *Id.*[7] In other words, Unlock will be repaid in full unless there is a catastrophic crash nearly twice as bad as the worst crash in modern history—a crash in which other mortgage lenders would also see widespread losses, as they did in 2008. *Id.* ¶¶ 60–61.

And it's exceedingly unlikely that Ms. Roberts would sell in such a crash anyway. Since her savings are invested in the house, she would have the least incentive to sell at that time. *Id.* ¶ 69. Additionally, Unlock designed its contract to enable it to effectively scuttle a sale at a disadvantageous time. *Id.* ¶ 70.

Unlock further guarantees its profits by using sophisticated models to target specific areas and homes that are most likely to rise in value. *Id.* ¶ 64. Unlock also charges thousands in opaque fees. *Id.* ¶ 57. Finally, at the time of sale, Ms. Roberts

---

[5] For brevity's sake, Ms. Roberts will generally refer to Unlock's payment of 70% of the home's value without mentioning the cap each time. The cap also makes no substantive change to the arguments here, since when the cap applies, Unlock is by definition receiving its initial payment *plus* 18% annual compound interest.

[6] 70% of the home's value will only be less than Unlock's initial payment if the house—initially appraised at $263,000—drops to less than $159,442—a 39% drop. *Id.*

[7] The United States as a whole saw a drop of only 19%, while Burlington County where Ms. Roberts lives saw a drop of 24%. *Id.*

must cover what will be tens of thousands of dollars in closing costs. Dkt. 79-1 at 6 § 1.8.3, 55. That further ensures Unlock only sees profits from the sale.

### D. Unlock touts its guaranteed returns to investors.

Locking homeowners into these mortgages is only the first step in Unlock's business model. After that, it bundles and securitizes these mortgages and sells them to investors. Dkt. 79 ¶ 95. And while Unlock argues in court that it risks not being paid back if the housing market drops, it presents a different face to investors. It touts that: "Embedded downside protection in [its] product structure allows for stable returns across various housing cycles" and that its "returns are uncorrelated with broader markets and inflation-protected." *Id.* ¶¶ 73–74.

Reflecting this, Unlock's security offerings have been exceedingly lucrative, selling for $197 million and $224 million. *Id.* ¶ 96. Unlock tells its investors that there is "$9+ Trillion" in home equity that is currently "untapped"—in other words, in the hands of the homeowners who paid for it. *Id.* ¶ 97. And despite Unlock's assertion that it is not engaged in mortgage lending, its 2023 security offering was awarded the "Residential Mortgage Backed Security of the Year." *Id.* ¶ 98.

### E. Procedural background

To try to escape this financial trap, Ms. Roberts brought suit in New Jersey Superior Court. *Id.* ¶ 1. Unlock removed to this Court and then moved to compel arbitration. *Id.*; Dkt. 26. This Court requested briefing on the statute of limitations

for Ms. Roberts's TILA claims. After a hearing, the Court granted Ms. Roberts leave to file a second amended complaint. Following that, Unlock filed a new motion to compel arbitration. Dkt. 80.

## LEGAL STANDARD

When a motion to compel arbitration can be decided based on "the face of a complaint, and documents relied upon in the complaint," it is evaluated under Rule 12(b)(6)'s standard, "accepting all factual allegations as true and construing the complaint in the light most favorable to the plaintiff." *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013). However, "if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing." *Id.* The court then evaluates the motion "under a summary judgment standard." *Id.*

## ARGUMENT

Unlock's motion should be denied for three independent reasons, any of which is sufficient. *First*, under the Truth in Lending Act, residential mortgage loans like Unlock's cannot require mandatory arbitration. *Second*, Unlock's contract is unconscionable and unenforceable under New Jersey law. *Third*, Ms. Roberts's claims do not fall within the scope of the arbitration clause.

## I. The Truth in Lending Act prohibits the mandatory arbitration clause in Ms. Roberts's residential mortgage loan contract.

Under TILA, "[n]o residential mortgage loan … may include terms which require arbitration." 15 U.S.C. § 1639c(e)(1). And "[n]o provision of any residential mortgage loan … shall be applied or interpreted so as to bar a consumer from bringing an action in … court [based on] any alleged violation of … Federal law." *Id.* § 1639c(e)(3). Unlock's product is a residential mortgage loan under TILA's plain text. As a result, Unlock cannot force Ms. Roberts to arbitrate.

### A. Unlock's product is a residential mortgage loan under the plain text of TILA.

TILA defines a "residential mortgage loan" broadly as "any consumer credit transaction … secured by a mortgage … on a dwelling." 15 U.S.C. § 1602(dd)(5). It is undisputed that Unlock's contract is secured by a mortgage on Ms. Roberts's dwelling. *See* Dkt. 79-2. So the only question, then, is whether it is a "consumer credit transaction." It is. A "consumer credit transaction" is one in which: (1) "credit is offered or extended" to (2) "a natural person," and (3) "the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1602(i). Only the first criterion—whether Unlock's product is "credit"—is disputed here, and it is amply satisfied.[8]

[8] Ms. Roberts is plainly a natural person, and her home—the "property" that is "the subject of the transaction" here—is for "personal," "family," or "household

**1.** "Every exercise of statutory interpretation begins with the plain language," and "[w]here the statutory language is plain and unambiguous, further inquiry is not required." *Downey v. Penn. Dep't of Corr.*, 968 F.3d 299, 306 (3d Cir. 2020). To start, TILA's broad reference to "*any* consumer credit transaction," 15 U.S.C. § 1602(dd)(5) (emphasis added), indicates that this definition must be read "expansively," *Smith v. Berryhill*, 587 U.S. 471, 479 (2019).

TILA also defines the term "credit" broadly. Credit is "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). The term "debt" is not defined, so courts "look to dictionary definitions to determine the ordinary meaning of [the] word." *Downey*, 968 F.3d at 306. In ordinary English, a "debt" is "[s]omething owed, such as money, goods, or services" or "[a]n obligation or liability to pay." Debt, *American Heritage Dictionary* (5th ed. 2022); Debt, *Oxford English Dictionary* (1980) ("something owed by one person to another"); Debt, *Merriam-Webster*, https://perma.cc/8XAV-8XHF ("something owed"). As a result, "the right granted by a creditor to a debtor to defer payment of debt," 15 U.S.C. § 1602(f), means the right to defer payment of "something owed."

Black's Law Dictionary further supports this reading. It defines "debt" as a "liability on a claim," "a specific sum of money due by agreement," or "[a]

---

purposes." Dkt. 79 ¶¶ 6, 104. The same is true for the "money" she received, which she used primarily to save her home from foreclosure. *Id.* ¶ 31.

nonmonetary thing that one person owes another, such as goods or services." Debt, *Black's Law Dictionary* (12th ed. 2024). A "liability" is "[a] financial or pecuniary obligation in a specified amount," Liability, *Black's Law Dictionary*, and a "pecuniary" obligation is one "relating to, or involving money," Pecuniary, *Black's Law Dictionary* (12th ed. 2024). Black's also includes "nonrecourse debt" as a kind of debt, where "a creditor can collect only on the collateral securing the debt"—meaning the amount the creditor recovers varies with the collateral's value. Debt, *Black's Law Dictionary*. There's also "contingent debt": "A debt that is not presently fixed but that may become fixed in the future with the occurrence of some event." *Id.*

And if there were any ambiguity or differences in the breadth of these definitions, TILA's definitions of credit and debt must be construed "liberally in favor of the consumer." *Rossman v. Fleet Bank (R.I.) Nat'l Ass'n*, 280 F.3d 384, 394 (3d Cir. 2002); *see also Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993). This ensures companies cannot "circumvent" their statutory "obligations" through "strategic" product structures. *Rossman*, 280 F.3d at 392, 399.

**2.** Unlock's product grants Ms. Roberts "the right … to defer payment of debt." In the words of Unlock's own contract, "[t]he 'Unlock Share'" that Ms. Roberts must pay "is the dollar amount that Unlock will receive for its [70%] percentage of the Property's Sharable Value." Dkt. 79-1 at 2, 5 § 1.8.1(c). And Unlock "waive[s] … its right to receive the Unlock Share until the occurrence of a

Settlement Event." *Id.* at 3 § 1.3.4. In other words, Unlock gave Ms. Roberts an advance and then deferred her obligation to pay Unlock 70% of the home's value for 10 years (unless a settlement event occurs even sooner). Dkt. 79 ¶¶ 52–53.[9]

Given this, there can be no serious question that Ms. Roberts has deferred the payment of "something owed." Debt, *American Heritage Dictionary*. Within 10 years of the date she entered the contract, it is *unavoidable* that Ms. Roberts *will* have to pay Unlock 70% of the value of her home. If that's not debt, any payday lender in the country could evade TILA by giving someone 44% of their paycheck for a future payment of 70% of their paycheck.

Nevertheless, Unlock claims that "there is no 'Settlement Event' that requires Plaintiff to make a payment to Unlock to buy out Unlock's interest or settle with Unlock." Unlock Br. 19. It also asserts that the contract "impose[s] obligations on a property owner" only "[i]n some rare circumstances," and that these obligations are "contingent" and "optional." *Id.* 13–14. None of these assertions are correct.

All of the Settlement Events *require* Ms. Roberts to pay Unlock 70% of the value of her home: (1) with a sale, Ms. Roberts must pay Unlock 70% of the sale price; (2) with an owner buyout, she must pay Unlock 70% of the home's value; (3) if she

[9] Unlock also invokes (at 18) the possibility that a homeowner could go through a complex and onerous process to try to offset her payment by the value of home improvements. Dkt. 79-1 at 14–16 § 7.1. But as a practical matter, that doesn't make a difference as to whether Unlock gets repaid or not. You'd still need a scenario where the home's pre-improvement value dropped a catastrophic amount.

dies, this triggers payment through essentially the same methods as a buyout or sale; and (4) if the 10-year term expires, this again triggers payment through essentially the same methods. Dkt. 79 ¶ 53.[10] And if she defaults, Unlock can foreclose to get its payment. Dkt. 79-1 at 6 § 1.8.2(b)(i); *id.* at 28–30 § 17.

Unlock's argument seems to rely on the fact that if the Settlement Event is a sale, Unlock has structured the payment in a slightly more complex way: Ms. Roberts can either pay Unlock directly; or at the time of the sale, when her house is put into escrow, she can deed Unlock 70%, which the escrow agent then pays Unlock from the proceeds of the sale. Dkt. 79-1, at 9 § 2.2, 2.3. Unlock calls this "Conversion." *Id.* Either way, Ms. Roberts must pay Unlock the same amount of money.[11]

TILA also does not "elevate superficial form over meaningful substance." *Vallies v. Sky Bank*, 2007 WL 2492730, at *4 (W.D. Penn. 2007) (citing *Rossman*, 280 F.3d at 390); *see also, e.g.*, *Cole v. U.S. Cap.*, 389 F.3d 719, 726–27 (7th Cir. 2004) (compiling cases). Instead, courts must look to the "economic substance" of the transaction. *Burnett*, 3 F.3d at 1262 (citing *Ford Motor Credit Co. v. Cenance*, 452 U.S. 155, 157–58 (1981)).

---

[10] Unlock claims that when a sale is impending, it also "has the right to 'make an offer in writing to purchase the Property.'" Unlock Br. 18 (quoting Dkt. 79-1 § 2.1(i)). But this is a rare contingency that only arises if the owner is planning on selling the home for a price that "differs materially from the market value of the Property." Dkt. 79-1 § 2.1(i). And even then, the owner is not required to accept this offer. *Id.*

[11] In the case of death or expiration of the 10-year term, if Ms. Roberts doesn't pay Unlock directly or sell her home first, Unlock exercises its right to "Conversion" and forces the sale to receive payment from the proceeds, Dkt. 79-1 at 12–13 § 4.7, 13 § 5.5—which Unlock admits (at 8) is "essentially the same" as a sale or owner buyout.

Here, the economic substance is that Ms. Roberts is required to pay Unlock the same amount—whether she pays Unlock directly in cash or by authorizing the escrow agent to pay Unlock out of the proceeds of the sale. Indeed, even Unlock (at 8) acknowledges that "Conversion" is just a means to receive its "percentage of proceeds of [the] sale." And Unlock's argument would allow any payday lender to escape regulation if the borrower must either pay in cash or sign over the same amount from her paycheck.

This makes sense. Making homeowners pay Unlock is its whole business model. It would come as a real surprise to the investors who have purchased hundreds of millions of dollars of securitized mortgages from Unlock if the company did not require homeowners to pay the company except in "rare circumstances."

**3.** If any more were needed, "the broader context of the statute as a whole" confirms that Unlock's product is credit. *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 210 (3d Cir. 2008). TILA's definition of credit covers a vast range of payment obligations with different features, including payment in the form of equity in the home that will accordingly vary with the value of the home.

TILA expressly covers "nonrecourse" credit, 15 U.S.C. § 1602(cc), which "requires the [creditor] to look only to the Debtor's collateral for payment," *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 438 n.3 (1999); Debt, *Black's Law Dictionary* ("nonrecourse" obligation is "[d]ebt for which the borrower is

*not personally liable*, so that a creditor can collect *only* on the collateral securing the debt" (emphases added)). The amount the creditor can recover will thus vary with the value of the security, which in the case of a mortgage is the home. Any loss to the creditor from changes in the security's value is "simply [the] attribute[] of a non-recourse loan," but its "non-recourse nature does not make the transaction at issue any less of a loan." *Island Leasing, LLC v. Kane*, 2020 WL 6326101, at *6 (D. Haw. 2020), *aff'd sub nom. In re Hawaii Island Air, Inc.*, 2023 WL 4785508 (9th Cir. 2023). Unlock argues (at 24) that with certain traditional nonrecourse obligations, the lender must pass through a default to collect from the collateral. But in substance, Unlock has just created a non-foreclosure mechanism for the same result. Either Ms. Roberts pays Unlock, or it collects from the value of the collateral at a sale. From Unlock's perspective, that's even better, as it doesn't need to go through foreclosure.

TILA also covers pawn shops, where the owner gives the borrower a discounted percentage of the value of a good in exchange for taking the good as security. *Burnett*, 3 F.3d at 1262. Then, either the borrower can buy back the good for a higher price, or the lender keeps the security. *Id.* Here, Unlock gave Ms. Roberts a discounted 44% of the value of her home up front. Then when payment comes due, Ms. Roberts must either pay Unlock 70% of the value of the home or Unlock will collect that amount from the sale of the home. *See* Dkt. 79 ¶ 53. That's much more obviously a debt than a pawn shop.

TILA's inclusion of reverse mortgages as a form of residential mortgage loan further illustrates why Unlock's product is credit. A "reverse mortgage" is defined as a "nonrecourse" credit obligation where: (1) a homeowner is given "one or more advances"; (2) the company receives security through "[a] mortgage … against the consumer's principal dwelling"; and (3) any "any principal, interest, and shared appreciation or equity is due and payable" upon default or "only after (A) the transfer of the dwelling; (B) the consumer ceases to occupy the dwelling as a principal dwelling; or (C) the death of the consumer." 15 U.S.C. § 1602(cc).

Unlock tries to distinguish its product from a reverse mortgage. As an initial matter, however, the product doesn't have to be a reverse mortgage to be subject to TILA's ban on mandatory arbitration: All residential mortgage loans are subject to that bar, and reverse mortgages are just one kind of residential mortgage. 15 U.S.C. § 1639c(e)(1).[12] The reason TILA's coverage of reverse mortgages is relevant is not because Ms. Roberts's loan must meet that definition to avoid arbitration, but because the inclusion of reverse mortgages sheds light on what counts as a credit obligation under TILA. It shows that obligations where payment is tied to equity in

---

[12] Similarly irrelevant is Unlock's argument (at 20–23) that its product is not a high-cost mortgage, which is also just one kind of residential mortgage under TILA. 15 U.S.C. § 1602(bb). So while Ms. Roberts's complaint sets out detailed allegations for why Unlock's product is a high-cost mortgage, Dkt. 79 ¶¶ 112–14, this isn't relevant to the motion to compel arbitration. And while TILA's definition of a high-cost mortgage doesn't include reverse mortgages, parties may argue "alternative theories of liability." *Hughes v. TD Bank, N.A.*, 856 F. Supp. 2d 673, 680 n.4 (D.N.J. 2012).

the home and varies with home price *are* credit obligations.

In any event, Unlock's product meets the definition of a reverse mortgage. (1) Unlock gave Ms. Roberts an advance. Dkt. 79-1 at 2. (2) In exchange, Ms. Roberts provided a mortgage on her home. *Id.* at 1. And (3) Unlock's payment is triggered by "death," "sale of the [p]roperty," and any "[d]efault" such as moving out, Dkt. 79-1 at 5–6 § 1.8.2, 26 § 14.3. At that point, Ms. Roberts must pay Unlock an amount tied to the equity in her home, Dkt. 79 ¶ 53.

Unlock contends that because its product has a term limit of 10 years, it can't be a reverse mortgage. Unlock Br. 24. But reverse mortgages can have terms of years. *Comment for 1026.33 - Requirements for Reverse Mortgages*, CFPB, cmt. 33(a)(2)(2), https://perma.cc/7NEP-PMPK. It's just not "permissible" to include a term of years so short that it will force the homeowner to sell her home to repay the debt. *Id.* Accordingly, Unlock's argument is that because its contract includes a term that is too harmful to homeowners to be permitted in a reverse mortgage under TILA, its product isn't subject to any reverse mortgage regulations. Unlock also claims (at 24–25) that its product isn't a reverse mortgage because Ms. Roberts could hypothetically use her home as a secondary residence. But as it stands, the contract *is* secured by Ms. Roberts's "principal dwelling," 15 U.S.C. § 1602(cc), the mere fact that Ms. Roberts could hypothetically use her home otherwise doesn't change that. And, neither has anything to do with whether its product has a future payment obligation.

**4.** Unlock argues that debt requires an obligation to pay a "specific amount," which it apparently takes to mean a specific dollar amount fixed at the outset. Unlock Br. 13–14. That is directly inconsistent with TILA, which includes variable rate mortgages as well as mortgages where payment is tied to "equity" in the home or its "appreciation" in value. 15 U.S.C. § 1602(bb)(1)(B), (cc)(2).· And the Black's Law Dictionary definition on which Unlock relies includes nonrecourse debts where "a creditor can collect only on the collateral securing the debt," which means repayment will vary with the value of the collateral. Debt, *Black's Law Dictionary*.

Unlock also claims that a debt requires "an absolute obligation" to pay, such that any possibility Unlock won't be paid—no matter how remote—exempts its product from TILA. Unlock Br. 14. Yet Ms. Roberts *is* absolutely required to pay Unlock 70% of the value of her home. *See supra* 13–14.[13] Further, Unlock's rule would improperly place "form over meaningful substance." *Vallies*, 2007 WL 2492730, at *4; *see also Burnett*, 3 F.3d at 1262. As the Third Circuit has explained in another context that places substance over form, adopting Unlock's preferred rule would make it "simplicity itself" to disguise a loan by adding any contingency on payment, no matter how "unlikely." *Merck & Co. v. United States*, 652 F.3d 475, 483 (3d Cir. 2011).

---

[13] As explained above, Unlock's product is structured so that this payment will always guarantee a profit. *See supra* 7–8. In any event, all "debt" requires is that there be *some* "obligation or liability to pay." Debt, *American Heritage Dictionary*; No matter how much the housing market drops, Ms. Roberts's house will be worth *something*. And Unlock's contract requires her to pay it 70% of that amount. Dkt. 79 ¶ 60.

For its rule, Unlock cites two cases about sale agreements that contained an option for the seller to repurchase the property later. *Johnson v. Washington*, 559 F.3d 238, 243 (4th Cir. 2009) (deciding case based on determination that agreement was not an equitable mortgage under Virginia law); *Bradford v. Terry*, 2021 WL 6210714, at *5 (Tenn. Ct. App. 2021). But Unlock's product is not a sale-repurchase agreement—Ms. Roberts didn't sell her home to Unlock. *See FAQ*, Unlock, https://perma.cc/C7R5-TKS6 ("Who owns the home? You do!"). Unlock gave her money in exchange for payment, which it deferred for 10 years—in other words, a debt. 15 U.S.C. § 1602(f). In any event, TILA *does* cover things like pawn shops, which employ "an option to repurchase." *Burnett*, 3 F.3d at 1262. And both the Third Circuit and the Supreme Court of New Jersey have recognized that options, including options to repurchase, can be used to disguise loans, including mortgage loans. *Merck*, 652 F.3d at 479, 483–84; *see also Zaman v. Felton*, 98 A.3d 503, 513 (N.J. 2014).

In sum, Unlock's product involves deferring payment of a debt and therefore constitutes "credit" under TILA. And because it is a "consumer credit transaction … secured by a mortgage … on a dwelling," it is a "residential mortgage loan." 15 U.S.C. § 1602(dd)(5).

### B. Unlock's arguments about "loans" in other contexts can't supplant TILA's definition of "credit," nor are they correct.

Unable to rely on TILA's definition of "credit," Unlock pivots to arguing that its product doesn't meet its preferred (non-statutory) definition of a "loan." Unlock

Br. 14–20. Unlock claims that there is an "absence of clear guidance from TILA" about what constitutes a "loan." *Id.* at 14–15. That's just not true. TILA expressly defines a "residential mortgage *loan*" as "*any* consumer credit transaction … secured by a mortgage … on a dwelling." 15 U.S.C. § 1602(dd)(5) (emphases added). And as explained above, it defines credit as "the right … to defer payment of debt." 15 U.S.C. § 1602(f). Unlock's arguments about the meaning of the term "loan" in other contexts is thus irrelevant. "Statutory definitions control the meaning of statutory words" and "exclude[] any [other] meaning." *Burgess v. United States*, 553 U.S. 124, 129–30 (2008).

In any event, Unlock's arguments about loans fail on the merits too. Contrary to Supreme Court and Third Circuit precedent, Unlock's arguments repeatedly place form over substance. That's because the substance is clear: Unlock has structured its product so that it is guaranteed that it will be paid be back, even if the housing market were to drop more than it did in the worst crash in modern history. That's a loan under any definition.

**1.** Unlock claims that its product isn't a loan because its contract states that it is "Not a Loan." Unlock Br. 16–17. That would clearly "elevate superficial form over meaningful substance." *Vallies*, 2007 WL 2492730, at *4. And beyond TILA, centuries of Supreme Court precedent insist that courts must look to substance, not labels: "There is no more familiar rule in the law than that the [lending] laws cannot be evaded by mere pretenses, shifts, or evasions." *Fowler v. Equitable Tr. Co.*, 141 U.S. 384,

403 (1891); *Scott v. Lloyd*, 34 U.S. 418, 446–47 (1835).[14] If anything, Unlock's efforts to get Ms. Roberts to sign a document stating its product is "not a loan" and "not subject to any federal, state and/or local law concerning consumer credit," Dkt. 79-1 at 37 § 21.5, only heightens concerns that Unlock is improperly trying to circumvent TILA.

Not only that, but Unlock's documents repeatedly let slip the true nature of its product. Several documents refer to it as a "lender," Ms. Roberts as a "borrower" or "debtor," and its product as a "loan." Dkt. 79-2 at 4, 79-5 at 2, 79-6 at 1, 79-7 at 1.

**2.** Unlock cites non-TILA cases for the claim (at 14–15) that something cannot be a loan absent a formal, absolute obligation to repay the advance. That is incorrect.

In the tax context, on which Unlock primarily relies, the Third Circuit has rejected exactly this argument: "[A] formal legal obligation" to repay "is not an absolute prerequisite for a determination that a transaction is a loan." *Merck*, 652 F.3d at 483. While courts often reference "an unconditional obligation to repay," the test is not whether there are "*literally* no conditions on repayment." *Id.* Otherwise "[i]t would be simplicity itself" to "draft a contract in which repayment would not occur in the event of some occurrence so unlikely" that there is no genuine risk. *Id.* Instead, courts ask if the product "ensure[s] repayment of funds as a practical matter." *Id.*

[14] The one case Unlock cites for its textual argument reaffirms the principle that "[i]n order to determine whether a transaction is a 'loan' … courts look to the substance." *Nolden v. Summit Fin. Corp.*, 244 So. 3d 322, 328 (Fla. Dist. Ct. App. 2018).

The facts in *Merck* illustrate why. In *Merck*, one company advanced another money in exchange for a complex option mechanism that pegged payment to certain interest rates that would vary with the market. *Id.* at 477–79. The defendants claimed this was not a loan because, "had the relevant interest rates dropped low enough," the advance would not have been fully repaid. *Id.* at 482–83. The Third Circuit saw through it: The transaction was structured such that the money would be repaid unless the relevant interest rates dropped below a level to which "they had not dropped since 1962." *Id.* at 483. As a result, "even with the collapse of interest rates at the end of the 2000s, [the money] would have been repaid." *Id.* There was thus no "serious uncertainty as to the return," making the product a loan. *Id.* at 484.

So too here. Unlock makes money unless the house drops in value by 39%. *See supra* 6–7. Using Federal Reserve data going back to the 1970s, that's far more than average home prices ever fell in New Jersey, even during the worst stretch of the 2008 crash. Dkt. 79 ¶ 51.[15] Notably, Unlock never actually disputes that it has effectively guaranteed it will recover its advance as a practical matter—much less cites any evidence to that effect, despite access to all its internal data on its products.

Even though Ms. Roberts cited the Third Circuit's decision in *Merck* in her

[15] If anything, TILA's definition of a loan would be broader than in *Merck*. *Merck* ruled for the government, and in the tax context any "ambiguities are construed most strongly and strictly against the Government." *Franklin Mills Assocs., L.P. v. Nationwide Life Ins. Co.*, 836 F. Supp. 2d 238, 247–48 (E.D. Pa. 2011). In contrast, TILA is construed "liberally in favor of the consumer." *Rossman*, 280 F.3d at 394.

complaint, Dkt. 79 ¶ 50, Unlock studiously avoids it. Instead, it quotes the district court decision below in *Merck*—not the Third Circuit's decision on appeal. Unlock Br. 15. Similarly, Unlock quotes another tax case that predates *Merck. Id.* (citing *Karns Prime & Fancy Food, Ltd. v. Comm'r*, 494 F.3d 404, 408 (3d Cir. 2007)). Yet *Merck* rejected exactly the overreading of prior caselaw that Unlock now advocates.

More generally, "courts have held that a loan is contingently repayable only when the lender has, by the terms of the loan, subjected itself to some greater hazard than the mere risk that the borrower might fail to repay the loan or that the security might depreciate in value." 9 Williston on Contracts § 20: 18 (4th ed. 2009). Here, at most, Unlock faces the risk "that the security"—Ms. Roberts's home—"might depreciate in value." *Id.* Indeed, it actually faces less hazard than many other lenders; because of how Unlock structured its product, the house can dramatically lose value and Unlock will still make a significant profit. Dkt. 79 ¶¶ 57–61.

**3.** Unlock also (at 18–19) lists a number of irrelevant features that it claims prevent its product from being a "loan." Nothing in TILA requires "periodic payments," Unlock Br. at 18, as it expressly includes credit where payment is due all at once after a triggering event, 15 U.S.C. § 1602(cc)(2). TILA also includes products where the "return … is predicated upon several different, variable factors including the Property's future value," Unlock Br. 18, like variable rate mortgages and reverse mortgages, *id.* § 1602(bb)(1)(B), (cc)(2). Unlock also claims that its mortgage "does not

secure the repayment of the Investment Payment." Unlock Br. 19. But the mortgage expressly secures Ms. Roberts's obligations under the contract, including "payment of the Settlement Payment," which is guaranteed to be higher. Dkt. 79-2 at 7.

**4.** Finally, Unlock also argues (at 17) that its product is not a loan under New Jersey law. But state law couldn't override TILA's statutory definition. And in any event, Unlock's product *is* a mortgage loan under New Jersey law. New Jersey courts also "look beyond the plain terms of an agreement" to "determine whether [an] agreement is in effect a mortgage." *Zaman*, 98 A.3d at 513.

That's precisely the case here. Unlock's product "has been labeled as a … sale" to "mask its actual objective: a mortgage loan secured by a deed to the property at issue." *Id.* at 513. Unlock's product has numerous features that New Jersey courts have identified as indicative of a hidden mortgage loan: (a) "the homeowner continue[s] ownership"; (b) "[a] substantial disparity between the value received by the homeowner and the actual value of the property"; (c) the "homeowner's continued possession of the property"; (d) "[t]he homeowner's continuing duty to bear ownership responsibilities, such as paying real estate taxes or performing property maintenance"; (e) "[d]isparity in bargaining power and sophistication"; (f) "the fact that the property was not listed for sale" when the parties entered into the agreement; and (g) "[f]inancial distress of the homeowner, including the imminence of foreclosure." *Id.* at 514; *see* Dkt. 79 ¶¶ 10–22, 67. That makes Unlock's product an

"equitable mortgage," which courts have held qualifies as credit under TILA. *See, e.g.*, *Johnson v. Novastar Mortg., Inc.*, 698 F. Supp. 2d 463, 469–71 (D.N.J. 2010).

### C. Agency commentary doesn't trump statutory text, nor does it apply to Unlock.

Unlock also claims that it should be granted an exception from TILA based on agency staff commentary about TILA's implementing regulations. As an initial matter, the plain text of the commentary on which Unlock relies makes clear that it doesn't govern TILA's statutory definition of credit. The commentary accompanies a regulation and only applies to the definition of "credit" "for purposes of [that] *regulation*." 12 C.F.R. pt. 226, Supp. I, Subpt. A, cmt. 2(a)(14)(1) (emphasis added). It therefore doesn't even purport to control the statutory definition. Nor could it, as staff commentary can't trump statutory text. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Even beyond that, the exceptions Unlock cites don't apply to its product. Unlock invokes two exceptions to "credit" under Regulation Z: (1) "option contracts," and (2) "investment plans." Neither of these apply.

**1.** Unlock's product isn't an "option contract[]." 12 C.F.R. pt. 226, Supp. I, Subpt. A, cmt. 2(a)(14)(1)(vii). The contract never even claims to be an "option."[16] That's unsurprising, because it's not an option. While in ordinary English, option can just mean choice, not every contract giving a party a choice is an "option

[16] The word "option" only appears once in the contract to describe Unlock's option to pursue liquidated damages. Dkt. 79-1 at 42.

contract." Instead, an option contract is "a contract conveying a right to buy or sell designated securities, commodities, or property interest at a specified price during a stipulated period." Option, *Merriam-Webster*, https://perma.cc/74JP-RSWH; Option, *American Heritage Dictionary* ("The right … to buy or sell an asset within a specified time at a set price."); Restatement (Second) of Contracts § 25 ("An option contract is a promise which … limits the promisor's power to revoke an offer.").

Unlock's contract does not convey any such right. Unlock claims (at 29) that its product is an option because in certain settlement events, if Ms. Roberts doesn't pay the company directly, Unlock has "the option to convert its investment into an ownership interest." But this "conversion" doesn't involve any offer from Ms. Roberts to Unlock to pay a set amount to buy her home. *See supra* 14.[17] It doesn't involve Unlock paying Ms. Roberts at all. As Unlock itself acknowledges (at 8), temporarily receiving an interest in the property for the purposes of the sale is simply the mechanism by which it collects its payment from the "proceeds of [the] sale." That's debt. Unlock says (at 29) that when payment comes due, it could theoretically "elect to extend"—*i.e.* give Ms. Roberts more time to pay—or "even take no further action"—*i.e.* decide not to collect at all. But a creditor always has the option to forgive

[17] As noted above, the possibility that Unlock can make an offer on Ms. Roberts's home is not part of the normal sale process, just a rare possibility when a sale is materially below market price. *See supra* 14 n.10; Dkt. 79-1 § 2.1(i). Plus, unlike an option, Ms. Roberts isn't obliged to accept the offer.

(or postpone payment of) a debt. That doesn't make the debt an "option contract."

Further, even if Unlock had included a purported option in its contract, any agency commentary would still be subject to the general TILA principle that courts must look to substance over form. That's particularly important, since companies often try to hide a loan by calling it an "option," as *Merck* itself shows. 652 F.3d at 479, 483; *see also Zaman*, 98 A.3d at 514 (same). And as explained above, the substance of this product is a residential mortgage loan under TILA.

Finally, Unlock relies on an unpublished, out-of-circuit district court case involving a different product, but it is easily distinguished. Unlock Br. 25–28. As an initial matter, even that case recognized that returns on a loan need not be a fixed amount. *Foster v. Equitykey Real Est. Invs. L.P.*, 2017 WL 1862527, at *4–5 (N.D. Cal. 2017).[18] Further, *Foster* involved a different product, under which the company would *only* receive payment if home prices went up, such that if "home prices decrease" the "Plaintiff will not owe [the defendant] any money." *Id.* That's entirely unlike Unlock, which will always receive 70% of the value of the home even if home prices decrease catastrophically. Dkt. 79 ¶¶ 58–60.

**2.** Unlock's product is also not an "[i]nvestment plan[] in which the party extending capital to the consumer risks the loss of the capital advanced." 12 C.F.R.

[18] Unlock also cited another unpublished out-of-circuit opinion, *Olson v. Unison Agreement Corp.*, 2023 WL 5609251, at *2 (W.D. Wash. 2023). This case merely relied on *Foster* and is also currently pending on appeal. *Olson v. Unison*, No. 23-2835 (9th Cir.).

pt. 226, Supp. I, Subpt. A, cmt. 2(a)(14)(1)(viii). Generally, an investment is "[a]n expenditure to *acquire* property or assets to produce revenue." Investment, *Black's Law Dictionary* (12th ed. 2024) (emphasis added); *see also* Investment, *American Heritage Dictionary* ("Property or another possession *acquired* for future financial return or benefit." (emphasis added)). Acquiring property means taking on both the burdens of ownership and risks of loss, as illustrated by the example the commentary gives: "[A]n arrangement with a home purchaser in which the investor pays a portion of the downpayment and of the periodic mortgage payments in return for an ownership interest in the property, and shares in *any* gain or loss of property value." 12 C.F.R. pt. 226, Supp. I, Subpt. A, cmt. 2(a)(14)(1)(viii) (emphasis added). In contrast, Unlock doesn't genuinely risk losing its advance, doesn't take co-ownership, doesn't share in the burdens of ownership, and doesn't share in *any* loss. *See* Dkt. 79-1 at 6–7 § 1.9 (requiring Ms. Roberts to cover all costs of homeownership); *see also supra* 6.[19]

Unlock (at 27) claims that the investment-plan exception turns "on the possibility, not the likelihood, that the investor would lose money." This would mean

[19] The investment exception was added in the early 1980s. Truth in Lending; Official Staff Commentary, 46 Fed. Reg. 50288-01 (Oct. 9, 1981). At the time, companies were experimenting with a novel home financing plan called a "partnership mortgage." Deborah Rankin, *Why Shared Mortgages Are Hard to Get*, N.Y. Times, Apr. 18, 1982, https://perma.cc/HYR6-B94P. "[D]isinterested investors, such as doctors or lawyers" were paired with homebuyers. *Id.* And "in return for providing part of the downpayment or subsidizing the homeowner's monthly mortgage payments in the early years of the loan," the "investor actually [became] a co-owner of the property, along with the buyer." *Id.*

that Unlock would be exempt from TILA even if it paid Ms. Roberts 1% of her home's value up front and collected 90% one year later. Once again, this places form over substance, as *Merck* explained in rejecting the same argument that a product is not a loan if there is any possibility of non-payment, no matter how "unlikely." 652 F.3d at 483. Unlock only risks losing money in an unprecedented crash where traditional mortgage lenders would also take losses, Dkt. 79 ¶ 53, meaning that on Unlock's reading all those lenders would also fall under the investment-plan exception. That would clearly "circumvent" TILA. *Rossman*, 280 F.3d at 392, 399.

In sum, Unlock's product is a residential mortgage loan under TILA. And "[n]o residential mortgage loan … may include terms which require arbitration." 15 U.S.C. § 1639c(e)(1). That's true "based on the face of [the] complaint[] and documents relied upon in the complaint." *Guidotti*, 716 F.3d at 776. If this Court believes more factual development is required, however, Unlock's motion should be denied and discovery granted. *See id.* at 780; *Singhal v. Unison Agreement Corp.*, 2023 WL 2734230, at *5 (S.D. Fla. 2023) (allowing case about similar product to "proceed through discovery" into whether it was a loan).

## II. The arbitration clause is unconscionable under New Jersey law.

Even if Unlock's arbitration clause weren't barred by federal law, it would still be unconscionable under New Jersey law. *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 200 (3d Cir. 2010). Because Unlock's arbitration clause is "a contract of adhesion," a

"sharpened inquiry concerning unconscionability is necessary." *Muhammad v. Cnty. Bank of Rehoboth Beach, Delaware*, 912 A.2d 88, 97 (N.J. 2006).[20] This sharpened inquiry includes four factors. *Pace v. Hamilton Cove*, 317 A.3d 477, 489 (N.J. 2024). These are "(1) the subject matter of the contract, (2) the parties' relative bargaining positions, (3) the degree of economic compulsion motivating the adhering party, and (4) the public interests affected by the contract." *Id.* Each factor points in the same direction here.

### A. The subject matter increases unconscionability concerns.

The first factor favors unconscionability. Here, "the subject matter of the contract concern[s] one of the most significant aspects of a person's life, namely [her] home." *Block v. Longstreet*, 2007 WL 4472122, at *7 (N.J. Sup. Ct. App. Div. Dec. 24, 2007) (unpub.). Further, New Jersey's Legislature has declared that regulating mortgages is "essential for the protection of the citizens," N.J.S.A. § 17:11C-52, and that it is the "the public policy of this State" to protect homeowners and help them "keep their homes," N.J.S.A. § 2A:50-54; *see also Est. of Ruszala ex rel. Mizerak v. Brookdale Living Cmtys., Inc.*, 1 A.3d 806, 820 (N.J. Sup. Ct. App. Div. 2010) (looking to legislative protections in relevant area in analyzing first factor).

### B. There was severe procedural unconscionability.

The second and third factors—bargaining position and economic

[20] A "contract of adhesion" is a contract "presented on a take-it-or-leave-it basis … without opportunity for the adhering party to negotiate except perhaps on a few particulars." *Pace*, 317 A.3d at 489.

compulsion—go to procedural unconscionability, which is high here.

**1.** It is hard to imagine more unequal "relative bargaining positions." *Pace*, 317 A.3d at 489. Unlock is a wealthy financial technology company that is so successful that it can bundle its loan contracts into securities worth hundreds of millions of dollars. Dkt. 79 ¶¶ 22, 96. On the other side is Ms. Roberts, a first-time homeowner and single parent facing foreclosure. *Id.* ¶ 22.

**2.** And not only was there severe inequality in bargaining positions, Ms. Roberts was driven to enter the contract by "economic compulsion." "[E]conomic compulsion" exists when people urgently "need access to cash." *Muhammad*, 912 A.2d at 98 n.4. Here, unless Ms. Roberts could pay off her tax certificate, she would lose her home. Dkt. 79 ¶¶ 10–13. And "[t]he possible loss of a home creates a dire economic circumstance because of both the loss of all accumulated equity in the home and the likelihood of permanent damage to one's credit rating if the mortgage is foreclosed." *Block*, 2007 WL 4472122, at *7. Unlock tries to cast aspersions on Ms. Roberts for accepting more money than the bare minimum to pay off her debt. Dkt. 85-1 at 31 n.14. But she took the money because she was having trouble meeting her ongoing financial obligations to keep her home, which would require more funds than just paying off the existing tax debt. Dkt. 79 ¶ 9.

**3.** As part of procedural unconscionability, court also look to "unduly complex contract terms," of which there are many. *Muhammad*, 912 A.2d at 96. Take the

paragraph titled "Remedy":

> Arbitration shall be the sole, exclusive and final remedy for any dispute between the Owner and Beneficiary. Remedies that would otherwise be available to owner under applicable federal, state or local laws shall remain available. The arbitrator will have no authority to award punitive damages or consequential damages.

Dkt. 79-1 at 34–35 § 20.4. The first sentence establishes that a "remedy" means a dispute-resolution forum: Arbitration, it says, is a remedy. Then the second sentence says that "remedies" under "federal, state, or local laws" remain available. That would seem to mean that other forums—*i.e.*, courts—also remain available. Further confusing things, the next sentence states that punitive and consequential damages (remedies in the relief sense of the term) are *not* available.

The scope of the dispute resolution provisions is also confusing. One clause states that only Ms. Roberts agrees, while another says that both parties agree. *Compare* Dkt. 79-1 at 34 § 20.3 ("*Owner* agrees that any and all controversies, claims, or disputes with [Unlock] … shall be subject to binding arbitration."), *with id.* at 39 § 21.16 ("*[Y]ou and Unlock* hereby knowingly, voluntarily, intentionally and irrevocably waive any and all rights each may have to a trial by jury."). Further confusion comes from the fact that the contract states that arbitration will take place "under the arbitration rules of JAMS, the resolution experts (the 'rules')." Dkt. 79-1 at 34 § 20.3. But it then states that: "to the extent that the applicable JAMS' arbitration rules conflict with the rules, the rules shall take precedence." *Id.* This suggests there is some

separate set of rules that govern the JAMS rules, but the contract doesn't specify any.

Under New Jersey law, "the many inconsistencies and unclear passages in the arbitration terms [make] them unenforceable for lack of mutual assent." *NAACP of Camden Cnty. E. v. Foulke Mgmt. Corp.*, 24 A.3d 777, 797–98 (N.J. Sup. Ct. App. Div. 2011). At the very least, they further support procedural unconscionability.

### C. The dispute resolution provisions are riddled with substantively unconscionable terms.

The final factor, "the public interests affected by the contract," focuses on "substantive" unconscionability, *Pace*, 317 A.3d at 489, such as "harsh or unfair one-sided terms," *Muhammad*, 912 A.2d at 96. Here, there are many.

**1.** The contract contains unconscionable limits on damages. It states that "the arbitrator will have no authority to award punitive damages or consequential damages." Dkt. 79-1 at 35 § 20.4. But arbitration provisions may not "limit a consumer's ability to pursue [a] statutory remedy." *Delta Funding Corp. v. Harris*, 912 A.2d 104, 113 (N.J. 2006); *see also Nino*, 609 F.3d at 203 (arbitration must "offer claimants the full scope of remedies available under" statutes). "[L]imits on compensatory damages"—such as consequential damages—"have the insidious effect of permitting [defendants] to budget potential liability as a mere cost of doing business" and leave those harmed "unable to obtain the full measure of relief warranted." *Ruszala*, 1 A.3d at 821–22. Similarly, "[t]he preclusion of punitive damages touches upon the societal interest of expressing the community's disapproval of outrageous conduct." *Id.* As a

result, an "arbitration … provision precluding the recovery of punitive damages [is] unenforceable." *Roman v. Bergen Logistics, LLC*, 192 A.3d 1029, 1036–37 (N.J. Sup. Ct. App. Div. 2018); *see also Ruszala*, 1 A.3d at 821–22.

Worse still, the contract says that "in no event will Unlock's aggregate liability … exceed the Investment Payment"—meaning Unlock's initial advance. Dkt. 79-1 at 40. In contrast, Ms. Roberts's liability has no such limits. Not only that, but Unlock has the right to "Liquidated Damages," including the "Settlement Payment"—70% of the home's value—which is far more than Unlock's advance. *Id.* at 42.

**2.** The contract also purports to waive Ms. Roberts's substantive rights under state and federal consumer protection laws in any arbitration: "To the fullest extent possible, Unlock and Owner agree that the Unlock Agreement is not subject to any federal, state and/or local law concerning consumer credit." Dkt. 79-1 at 37 § 21.5. But these statutes cannot be waived. *See, e.g.*, *Hojnowski v. Vans Skate Park*, 901 A.2d 381, 387 (N.J. 2006). The only reason to include this unenforceable provision is to "deter potential litigants" from asserting their rights by making them think they've waived them. *Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 285 & n.17 (3d Cir. 2004).

**3.** The contract also provides that "Unlock may execute any of its duties under the Unlock Agreement by or through agents," yet "Unlock will not be responsible for the negligence or misconduct of any agent that Unlock selects." Dkt. 79-1 at 39 § 21.13. Ms. Roberts was also required to "expressly waive any claims against any of

Unlock's agents, assignees, affiliates, employees, directors or funding sources." *Id.* § 21.14. Thus, so long as Unlock acted through agents—as all companies do—Ms. Roberts loses her ability to hold anyone liable. But "a contract that releases liability from a statutorily-imposed duty" "violate[s] public policy." *Hojnowski*, 901 A.2d at 386–87. This provision is also "baldly one-sided" in favor of Unlock, the "stronger party," *Nino*, 609 F.3d at 202, 207–08, since Ms. Roberts is expressly liable for the actions of anyone acting on her behalf. Dkt. 79-1 at 38 § 21.12.

**4.** These are not the only provisions that are "unconscionable" because they are "a deterrent to the vindication of [Ms. Roberts's] statutory rights." *Delta Funding*, 912 A.2d at 113; *see also Parilla*, 368 F.3d at 285 & n.17 (same). The indemnification clause puts Ms. Roberts on the hook for Unlock's legal expenses for a wide range of claims, independent of the outcome. Dkt. 79-1 at 38–39 § 21.2. This even applies to "Losses between [Ms. Roberts] and Unlock." *Id.* at 38–39. So Ms. Roberts must indemnify Unlock *even if* she brought the claims—and won. *Id.* This would clearly improperly deter her from bringing meritorious claims, and this provision is also one-sided, since Unlock has no such duty to indemnify Ms. Roberts. *Parilla*, 368 F.3d at 285 & n.17.

The contract also contains an exceedingly broad definition of "Event of Default" that threatens to penalize homeowners for filing claims in court. A default occurs if "[y]ou breach or fail to perform in accordance with *any provision* of the Unlock Agreement, or You take *any action* to … interfere with or negatively impact

Unlock's rights." *Id.* at 27 § 16.1(a) (emphases added). That would seem to include Ms. Roberts seeking punitive or consequential damages or seeking to hold Unlock accountable for the actions of its agents. And an "Event of Default" allows Unlock to seek damages or even foreclose on Ms. Roberts's house. Id. at 28–31 § 17.[21]

### D. The arbitration clause is unenforceable as a whole.

In cases like this where "the cumulative effect of the various unconscionable terms" renders "the entire [arbitration] agreement … permeated by unconscionability," it is "unenforceable." *Achey v. Cellco P'ship*, 293 A.3d 551, 558, 560 (N.J. Super. Ct. App. Div. 2023); *see also Nino*, 609 F.3d at 202; *NAACP*, 24 A.3d at 798. That is true even when a contract has a severability clause. *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 271 (3d Cir. 2003).

This result is particularly warranted here. The procedural unconscionability here is even greater than in other cases. For example, in *Achey*, the contract was for cell phone service, and the only procedural concern noted was that it involved a contract of adhesion. 293 A.3d at 557. As to the many substantively unconscionable provisions, these form "an unconscionable wall of protection for defendants from accountability for valid consumer fraud claims and cannot stand." *Id.* at 559. "The

---

[21] Courts "determine unconscionability as of the time the contract was formed." *Parilla*, 368 F.3d at 285. "If the provision, as drafted, would deter potential litigants" from bringing claims, "it is unenforceable, regardless of whether, in a particular case," the defendant invokes it. *Id.* at 285 n.17.

only conceivable purpose of [these] one-sided provisions is to stack the deck in [Unlock's] favor" and deter Ms. Roberts from invoking her rights. *Nino*, 609 F.3d at 202, 207–08; *Alexander*, 341 F.3d at 266. And courts have refused to sever even when there are fewer such provisions. *See Achey*, 293 A.3d at 558–60 (three provisions); *Nino*, 609 F.3d at 202–05 (three provisions); *Alexander*, 341 F.3d at 271 (four provisions).

## III. Ms. Roberts's claims aren't covered by the arbitration clause.

Finally, Unlock's motion should be denied for another, independent reason: The arbitration clause doesn't cover Ms. Roberts's claims, which arise under federal or state statutes. In determining whether claims fall within the scope of an arbitration clause, courts "apply ordinary state-law principles." *Moon v. Breathless Inc.*, 868 F.3d 209, 213 (3d Cir. 2017). New Jersey law requires an arbitration clause to "clearly and unambiguously signal to [a] plaintiff that she was surrendering her right to pursue her statutory claims in court." *Id.* at 215–16. Unlock's arbitration clause does not.

**A.** "[U]nder New Jersey law, any contractual waiver-of-rights provision must reflect that the party has agreed clearly and unambiguously." *Atalese v. U.S. Legal Servs. Grp., L.P.*, 99 A.3d 306, 312–13 (N.J. 2014). This applies to arbitration clauses, as "[o]nly those issues may be arbitrated which the parties have agreed shall be." *Id.* at 313, 316.

**B.** "To cover a statutory right under New Jersey law, an arbitration clause must" both "identify the general substantive area that the arbitration clause covers" and "reference the types of claims waived by the provision." *Moon*, 868 F.3d at 214–

15. Though the clause "need not … mention the specific statutory rights at issue," it must nonetheless "clearly and unambiguously signal to plaintiff that she was surrendering her right to pursue her statutory claims in court." *Id.* at 215–16.

Under this standard, when an arbitration clause identifies other claims an individual must arbitrate but doesn't mention "statutory rights," it does not meet that standard. For example, statutory claims weren't covered by an arbitration clause covering "any claim or dispute between [the plaintiff] and the [defendant] related to this Agreement or related to any performance of any services related to this Agreement." *Atalese*, 99 A.3d at 310. The same went for a clause stating that "[i]n a dispute between [the plaintiff] and [the defendant] under this Agreement, either may request to resolve the dispute by binding arbitration." *Moon*, 868 F.3d at 212, 213–15. So too with a clause providing that "any controversy or claim arising out of, or relating to, this Agreement or the breach thereof, shall be settled by arbitration." *Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A.*, 773 A.2d 665, 668 (N.J. 2001). Such clauses "d[id] not mention, either expressly or by general reference, statutory claims." *Moon*, 868 F.3d at 215. Instead, they "mentioned contract disputes," indicating statutory claims were not covered. *Id.*

So too here. There is no "significant difference between these … formulations" and Unlock's contract, which refers to other claims but not statutory claims. *Id.* at 216. The arbitration clause refers to claims: "arising out of,

relating to, or resulting from the Unlock Agreement or the Property." Dkt. 79-1 at 34 § 20.2. Additionally, a contract "must explain that the plaintiff is giving up her right to … have a jury resolve the dispute." *Moon*, 868 F.3d at 214. Here, the contract states that the parties waive the right "to a trial by jury in any litigation based on, or arising out of, under, or in connection with, *the Unlock Agreement*, *or any other documents and instruments* executed in connection herewith." Dkt. 79-1 at 39 § 21.16 (emphasis added). By referencing other kinds of claims but "not statutory rights," these clauses don't "clearly and unambiguously signal to plaintiff that she [i]s surrendering her right to pursue her statutory claims in court." *Moon*, 868 F.3d at 215–16.[22]

**C.** Finally, even if statutory claims were covered, under the contract, "any party may petition a court for injunctive relief." Dkt. 79-1 at 35 § 20.5. Ms. Roberts sought equitable relief on each of her claims. *See* Dkt. 79 ¶¶ 119, 127, 141, 146, 150. Those requests are not subject to arbitration.

## CONCLUSION

Unlock's motion should be denied.

[22] In prior briefing—but not here—Unlock tried to distinguish its clause from other cases because it states that it applies to "any and all controversies, claims, or disputes…arising out of, relating to, or resulting from the Unlock Agreement *or the Property*." Dkt. 47 at 17. But *Atalese* involved a clause covering "any claim or dispute between [the plaintiff] and the [defendant] related to this Agreement *or related to any performance of any services related to this Agreement*." 99 A.3d at 310 (emphasis added).

Respectfully submitted,

_s/Edward Hanratty_
EDWARD HANRATTY
LAW OFFICE OF EDWARD HANRATTY
57 W. Main Street
Freehold, NJ 07728
(732) 866-6655
_thanratty@centralnewjerseybankruptcylawyer.com_

THOMAS SCOTT RAILTON
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
_thomas@guptawessler.com_

June 26, 2025

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States District Court in the Court of New Jersey by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*s/ Edward Hanratty*
Edward Hanratty