# Exhibit 1

**Com. v. Hometap Equity Partners, LLC, 2025 WL 2468564 (2025)**

**2025 WL 2468564 (Mass.Super.) (Trial Order)**
Superior Court of Massachusetts.
Suffolk County

COMMONWEALTH of Massachusetts,

v.

HOMETAP EQUITY PARTNERS, LLC and Hometap Management Holdings, LLC.

No. 2584CV00469-BLS2.
August 21, 2025.

**\*1** CIVIL ACTION

**Memorandum of Decision and Order on Defendants' Motion to Dismiss**

Debra A. Squires-Lee, Judge.

The Commonwealth of Massachusetts has brought five claims of unfair and deceptive acts and practices under G. L. c. 93A, § 2 against Hometap Equity Partners, LLC and Hometap Management Holdings, LLC (together Hometap) in connection with Hometap's product, the Home Equity Investment (HEI). The Commonwealth alleges the HEI is an illegal mortgage loan (Count I), violates the criminal usury statute (Count II), has been marketed deceptively (Count III), was unaccompanied by required state and federal loan disclosures (Count IV), and is an unfair, oppressive or otherwise unconscionable product (Count V). The Commonwealth seeks a declaration that all HEI contracts with Massachusetts consumers are unlawful mortgage loans and subject to the criminal usury statute, a permanent injunction barring further violations of G. L. c. 93A, reformation of the HEIs in the Commonwealth, an order requiring Hometap to pay restitution, and an award of civil penalties and costs.

Hometap moves to dismiss the Complaint pursuant to Mass. R. Civ. P. 12(b)(6). Hometap argues that three of the Commonwealth's counts are based on the incorrect premise that the HEI is a loan when, according to Hometap, the HEI is an option contract (Counts I, II, and IV). As to the remaining counts, Hometap argues the Commonwealth has not alleged facts that plausibly suggest the HEI is unfair or unconscionable (Count V) or that the HEIs have been marketed deceptively (Count III).

After hearing and review, and for the reasons stated below the Motion to Dismiss is **DENIED.**

**BACKGROUND**

I recite the relevant facts asserted in the Complaint, "taking them as true for purposes of evaluating the motion to dismiss." Edwards v. Commonwealth, 477 Mass. 254, 255 (2017). Although, in general, I do not accept as true conclusory allegations or legal conclusions, see Iannacchino v. Ford Motor Co., 451 Mass. 623, 632-633 (2008), because the Commonwealth proceeds in the public interest and pursuant to G. L. c. 93A, § 4, I include a brief description of Massachusetts regulations governing various mortgage products as detailed in the Complaint. Further, I consider and address the exhibits attached to the Complaint. See Polay v. McMahon, 468 Mass. 379, 381 n.3 (2014), and cases cited. Lastly, because the Complaint is lengthy and complex, I provide only an overview of the factual allegations regarding the HEI product and Hometap's conduct. Some facts are reserved for discussion below.

### A. Reverse and Subprime Mortgages

In the 1980s and 1990s a new form of home mortgage, reverse mortgages, began to proliferate. A reverse mortgage is typically marketed to homeowners with equity but insufficient assets to cover expenses. The lender provides cash in exchange for an interest in the homeowner's equity. The borrower makes no monthly payments because the lender recoups its investment through a voluntary or involuntary sale of the home. This differs from a traditional mortgage which the borrower pays monthly and the home serves as collateral for the risk of default. In a traditional mortgage, a homeowner's debt decreases with monthly payments at the same time the homeowner's equity increases. In a reverse mortgage, the homeowner's debt increases over the life of the loan which is called negative amortization.

 **\*2**  Reverse mortgages are almost always non-recourse meaning the lender cannot recover any deficiency from the homeowner if the loan balance exceeds the value of the property. Lenders manage the risk of such non-recourse loans by limiting the size of loans or their duration, or pooling actuarial risk among borrowers.

To protect elderly homeowners, Massachusetts regulations provide that reverse mortgages mature only upon death, default, a sale of the property or when the borrower moves out of the property. In addition, reverse mortgages are limited to owner-occupiers who are over age 60, who receive counseling, and are permitted a seven day rescission period. Reverse mortgages that are federally insured must also comply with federal regulations including limits on the amount of origination fees and closings costs.

In the late 1990s and early 2000s, subprime mortgage lending, another non-traditional form of mortgage, expanded. These mortgage products were marketed nationwide to people with limited access to mainstream loans, often by nonbank entities to avoid oversight. Loans were offered against the value of the home with no regard to or investigation into the borrower's ability to pay the loan. These loans were called "low doc" or "no doc" loans. The mortgages were often sold onto the secondary mortgage market to offload risk. Subprime lenders would also repeatedly refinance loans in short periods of time to generate fees. Subprime loans also often included the following features: negative amortization, interest-only periods, higher rates than disclosed initially, and balloon payments requiring repayment of the principal in a single payment at the end of the loan.

Subprime mortgages led to a mortgage crisis with millions of homeowners unable to pay their mortgages and ultimately losing their homes in a wave of foreclosures. The crisis ultimately led to a nationwide recession.

The Commonwealth enacted regulations to limit subprime loan practices including limiting high cost loans, limiting adjustable-rate subprime loans, allowing borrowers to cure defaults, and permitting borrowers to modify certain loans.

### B. Hometap's HEI

Hometap, founded in 2018, originates, advertises and markets HEIs in Massachusetts. The Commonwealth alleges that HEIs include four key features: an upfront cash payment without underwriting to assess income, jobs or other assets; acquisition of a percentage interest in the homeowner's equity at two times the value of the cash payment; a return that can and does exceed a twenty percent annual interest rate; and a ten-year balloon payment.

*HEI Structure*. Hometap uses a form Option Purchase Agreement (Option Agreement). It provides that the homeowners sell Hometap an "exclusive and irrevocable option to acquire an undivided percentage interest of a fee simple title ownership" in the borrower's property (Option) in exchange for an "Investment Amount" which is a cash payment less fees and costs, some of which Hometap retains. The percentage equity option in the premises that Hometap holds is two times the amount

**Com. v. Hometap Equity Partners, LLC, 2025 WL 2468564 (2025)**

the Investment Amount (Hometap Percentage).[1] When a homeowner signs the Option Agreement, the value of the Hometap Percentage exceeds the Investment Amount. Thus, as described in the Complaint, with an Investment Amount of $100,000, the homeowner would receive approximately $97,000 and Hometap would hold the option to purchase home equity of $200,000.

**\*3** The homeowner must repay the Investment Amount (settle) within ten years, or earlier if title is transferred or other events of default occur. The value of Hometap's share in the property (Hometap Share) at settlement is calculated by multiplying the Hometap Percentage by the property's value when the option is exercised, determined by an appraisal. According to the Commonwealth, Hometap's profit is driven by equity devaluation and not home value appreciation because the homeowner must pay Hometap twice the Investment Amount before factoring in appreciation. "Thus, it is Hometap's devaluation of homeowner's equity rather than home appreciation that is truly responsible for Hometap's profit," to the detriment of the homeowner.

The Option Agreement caps the annualized rate of return at twenty percent of the Investment Amount by limiting the total value of the Hometap Share to an amount equal to that annualized rate of return (Hometap Cap). According to the Commonwealth, the Hometap Cap "functions as a compounding interest rate" and is applied against the total Investment Amount, including fees that Hometap retained. Thus, HEIs that settle at the Hometap Cap "uniformly exceed a 20% simple interest rate on the amount advanced."

Hometap protects its "contractual and economic interest in the Option" through a Mortgage and Security Agreement recorded when the Option Agreement is executed. The Mortgage provides that, upon an event of default, Hometap may take possession of the property without any foreclosure action and have the right to sell the property at a nonjudicial foreclosure sale.

Homeowners can settle before the ten-year window. In addition, property values can decline. But even in these scenarios, the homeowner's equity is still devalued - at a rate of 33% rather than 50%. Hometap ensures it will be repaid the Investment Amount because the average home "would need a realized decline of 25% before Hometap would lose its first dollar of principal." Thus, "regardless of what happens to property values, homeowners will pay back vastly more than they receive from Hometap" and Hometap's principal would never be at risk. Included within the Complaint is an analysis of the anticipated repayment amounts and effective interest rates based on a $100,000 Investment Amount, using various assumptions in the change in home value showing that, even in the worst real estate market, Hometap would earn a six percent return on its Investment Amount. Thus, Hometap is not investing in equity because its investment is never meaningfully at risk.

*Marketing and Sales*. Until at least the spring of 2024, Hometap claimed on its website that it would "invest alongside homeowners" and would do so "without any … interest over the life of the investment," which would lead homeowners to believe that only home appreciation drives Hometap's returns. To its investors, however, Hometap, markets the HEI as providing downside protection "even during times of declining home values" and that it includes "an adequate cushion" to minimize potential losses. The cushion is, in fact; equity devaluation which insures Hometap against any risk of loss of its investment. Such advertising would lead an average homeowner to believe that Hometap's investment is equal to its equity option and not twice the value of its investment.

Hometap employs sales representatives who use scripts to explain the HEI to homeowners. At times, these representatives explain to homeowners that Hometap would share in any loss if the property were to depreciate. The representatives also imply they are neutral "guides," not employed to convince the homeowner to take out an HEI when they are, in fact, employed by Hometap to sell HEIs. They also do not explain that the homeowner may be eligible for less costly loans or that the HEI might make it more difficult to refinance in the future. Nor are homeowners provided the actual cost of the HEI - such as by including an Annual Percentage Rate or effective interest in various scenarios - such that homeowners can comparison shop. "The representations in Hometap's Marketing and made by its Investment Managers had, on net, a tendency to obscure the true

**Com. v. Hometap Equity Partners, LLC, 2025 WL 2468564 (2025)**

cost of the Hometap HEI and the reality that the Hometap HEI is dramatically more costly to homeowners than other mainstream mortgage products or that Hometap's marketing materials and sales scripts communicated."

***4** _Subsequent HEIs._ Hometap offers homeowners an option to pay off the first HEI with a new larger HEI to obtain additional cash, initially called a "double tap" and later an "investment increase." In those circumstances, Hometap charges the homeowner the same fees charged earlier. Changing the name from "double tap" to "investment increase" falsely implies the new HEI is only an increase and thus, the homeowner will not have to pay all the fees and costs. The Commonwealth described a scenario where a homeowner entered into an HEI for $227,950, and less than a year later entered into a second for an additional $29,000. Hometap charged and the homeowner paid nearly $4,000 in fees plus a 23.9% effective interest rate on the first HEI. Hometap, as a result, owned the right to 50% of the value of the homeowner's $1 million home having paid the homeowner only $257,000 after fees.[2] Further, Hometap did not always disclose it - would charge additional fees.

_Third Party Costs_. Hometap misleads homeowners in connection with alleged third party costs for appraisals. First, because Hometap refers to the costs as "third-party" costs, the homeowners believe the amount is paid to a third party whereas Hometap retains the vast majority of the fee. Second, although Hometap charges $299 for a virtual appraisal, the appraisal it conducts costs less than $100. The same is true with respect to the $599 Hometap charges for a traditional, physical appraisal -Hometap keeps most of the fee. Hometap thus profits, significantly, from both types of appraisals. Further, Hometap requires a formal appraisal when the HEI is paid off, but not when the HEI is generated. Because physical appraisals result in higher valuations, Hometap receives a higher profit if it does not use the same valuation at the beginning and end of the HEI.

_Renovation Adjustments_. Hometap markets the HEIs as a financing source for renovations and offers a "renovation adjustment" to allay concerns homeowners may have about giving Hometap a percentage of equity prior to a renovation. For renovations of at least $25,000, the renovation adjustment is advertised as an appraiser determined value of the property post renovation compared to an appraisal without the renovation. But Hometap does not disclose that the amount of the adjustment is limited to the lesser of the amount actually spent or the difference. Thus, if a homeowner spent $50,000 on a renovation resulting in $100,000 in increased value the homeowner would be entitled to only the $50,000. The restriction is disclosed only in the lengthy contract which is provided only after the application and underwriting is complete.

_Targeted Homeowners_. "A substantial fraction of Hometap's customers are homeowners facing financial vulnerability such as lack of income, high debts, or high expenses." That is because Hometap markets HEIs' to homeowners who cannot qualify for a traditional loan, retirees, and the unemployed. Hometap also markets to consumers seeking to pay off debt and has persuaded customers to use higher cost HEI's to pay off lower cost unsecured debt. Hometap also markets HEIs' to homeowners who had obtained COVID forbearances without disclosing other, lower cost options.

_Lack of Underwriting_. Hometap does not determine whether a homeowner can repay the HEI using income or assets and makes no assessment of the homeowner's ability to pay taxes, insurance, maintenance expenses, or existing mortgage payments, "even though failure to make these payments" triggers the homeowner's obligation to repay the HEI. The only evaluation Hometap conducts is whether the homeowner can repay the HEI through a sale or refinancing of the property. The lack of assessments result in the homeowner's ability to get money quickly, and without documentation, and may lead them to choose an HEI over loans that cost less and have safeguards.

***5** Hometap can only provide cash quickly if the HEI product is not governed by the regulations put in place with respect to reverse and subprime mortgages. Thus, in marketing the HEI, Hometap neither insures that it provides money only to homeowners with the ability to repay, as with traditional mortgages, nor complies with the strict regulatory limits on reverse mortgages.

Com. v. Hometap Equity Partners, LLC, 2025 WL 2468564 (2025)

*Structural Unfairness*. A significant percentage of Hometap customers will not be able to afford the purchase repayment when due after ten years through income, assets or a refinancing because their income and credit history will not support a loan large enough to pay off an original mortgage plus the HEI. In that event, Hometap can take joint ownership and exercise its right to foreclose or sell the property.

## DISCUSSION

In evaluating a motion brought under Mass. R. Civ. P. 12(b)(6), I "look beyond the conclusory allegations in the complaint," Curtis v. Herb Chambers I-95 Inc., 458 Mass. 674, 676 (2011), and determine if the plaintiff has pleaded "factual allegations plausibly suggesting (not merely consistent with) an entitlement to relief." Iannacchino, 451 Mass. at 636 (quotations omitted). In doing so, I must accept as true all facts pleaded in the complaint. Edwards, 477 Mass. at 255. I also accept as true "such inferences as may be drawn [from those facts] in the plaintiff's favor." Blank v. Chelmsford Ob/Gyn, P.C., 420 Mass. 404, 407 (1995). Applying this standard, I. conclude that the Commonwealth has alleged sufficient facts to state plausible entitlements to relief on all counts.

### I. Counts I, II, and IV

Counts I, II, and IV all allege violations of G. L. c. 93A based on the illegal provision of unlawful mortgage loans. Count I alleges that HEIs are illegal reverse mortgage and high-cost mortgage home loans that do not comply with Massachusetts law. Count II alleges the HEIs are usurious loans that violate G. L. c. 271, § 49. And Count IV alleges deceptive marketing related to the provision of loans. Hometap argues that Counts I, II, and IV must be dismissed because they are all based on the incorrect premise that the HEI is a loan.

The parties' respective positions center on whether the HEI is an option or a loan. Hometap argues the HEI is not a loan and not a mortgage loan but an option to acquire a percentage ownership in property in exchange for a cash payment.[3] Hometap argues that options to compel the conveyance of real property are common and generally permissible. No one disagrees. See Certified Corp. v. GTE Prods. Corp., 392 Mass. 821, 824 (1984) ("An option to purchase property which binds the successors and assigns of each party, and which includes mutual covenants involving the property, creates a contingent equitable interest in the option holder."). With that understanding, Hometap argues the HEIs are options because Hometap pays homeowners for the right to obtain a percentage possessory interest in the homeowner's property in the future upon the occurrence of various contingencies, including the homeowner's failure to repay (settle) the option payment (Investment Amount) within ten years.

**\*6** The Commonwealth responds that the HEIs are merely disguised loans, and that the nomenclature does not control, because Hometap delivers money with the expectation that it will be repaid via settlement or through a forced sale of the property. See Murphy v. Charlestown Sav. Bank, 380 Mass. 738, 746 (1980) (defining a "loan" as "(d)elivery by one party to and receipt by another party of a sum of money upon agreement, express or implied, to repay it, with or without interest."), quoting Black's Law Dictionary 844 (5th ed. 1979).

Assuming the facts asserted in the Complaint are true, as I must, the Commonwealth has sufficiently alleged that HEIs are, in substance, loans. The Commonwealth alleges that Hometap provides money to homeowners with a requirement that it be repaid and that the HEI structure ensures there is *no substantial risk* that Hometap will lose its principal.[4] The money is either repaid in ten years, with a substantial increase, which the Commonwealth alleges constitutes interest, or Hometap exercises its option and its right to foreclose or force a sale. The Complaint also alleges that Hometap explicitly markets its products to homeowners in need of cash *in the short term* who will, therefore, be unlikely to be able to settle in ten years. And, neither the homeowner nor Hometap anticipate that Hometap will actually retain a possessory-interest in the property. Put elsewise, Hometap never

intended to be a joint equity owner with any homeowner. Those allegations make the HEI - in substance - more akin to a loan than an option to purchase real estate.[5] See In re J.G. Wentworth Originations, LLC, No. 17-2188-C, 2017 WL 3573537, at *1 (Mass. Super. Aug. 10, 2017) (Gordon, J.) (structured sale of personal injury payments at a 34.2% discount "is in function and economic substance—if not nominally in form—a loan" subject to usury law).

That the HEIs are non-recourse does not necessarily mean they are not loans as a matter of law. See In re Stone St. Cap., LLC, No. NOCV2012-01891, 2013 WL 3341052, at *3 (Mass. Super. May 10, 2013) (Salinger, J.) ("A loan of money made on a non-recourse basis - meaning that the borrower is not liable for repaying the lender and that the lender instead must rely on some collateral, other assets, or third-party obligation - is still a loan."), citing Commissioner of Internal Revenue v. Tufts, 461 U.S. 300, 313 (1983) ("a nonrecourse loan should be treated as a true loan" for purposes of applying Internal Revenue Code). See also G. L. c. 167E, § 7(h) (defining "non-recourse reverse mortgage loan" as "a reverse mortgage loan which limits the lender's recovery solely to the value of the property at the time the loan becomes due and payable").

Nor does labelling the transaction and operative agreement as an "option" control. It is the substance of the transaction that governs not the labels. See Singhal v. Unison Agreement Corp., No. 22-60656-CIV, 2023 WL 2734230, at *5 (S.D. Fla. Mar. 31, 2023) ("The law is clear that the substance of the transaction rather than the form is examined to determine whether the transaction should be considered a loan."). Indeed, more than a century ago, the Supreme Judicial Court (SJC) considered whether the transaction at issue - nominally a real estate purchase with an option to repurchase -was a real purchase or a "conveyance received by the defendants as security for a loan made by them to the plaintiff[.]" Southwick v. Bigelow, 237 Mass. 299, 304 (1921). Based on a master's factual findings that the parties "contemplated the payment within a year of the $12,000 advanced by the defendants, and that the deed and agreement were given as security therefor," the SJC held the purported sale was "not one in reality." Id. at 305. Rather, the transaction constituted a loan with a mortgage. Id. Thus, Southwick teaches two things - the substance and not the form controls - and the determination of the true nature of a transaction like the one at issue here is a question of fact. Id. Accord Eastman Marble Co. v. Vermont Marble Co., 236 Mass. 138, 152-153 (1920) (option to purchase real estate does not create an interest in real estate).

*7  The Commonwealth also is correct that a typical option to purchase real estate involves the payment of consideration for the option itself and then the payment of the agreed-upon purchase price if the option is exercised. See, e.g., Thacher v. Weston, 197 Mass. 143, 146 (1908) (option contract provided that, in consideration of $25, plaintiff held option to purchase real property for $10,000); FBT Everett Realty, LLC v. Massachusetts Gaming Comm'n, No. 1881CV00304-B, 2021 WL 2584131, at *2 (Mass. Super. June 16, 2021) (Salinger, J.), aff'd in part rev'd in part on other grounds, 489 Mass. 702 (2022) (option contract for land on which to build a casino included monthly payments of $100,000 "in exchange for acquiring and maintaining the right, but not any obligation, to buy the property for *$75* million" if option holder was awarded a casino license) Here, the Commonwealth alleges that all the value for the percentage possessory interest in the real property is paid as consideration for the alleged option and not when the option is exercised. As noted, it also alleges that the mortgage does not secure the option, as Hometap argues, but repayment because Hometap "has no intention of becoming a joint owner" of any homeowner's property. Those alleged facts would support a conclusion that the arrangement is not a true option but a loan.

At the end of the day, the Commonwealth's allegations, if true - that Hometap pays money to homeowners who are subject to foreclosure and a forced sale if they fail to repay Hometap approximately two times Hometap's investment - would support the conclusion that the transaction at issue is not an option but a loan. At this stage of the litigation, it is premature to conclude one way or the other, but the Commonwealth has alleged facts which plausibly suggest the HEIs are loans and thus violate G. L. c. 93A because they are illegal mortgage loans (Count I), violate the criminal usury statute (Count II), and violate required state and federal loan disclosures (Count IV).

Com. v. Hometap Equity Partners, LLC, 2025 WL 2468564 (2025)

Hometap's other arguments are not persuasive at this stage of the litigation. First, Hometap relies on In re Yang, No. 23-00075-RLM-11, 2023 WL 7104764, at *1 (Bankr. S.D. Ind. Oct. 23, 2023) for the proposition that a "home equity sharing agreement" in which a company paid cash to acquire an option for a future interest in real property was an option contract. Again, there is no dispute that real estate option contracts can be valid. Indeed, In re Yang involved a more traditional option contract, as discussed above, where the company paid "paid $54,250.00 for the future right to purchase a 70.00% interest in the property for *an additional payment of* $157,325.00." Id. (emphasis added). There, unlike here, most of the consideration for the acquisition of the property interest (three times the option amount) was paid upon exercise of the option.

Hometap argues next that its return on investment is not interest because it is not a charge calculated as a product of principal, interest, and length of loan. But additional compensation to a lender need not be calculated in any particular way to constitute interest. "The word interest in its usual sense is the compensation fixed by the parties or allowed by law for the use of money or as damages for its detention." Begelfer v. Najarian, 381 Mass. 177, 181 (1980), citing Hayes v. Commissioner of Corps. & Taxation, 261 Mass. 134, 136 (1927). See G. L. c. 271, § 49(a) (defining "interest or expenses" for purposes of criminal usury to include "all sums paid or to be paid by or on behalf of the borrower for interest, brokerage, recording fees, commissions, services, extension of loan, forbearance to enforce payment, and all other sums charged against or paid or to be paid by the borrower for making or securing directly or indirectly the loan").

Next, Hometap's reliance on Foster v. Equitykey Real Est. Invs. L.P., No. 17-CV-00067-HRL, 2017 WL 1862527, at *4 (N.D. Cal. May 9, 2017) does not require dismissal. The option at issue there was a payment of "$196,000 to purchase the option to participate, at a rate of 100%, in the appreciation of the property, if any, from its initial value of $1,200,000." Id. at *3. While recognizing that the intent of the parties is "an important factor in determining whether a loan was created," the court held the payment was not a loan but an option because there was "no guarantee that the payment received by Mr. Foster need ever be returned." Id. at *4. The differences are clear. In Foster, return of any portion of the money was entirely contingent on an increase the property appreciating in value. Here, the Commonwealth has alleged that the HEI's structure ensures a return to Hometap regardless of home appreciation because of the functional equity devaluation. For the same reason, Hometap's reliance on the comments to 12 Code. Fed. Regs. Part 1026 does not persuade me that dismissal is appropriate. Those comments note that the Federal Truth in Lending Act (TILA) does not apply to option contracts in which the party advancing money to a homeowner risks the loss of the capital advance. See 12 Code Fed. Regs. § 226, Supplement I, Subpart A, 2(a)(14)(vii) (TILA does not apply to "[t]he execution of option contracts" and "[i]nvestment plans in which the party extending capital to the consumer risks the loss of the capital advanced."). Here, as oft noted already, the Commonwealth alleges *as a matter of fact* that Hometap risks no such loss. The truth of that assertion will be tested in this case but is sufficient to avoid dismissal.

**\*8** Finally, Hometap argues that Count I must be dismissed because the Commonwealth alleges both that the HEI is an unlawful reverse mortgage that fails to comply with G. L. c. 167E, §§ 7, 7A, and a "high cost mortgage loan" as defined by G. L. c. 183C, § 2, and "no product can be both a reverse mortgage and a high cost home mortgage loan." The Commonwealth responds that it has alleged facts which would support the conclusion that HEIs are unlawful reverse mortgages. I agree. The Commonwealth alleges that the HEI is a non-recourse cash payment, secured by a mortgage, and any shared appreciation, principal, or interest are due only upon certain circumstances or at the end of a fixed term and that Hometap did not comply with the regulations governing such loans. (See Com. Mem. at 12-13). The Commonwealth also responds that it has alleged that the HEI is a high cost loan under G. L. c. 183C, § 2. I agree as well.[6] Based on the facts in the Complaint, the Commonwealth has alleged a loan secured by a homeowner's principal dwelling with an annual percentage rate that will exceed nine percent.

For all the above reasons, the Motion to Dismiss Counts I, II, and IV must be **DENIED.**

### II. Count III

**Com. v. Hometap Equity Partners, LLC, 2025 WL 2468564 (2025)**

Count III alleges deceptive marketing in connection with the HEI. The Commonwealth alleges that Hometap's marketing and sales communications would lead consumer to believe that Hometap's returns stem from the Hometap fee and from home price appreciation when, in actuality, Hometap's return comes from devaluing the homeowner's equity and purchasing it at below market value. In support of its motion, Hometap argues that the Hometap marketing graphic included in the Complaint discloses all the facts from which a reasonable consumer could understand that, at settlement, for a $100,000 payment, Hometap would be entitled to fifteen to twenty percent of the home's value which, in the footnote, is disclosed as home worth $1 million. Further, Hometap argues that the Option Agreement and Investment Term Sheet fully disclose the structure of the HEI and explain in detail how the Hometap Share would be calculated. As a matter of law, then, Hometap argues the marketing could not be deceptive.

This is a closer question. Homeowners are entitled to enter contracts of their choosing - so long as statutorily and regulatorily compliant - and are assumed to have read and understood the contracts and other material provided to them. However, marketing is deceptive if it "directly, *or by implication,* or by failure to adequately disclose additional relevant information, has the capacity *or tendency* or effect of deceiving buyers or prospective buyers in any material respect." 940 Code Mass. Regs. § 3.05(1) (emphasis added). Thus, advertising need not be "totally false in order to be deemed deceptive in the context of G. L. c. 93A.... The criticized advertising may consist of a half-truth, or even may be true as a literal matter, but still create an *over-all misleading impression* through failure to disclose material information." Exxon Mobil Corp. v. Attorney Gen., 479 Mass. 312, 320 (2018), quoting Aspinall v. Philip Morris Companies, Inc., 442 Mass. 381, 394-395 (2004) (emphasis added). Here, the ultimate price of the HEI is certainly material, and the Commonwealth has alleged that Hometap's marketing would mislead an objective homeowner as to the ultimate price he or she would have to pay or face foreclosure or a forced sale. Hometap argues that the Commonwealth's other alleged misleading material - related to third party costs, successive HEIs, and the renovation adjustment - are insufficient either because the disclosures or lack of disclosures were not material or because all were disclosed.

**\*9** After careful review of the Complaint the questions of deception and causation are ones that must be developed in discovery, as the "analysis of what constitutes an unfair or deceptive act or practice requires a case-by-case analysis … and is neither dependent on traditional concepts nor limited by preexisting rights or remedies." Exxon Mobil Corp., 479 Mass. at 316, citing Kattar v. Demoulas, 433 Mass. 1, 14 (2000), and Travis v. McDonald, 397 Mass. 230, 232 (1986). See Nei v. Burley, 388 Mass. 307, 313 (1983) ("This flexible set of guidelines as to what should be considered lawful or unlawful under c. 93A suggests that the Legislature intended the terms 'unfair and deceptive' to grow and change with the times.").[7]

For all the above reasons, the Motion to Dismiss Count III must be **DENIED.**

### III. Count V

Count V alleges that the HEI is an unfair, oppressive or otherwise unconscionable product. The claim is based primarily on the structure, as described above, and the allegation that Hometap markets to financially vulnerable consumers who are in debt and cannot qualify for traditional loans, without any investigation regarding whether those homeowners can settle the HEI. The Commonwealth asserts that conduct - whether or not an HEI is a loan - falls within the penumbra of unfairness protected by Chapter 93A.

Hometap argues that the Commonwealth cannot rely on mortgage lending regulations or the usury statute to allege unfairness because the HEIs cannot and should not be measured against regulations that govern loans. According to Hometap, it is not "logical to hold an equity product to the cost limitations of debt products because equity costs more than debt in the market because the equity investor takes on more risk" and "applying the usury limitation to an equity-based product is novel." (Hometap Mem. at 16). I am not persuaded.

Com. v. Hometap Equity Partners, LLC, 2025 WL 2468564 (2025)

Chapter 93A, although more than a half a century old at this point, remains "a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights." Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 469 Mass. 813, 822 (2014), quoting Slaney v. Westwood Auto, Inc., 366 Mass. 688, 693 (1975). Further, "whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact. But whether conduct found to be unfair or deceptive rises to the level of a chapter 93A violation is a question of law." H1 Lincoln, Inc. v. South Washington St., LLC, 489 Mass. 1, 13-14 (2022) (quotations and citations omitted). "To determine whether conduct rises to the level of an unfair act or practice, courts look to the following factors: '(1) whether the conduct is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers or other businesses' " Columbia Plaza Assocs. v. Ne. Univ., 493 Mass. 570, 587 (2024), quoting H1 Lincoln, Inc. v. South Washington St.. LLC, 489 Mass. 1, 14 (2022).

It is not *inappropriate* to measure the HEI against statutes and regulations protecting homeowner mortgagees or other consumer borrowers. In Commonwealth v. Fremont Inv. & Loan, 452 Mass. 733, 742 (2008), the Court rejected the argument that the defendant did not violate any established concept of unfairness when it originated its loans because "new rules or standards for defining what is unfair" could not be applied retroactively. The Court reiterated that Chapter 93A "creates *new* substantive rights and, in particular cases, makes conduct unlawful which was not unlawful under the common law or any prior statute," and that the concept of unfairness is not frozen in time because "[t]here is no limit to human inventiveness in this field.' " Id., quoting Kattar v. Demoulas, 433 Mass. 1, 13 (2000). Given G. L. c. 93A's flexibility, "[w]hat is significant is the particular circumstances and context in which the term is applied." Fremont, 452 Mass. at 743.

**\*10** Here, Hometap concedes that it created a new option for homeowners seeking to access their home's equity. It also concedes that the product is currently unregulated.[8] Therefore, it is not impermissible when considering whether the HEI is unfair or oppressive to consider the guardrails that are in place to protect homeowners who seek to access their equity through traditional or reverse mortgages, as well as the harms those provisions seek to prevent and remedy.

The Commonwealth alleges that the HEI is unconscionably expensive because it provides Hometap a right to a home equity share worth more than twice what it paid the homeowner.[9] It alleges HEI features akin to those found to violate G. L. 93A in Fremont namely the failure to consider the homeowner's ability to repay or settle without losing their home, a balloon payment after ten years, and deliberate marketing to individuals with high debt and low credit, which make it highly likely that homeowners were/are doomed to "default" at the ten-year term.[10] Cf. Fremont 452 Mass. at 743. Characterized as debt or equity, the Commonwealth alleges that Hometap enters into contracts with homeowners knowing that the homeowners will not be able to satisfy their obligation to "settle" up with Hometap and will, therefore, lose their homes. Cf. Drakopoulos v. U.S. Bank Nat. Ass'n, 465 Mass. *775,* 786 (2013) (Chapter 93A "prohibits the origination of a home mortgage loan that the lender should recognize at the outset [ ] the borrower is not likely to be able to repay"). Those allegations support the claim that the HEI violates Chapter 93A.

Finally, whether the AGO will establish a right to recover penalties, costs or attorney's fees by establishing that Hometap knew or should have known that the HEI violated G. L. c. 93A cannot be decided at this stage.

**ORDER**

For the foregoing reasons, Defendants' Motion to Dismiss the Complaint is **DENIED.**

<<signature>>

**Com. v. Hometap Equity Partners, LLC, 2025 WL 2468564 (2025)**

Debra A. Squires/Lee

Justice of the Superior Court

August 21, 2025

Footnotes

1     The Commonwealth alleges Hometap does not adequately disclose the 2x delta between the Investment Amount and the Hometap Percentage.

2     The Complaint alleges another homeowner entered into a double tap that resulted in Hometap owning fifty percent of the homeowner's home value even though it paid less than twenty percent of the value.

3     Hometap asserts that it has offered HEIs in the Commonwealth for years; the Massachusetts Division of Banks (DOB) publicly recognizes that HEIs are critically distinct from loans and has indicated that it does not have the legislative authority to regulate such shared equity products; state legislators have recognized the HEI product is not a loan; and that bills are pending before the legislature that would allow the creation of a-regulatory framework for products such as HEIs. Hometap also asserts that prior to offering HEIs in the Commonwealth, Hometap met with both the DOB and the Attorney General's Office (AGO) and neither expressed concern. Thus, the AGO "sat on its hands for years" permitting Hometap to invest significant sums in the Commonwealth prior to determining the product was unfair.

     Against that backdrop, Hometap argues that the AGO's pursuit of G. L. 93A claims in this case "short-circuits" and "contravenes" the legislative process and violates Hometap's due process rights. Those issues, however, are not squarely presented before me on the instant motion. And, to the extent I accept Hometap's assertions without converting the motion to one for Summary Judgement, see Mass. R. Civ. P. 12(b), the argument that the AGO is ahead of the DOB or the legislature in taking steps to protect consumers from a product the AGO believes, and alleges is unfair and unconscionable, or has perhaps reached a different conclusion as to the fairness of HEIs after they were offered to Massachusetts consumers is not a basis on which to grant a Motion to Dismiss. Today, I evaluate only whether the Commonwealth has stated claims for relief ultimately subject to judicial review.

4     Hometap's insistence that the *contract* does not require repayment is simply another way of saying the loan is non-recourse because repayment would be required if the homeowner wished to continue to live in and own the property after ten years. See *infra*.

5     The possibility that Hometap may recover less than its investment amount may be provable. But on a Rule 12(b)(6) motion I must accept as true the Commonwealth's factual allegations that the equity devaluation inherent in the HEI's structure makes that possibility illusory because the property would have to decrease by more than 25% for that eventuality to occur.

6     A plaintiff may plead alternative and overlapping theories of liability and any redundancy, if it exists, is more appropriately addressed on a full record via a motion in limine or pursuant to Rule *56*. See Massachusetts Port Auth. v. Turo, Inc., No. 1984CV01773BLS1, 2020 WL 2617169, at *4 (Mass. Super. Apr. 14, 2020) (Green, J.).

7     With respect to the allegations concerning Hometap's sales representatives, although puffery and statements of opinion will not support a G. L. 93A claim, see von Schonau-Riedweg v. Rothschild Bank AG, 95 Mass. App. Ct. 471, 497 (2019), the Commonwealth has alleged more than mere puffery, including failures to disclose meaningful information. Reliance and causation must await resolution at a later stage.

8     That bills may be "pending" is of no import in connection with a motion to dismiss for failure to state a claim.

9     I do not view this argument as an attempt to amend the complaint where the factual allegations regarding the alleged excessive cost of the product are contained within the Complaint.

**Com. v. Hometap Equity Partners, LLC, 2025 WL 2468564 (2025)**

| | |
|---|---|
| 10 | It is immaterial that some of Hometap's customers had better credit ratings or sought funds for purposes other than to pay off high interest, unsecured consumer debt. |

**End of Document**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.