**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

ANGELA ROBERTS,                    **CIVIL ACTION NUMBER:**

          Plaintiff,              **24-cv-1374-CPO**

     v.                            **MOTION TO COMPEL**
                                   **ARBITRATION**
UNLOCK PARTNERSHIP SOLUTIONS
AOI, INC., and CLEAR EDGE
TITLE, INC.,

          Defendants.

          Mitchell H. Cohen Building & U.S. Courthouse
          4th & Cooper Streets
          Camden, New Jersey  08101
          December 4, 2025
          Commencing at 3:12 p.m.

**B E F O R E:**              **THE HONORABLE CHRISTINE P. O'HEARN**
                              **UNITED STATES DISTRICT JUDGE**

**A P P E A R A N C E S:**

     GUPTA WESSLER, LLP
     BY:  THOMAS SCOTT-RAILTON, ESQUIRE
     2001 K STREET NW, SUITE 850 NORTH
     WASHINGTON, DC  20006
     For the Plaintiff

     LAW OFFICE OF EDWARD HANRATTY
     BY:  EDWARD HANRATTY, ESQUIRE
     57 WEST MAIN STREET
     2nd FLOOR, SUITE 2D
     FREEHOLD, NEW JERSEY  07728
     For the Plaintiff

     Meta Goddard, CRR, RMR, CCR, Official Court Reporter
              Meta_Goddard@njd.uscourts.gov
                   856-576-7063

     Proceedings recorded by mechanical stenography; transcript
          produced by computer-aided transcription.

**A P P E A R A N C E S (Continued):**

McGLINCHEY STAFFORD PLLC
BY:  ALEXANDER GREEN, ESQUIRE
112 WEST 34th STREET, SUITE 1515
NEW YORK, NEW YORK
For the Defendant Unlock Partnership Solutions

STRADLEY RONON STEVENS & YOUNG, LLP
BY:  CHRISTOPHER A. REESE, ESQUIRE
457 HADDONFIELD ROAD, SUITE 100
CHERRY HILL, NEW JERSEY  08002
For the Defendant Unlock Partnership Solutions

**ALSO PRESENT:**
Haley Minix, Courtroom Deputy
Page Kim, Law

*United States District Court*
*District of New Jersey*

(PROCEEDINGS held in open court before The Honorable Christine P. O'Hearn, United States District Judge, at 3:12 p.m.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Please be seated.

We're on the record in the matter of Roberts versus Unlock Partnership Solutions, Docket 24-1374.

Can I have appearances starting with the plaintiff?

MR. SCOTT-RAILTON:  Thomas Scott-Railton for Ms. Angela Roberts, the plaintiff.

MR. HANRATTY:  Edward Hanratty for the plaintiff.

THE COURT:  And for defendant?

MR. GREEN:  Alex Green on behalf of Unlock Partnership Solutions AOI, which I'll just refer to as Unlock, Your Honor.

MR. REESE:  Good afternoon, Your Honor.  Christopher Reese on behalf of Unlock also.

THE COURT:  Currently before the Court is a Motion to Compel Arbitration, which is the defendant's motion.

Plaintiff filed a Second Amended Complaint on March 20, 2025, which is ECF 79.  The defendant then renewed its Motion to Compel Arbitration on May 5th, which is ECF 85.  And the plaintiff filed opposition thereafter on June 16, ECF 92; and defendant replied, ECF 96.

I also received supplemental authority notices from the parties dated August 11, October 14, November 13, and

December 1.  And that's ECF 97, 98, 100, and 103.

Defendant, it's your motion.  I will hear from you.

MR. GREEN:  Yes, Your Honor.  Your Honor, we are here on Unlock's Motion to Compel Arbitration.  This action centered around an agreement which is referred to by title as the Forward Sale and Exchange Agreement consummated on November 11, 2021, between the plaintiff and Unlock.

The nature of this agreement is very much the core of what the disagreement between the two parties are on this Motion to Compel Arbitration.

In opposition of the Motion to Compel Arbitration, there were arguments that this is a residential mortgage loan, there were arguments this is a high cost mortgage loan, there were arguments that this was a reverse mortgage, some of which are mutually exclusively terms --

THE COURT:  Let me stop you for one second.  Do you agree, if I find that it's a residential mortgage, that I don't need to reach, for purposes of your motion, whether it's a high cost mortgage or a reverse mortgage?

MR. GREEN:  For that specific point, yes, Your Honor.

THE COURT:  So I'd liked to focus first on whether or not it's a residential mortgage, because I think that that's the threshold or the key issue.

I understand that it could then also be triggered to have some additional or higher protections if it falls in the

other two categories, but I'd like to focus on that issue if we can. And then, maybe at the end, we'll talk about the other two a little bit. If we can start with that.

MR. GREEN: Of course, Your Honor.

THE COURT: Thank you.

MR. GREEN: So the Court term for -- as defined in the Truth in Lending Act, a residential mortgage loan is -- and this is the key terminology used under the Act -- a consumer credit transaction. It's a consumer credit transaction that's secured by a mortgage for --

THE COURT: A little bit louder and a little bit slower.

MR. GREEN: Sure. Under the Truth in Lending Act, a residential mortgage loan is defined as a type of consumer credit transaction.

Following down the whole of how that's defined and then how the next thing is defined, consumer credit is defined as an extension of credit.

Credit is defined as the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment.

Your Honor, what we have professed throughout our briefing is that, at the core of this -- of whether it is a residential mortgage loan, is whether the Forward Sale and Exchange Agreement is a type of debt or creates debt.

We say no, Your Honor.  At its very core, the Forward Sale and Exchange Agreement is exactly what it says that it is. It is a forward sale.  That term is typically, at least in legal authorities, found more in the context of securities law and commodities law; but it's defined as an agreement to buy or sell an asset at a certain future time for a certain price.

The term "debt" is defined in Blacks Law Dictionary as a liability or a specific sum of money due by agreement. Inherent with that definition is an understanding that the term "debt" involves an absolute obligation to repay an amount of money.  That, at the core, is what a debt is; and by extension, what credit is, what a loan is.

We cited a case that was, admittedly, from a different jurisdiction, Your Honor; but that we thought treated the issue quite well and actually addressed it under the Truth in Lending Act.  That's the *Bradford v. Terry* case, where the Court explained that an obligation to repay must be absolute.  That is its nature.  Without a debt, there could be no claim in that case under the Truth in Lending Act.

Here, Your Honor, at the core, this is a forward sale, as I said.  What is being sold is a specific ownership interest percentage in a piece of real property.  This is the sale of an ownership interest in real property with some additional provisions to it.

Unlock made an investment payment to the plaintiff in

2021 in exchange for the option to claim an ownership interest of up to 70 percent in the property, the real property.

At the time that the plaintiff signed the Forward Sale and Exchange Agreement, she did not have any absolute obligation to pay any specific amount to Unlock.  She still does not, to this day.

In opposing the Motion to Compel Arbitration, plaintiff does refer to a definition of debt found in the American Heritage Dictionary, a definition of debt that simply says, "Something owed such as money, goods, or services".

Your Honor, there are several definitions under that particular entry in that dictionary, several examples of how it's used; for instance, a debt of gratitude, a criminal repaying his debt to society, a life debt that's owed.

Your Honor, there are different ways that different words can be used in literature, perhaps in different time periods.  We are focused solely on how the word "debt" is used in the Truth in Lending Act.

And what we have shown in our briefing and what we're saying here today is that the term "debt" in the Truth in Lending Act means an absolute obligation to repay money.

THE COURT:  Tell me how your client ends up, or how the plaintiff ends up not repaying anything any time --

MR. GREEN:  Well, Your Honor --

THE COURT:  -- such that it would not be absolute.

MR. GREEN:  Your Honor, at the -- so what is obtained at the time of consummation is a contractual option to convert to an ownership interest after a period of time or upon the settlement event, is what it's called.

THE COURT:  And there are four of them?

MR. GREEN:  Yes, Your Honor.

THE COURT:  My understanding is, if any of those four events occur, your client gets paid money.

MR. GREEN:  That's not necessarily true, Your Honor.

THE COURT:  Tell me an instance in which, under those four conditions, your client doesn't get any money.

MR. GREEN:  A settlement can occur and Unlock can opt to not convert to an ownership interest.

THE COURT:  Basically, that's essentially you giving the plaintiff $111,000 for free and never seeking to recoup a single penny of it, and waiving your right under the contract to take any proceeds.  Is that right?

MR. GREEN:  Yes, Your Honor.

THE COURT:  Okay.  Is that really commercially likely? Can you identify a single instance in which that's ever occurred?

MR. GREEN:  I cannot say that it's never occurred.  I would have to speak with my client and offer that evidence, but I can't proffer that one way or the other.

THE COURT:  How would your client ever make any money,

and why would they go around doing this if they were going to exercise their option to waive their right to take any proceeds?  It doesn't seem to make any commercial sense to me at all.

Which leads me to believe that it's really elusory and written in there so you could make the argument that you're making which is, We don't have to.

But if you sit back and think about it, your argument means we can give someone $115,000; and if tomorrow, the sale of their house is the same price or more or less, whatever, she decides to sell, she can keep that $150,000 or $115,000, we're not going to exercise our option to recoup whatever the percentage is of the value of the house.

That seems to me to be so far-fetched and so unrealistic to render it elusory, ineffective, pick whatever word you want; to me, it's in no way conceptually ever going to happen.

MR. GREEN:  That's not the only way.  That was one way, Your Honor, in which --

THE COURT:  Tell me how else.

MR. GREEN:  -- this is distinguishing from being that situation, Your Honor.

Again, what is being acquired here, what the sale is for, is for an ownership interest in property.  So at the -- whether a settlement event happens, as I said, they could opt

not to convert their interest and not claim an ownership interest in the property, or they can.

And what they're receiving then, Your Honor, is an ownership interest in the property.  That ownership interest can be paid out upon the sale of the property.  It's paid out from a third-party practitioner, can be, depending -- in the amount of which would vary depending on the value of the property at that time, the time of the settlement event.

But what they're receiving is that percentage interest, and they would stand as a percentage owner alongside the current owner of the property, and receive the apportioned sale proceeds of the property if the sale occurs.

THE COURT:  Right.  Kind of like if I am married and I'm getting divorced and my husband and I own the property and we go to settlement and I take 50 percent and he gets 50 percent.

MR. GREEN:  Yes, Your Honor.

THE COURT:  Just a different percentage that you guys contractually agree upon as opposed to the law saying that you split your assets 50/50.

MR. GREEN:  Yes, Your Honor.

THE COURT:  Okay.  But to go back to the first point, though, the very first thing that you argue, it's not a mortgage because it's not an absolute requirement or obligation to repay.

Is there any other circumstance other than your client essentially disclaiming ownership rights, and basically saying take that money and walk away, you're good, that it's not an absolute repayment?

MR. GREEN:  Well, the word "repayment" itself implies that the payment would be coming from, in that circumstance, the "borrower".

Here, the payment is coming from a third party not from the actual homeowner under the normal course of -- for instance, if the term of 10 years expires.

THE COURT:  Okay.  But is there any circumstance, other than your client deciding to essentially walk away, that your client doesn't get money regardless of where it comes from?

MR. GREEN:  Any circumstance in which it doesn't get the same amount -- any money whatsoever?

THE COURT:  Any amount, yes.

MR. GREEN:  I would have to go through the different iterations; but right now, Your Honor, I'm not able to think of a certain circumstance besides that.

THE COURT:  That's the first key thing.  Right?  You argue, Well, it's not an absolute payment, we might not seek to elect to exercise our option.

The only other way you say is, Well, there's no guarantee, we might get less, we might get more, it's not a

specific amount, we don't know.

But according to the plaintiff -- and I'm assuming these are public numbers and they verified them.  In the Amended Complaint they say, literally, the property would have to be devalued nearly double what the worst housing market crash has been for you to get no money.  Right?

MR. GREEN:  I dispute those numbers.  I don't think they're -- I don't have an expert in the housing market here.  But I understand the argument regarding the devaluation, the amount of devaluation that would have to occur here.

Your Honor, I do think that it is a material distinction that, in this circumstance, that our client would be receiving a percentage ownership and that any money would not be repaid, or would be paid for the first time either at an agreed upon rate, fair market value, however it is determined, with a third-party purchaser in an amount that cannot be determined at this time.

THE COURT:  You mean it would be paid simply because, when you go to closing, that the title agent would give one check to you and one check to the plaintiff?  Is that what you're suggesting?

MR. GREEN:  From the money that's received from the -- either in cash or from financing of their own.

THE COURT:  You think that because it doesn't go through the plaintiff and then the plaintiff giving you those

monies, that somehow makes it different?

MR. GREEN:  I do think that that's a material distinction here, Your Honor.

THE COURT:  Does the plaintiff have the option at closing to tell the closing agent, Don't give them that money, I object?

MR. GREEN:  No, Your Honor; because, as the situation you pointed out, no more than you and your husband who each has a 50-percent ownership interest in a property would have that right.

THE COURT:  All right.  Go ahead.

MR. GREEN:  Apologies, Your Honor.

THE COURT:  That's okay.  While you're looking for that, am I also correct that if the plaintiff fails to make a settlement payment under one of the four events, right, that your client would have the right to foreclose on the property or bring a lawsuit to enforce its contractual right?

MR. GREEN:  Assuming that the settlement payment in those instances would be coming from the plaintiff, I believe like, in the instance where there is a sale with a third-party purchaser, that settlement payment would be coming from the third-party purchaser.

THE COURT:  You would have a recourse whether it is to seek to foreclose or to sue somebody.  You have a recorded instrument.  Right?

MR. GREEN:  There is a recorded instrument.  It's a performance mortgage, Your Honor.

THE COURT:  If somebody distributed the proceeds, you would have an issue.  Right?  I think that's why title companies have malpractice insurance.  Right?  They can't -- they should know.

MR. GREEN:  If my client was unaware of a transfer of the property and there were proceeds that were transferred, basically going around its contractual option, or if it's converted, percentage ownership interest in the property, then I imagine that there -- Your Honor, I would imagine there would be recourse under the contract.  There would likely also be recourse under common law as well.

THE COURT:  That's my point, that you have a legal recourse to recoup the monies that you paid.

MR. GREEN:  As any co-owner would.  Yes, Your Honor.

THE COURT:  All right.  And then, do you also agree that --

MR. GREEN:  That recourse, though, Your Honor, in the instance where the money is coming from a third party or the escrow agent, the legal recourse -- who the legal recourse would be for that -- under those circumstances, I suppose it could vary.

THE COURT:  Okay.  All right.  Go ahead.

MR. GREEN:  Your Honor, the unconditional obligation

to repay is also found in the Third Circuit's treatment of a loan and other contexts as well.

For instance, the *Merck and Company v. United States* opinion and the preceding opinions *Karns Prime & Fancy Food v. The Commissioner.*

Both of those kind of note that the key question is whether there was an unconditional obligation to repay.

*Merck* is cited in the opposition, Your Honor, as an example of how certain transactions can be considered loans. We do believe that the main legal standard and the analysis by which *Merck* uses is instructive here.  We think that the result is vastly different, however.

THE COURT:  What about the Third Circuit did say though, right, that it would be simplicity itself for two parties to direct a contract in which repayment would not occur in the event of some occurrence that was so unlikely that both parties could be confident that it would never transpire; and thus, repayment would occur despite the transfer of being deemed conditional?

It cannot be true that a party can convert a loan into a sale merely by including a provision establishing one condition precedent for repayment no matter how unlikely the condition.

So I don't know that *Merck* helps you because that's kind of what I'm saying.  Right?  I'm saying, Okay, technically

you say all over the place, This is not a residential mortgage, this is not a mortgage.

But the plaintiff has an out of repayment.  And the only way that she doesn't pay something or somebody doesn't pay you something is if you decide unilaterally not to exercise your right to claim it.  Right?

And so, isn't that exactly what the Third Circuit said that, when you draft a contract, when it's so unlikely not to occur, that in effect it's a ruse, it's elusory.

MR. GREEN:  That is what it said, Your Honor.  The way that I was going to distinguish *Merck*, however, is that that contract was for -- the point of that contract was for the exchange of money; money going in, money coming back.

Without getting into specifics, Your Honor, I'm going to try to stay as high level as possible.  Quite frankly, if I go too far, I won't understand it.

That was an interest swap agreement between two companies.  And for each company with an interest swap agreement, you have a pay leg and a receive leg.  Basically you're receiving your interest payment, you pay it out to the other side, and then, you receive the interest rate from the opposing side.

One of those parties, a parent company, purchased the receive leg from one of the subsidiaries.  So in effect -- and this is the characterization from the Court -- they received a

lump sum in exchange for the right to receive revenues over the remaining life of the swap.

The point of that transaction was to pay an amount of money and receive a greater amount in installment payments later on.

The point of this transaction, Your Honor, the thing that is being sold, is a percentage interest in the real property.

If nothing happens, if the plaintiff decides not to opt to -- any of the other options that she may have to remove this home equity investment contract, if none of those options happen, then what happens at the end of the ten-year period, is that Unlock is able to claim its percentage interest in the real property.

That, Your Honor, is what makes this distinguishable in the context of the Truth in Lending Act. *Merck*, if you recall, was actually dealing with an IRS notification -- I think it was an IRS notice, technically, about how you're supposed to report taxes for an interest rate swap.

THE COURT: Different context, I understand.

MR. GREEN: Different context. We believe that the *Foster* opinion from the Northern District of California is instructive as to how this distinction matters in the context of the Truth in Lending Act.

The *Foster* opinion, Your Honor, had a home equity

investment contract that was, in material respects, similar here.  There, Your Honor, the Court discussed in depth several exclusions that the CFPB had noted were not examples of credit. I want to be very clear about the wording that the CFPB used here.

This was commentary, Your Honor.  It wasn't an official rule making.  This was notice that this was an exclusion from what is considered credit, not an exception. This is not something that would be considered credit but for, you know, an official rule or something along those lines.

This was a recognition of transactions that would not be considered extensions of credit.  And two of the examples are relevant here:  The execution of option contracts and an investment plan in which the party extending capital to the consumer risked the loss of the capital advanced.

Your Honor, what's effectively happening here is -- and we saw this before with the Amicus brief from the CFPB which has since been withdrawn; but what plaintiff is essentially arguing with here is to add in language to the CFPB.

They essentially want to say that if there is no material risk of loss of the capital advance.  That's not what the commentary says, and that's not what the definition requires.  It's the creation of a standard that doesn't exist. And that was refused in the *Foster* decision which, Your Honor,

is not binding in this court, of course, but we believe it is instructive here.

THE COURT:  I'm not saying it's not instructive. There's a handful of cases that have addressed this issue, as we all know, because you keep sending me notices of supplemental stuff coming out.

I think if you read it in conjunction with *Merck*, I don't think just because *Merck* was not under TILA that it would change the theoretical or sort of starting point that, yeah, you can pretty much put anything in there; but if it's so unlikely to occur, it doesn't really make it optional because it's never going to happen.  Everybody knows it's never going to happen.

I can't take judicial notice of it, but I want to say I could take judicial notice that someone is not going to give someone $115,000 and decide later, I'm okay, good.  Maybe if it's like your relative or your kid, but that's not the situation.

It just seems so far-fetched and so unlikely that I have to -- I look at *Foster*, but then I look at it in conjunction with the Third Circuit's discussion on that issue, and I can't help but think if they made that comment in the context of two commercial entities, right -- because there were two commercial entities there.  Right?  Yes?

MR. GREEN:  In *Merck*?

THE COURT:  Yes.

MR. GREEN:  Yes.

THE COURT:  Where you don't have a consumer and we don't have the policies underlying TILA and that's to be construed for the benefit of the consumer, right; and with that in mind, that they wouldn't feel the same way, if not stronger, about looking at that issue.

MR. GREEN:  Your Honor, the fact that this is an exchange in a sale for an interest in real property -- and we could swap out any other asset there.  Crypto -- well, that probably has its own problems.

But the fact that what is being sold is an interest -- an ownership interest in an asset, in property, that is a categorical distinction, is what we're saying, from what can be considered a loan which is an extension -- an advancement of money so that that money can be repaid usually with interest.

What we're saying is that tying it to the fact that this is a sale, by definition, excludes it from being considered a debt, from being considered an extension of credit, from being considered a residential mortgage loan, Your Honor.

THE COURT:  Okay.  Can you talk to me a little bit about your argument that it's an option contract, and therefore, it's covered under one of the exceptions?

MR. GREEN:  Yes, Your Honor.  Again, very minor thing.

I'll just note it wasn't an exception and it wasn't, as far as I know, an official rule making but commentary.  So it's just that -- commentary recognizing that these are outside of the scope, Your Honor.

But yes, Your Honor, it is an option or at least it has significant elements of an option because there's nothing that needs to be done from the other side after the transaction occurs.

Unlock has the absolute and discretionary right to convert its interest in this case, a 70-percent ownership interest in the real property.

Your Honor, the definition that we have put forward, one that we found, was that, as explained by one New Jersey Appellate Court, an option contract has two elements; the underlying offer, and the collateral promise to keep the offer open for a certain amount of time.

THE COURT:  I don't think you addressed this.  Doesn't an option contract or for a contract to be deemed an option, and there be an effective option, have to be supported by consideration in addition to whatever the investment payment is, as you call it here?

There has to be separate consideration, doesn't there?

MR. GREEN:  Your Honor, under the definition that we found, that doesn't seem to be -- while that may be a more traditional option that comes before the Court more frequently

or that we see more frequently, that does not seem to be a defining characteristic under New Jersey law.

THE COURT: Okay. Anything else you want to argue?

MR. GREEN: I do, Your Honor. One aspect that was argued was that looking at that one -- at one of the several definitions that were found on the American Heritage Dictionary is that a debt can technically be anything owed rather than just a repayment of money.

We think that's contrary to what the Truth in Lending Act, what the purposes were. And that's kind of what I'm getting at, Your Honor, when I talk about how the fact that this is a sale of an interest in real property is a categorical distinction that takes it outside of the Truth in Lending Act.

One instance that we found to support that, there is a Third Circuit opinion that recognized that the Truth in Lending Act technically doesn't define the term "debt," which is why, frankly, the parties have disagreed on it. That's why the parties have put forward various definitions.

The Fair Debt Collection Practices Act, Your Honor, does define debt. And there is at least one distinction from the Third Circuit or where the Third Circuit recognized, since the truth in lending contract does not contain a definition of the term "debt", the U.S. Court of Appeals for the Third Circuit has, in at least one instance -- and two, because I'm quoting from an opinion -- stated that we believe the term as

used in the Truth in Lending Act should be construed as it is defined in the FDCPA.

That definition, Your Honor, is any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which money, property, insurance, or services which are the subject of the transaction are primarily for personal family or household purposes.

Your Honor, an obligation of a consumer to pay money, that is not what we have here. What happens in the normal course, if the homeowner doesn't -- elects to take none of the options available to her in this case, after 10 years, Unlock gets their specified ownership interest.

And at the sale of the property would sit alongside -- as a co-owner of the property, would be entitled to a certain percentage of any proceeds from the sale of the property.

THE COURT: And that goes back to your point that, simply because that check is being written by a title agent to you as opposed to the plaintiff herself, that that's a material distinction?

MR. GREEN: Yes, Your Honor.

THE COURT: Okay.

MR. GREEN: Your Honor, you mentioned that you had a question.

THE COURT: I was looking for my other question, I'm sorry.

MR. GREEN:  That's okay.  I only asked you because otherwise --

THE COURT:  Hold on a second.  To go back for a second, because I was just actually looking at the same issue, what makes you say that the definition of an option contract or whether or not it fits under the option guidance, regulatory statement, whatever you want to call it, under TILA would be governed by New Jersey law and not common law or something else?

MR. GREEN:  Federal common law, Your Honor?

THE COURT:  Yes.  Otherwise, wouldn't it vary from state to state?  Which we wouldn't want under TILA, we would want a uniform definition, wouldn't we?

We wouldn't want TILA to be interpreted and applied differently in different states, would we?

MR. GREEN:  I think TILA is interpreted to apply differently in different states, at times.

But Your Honor, in this instance, the contract itself is governed by New Jersey law.  And I would say whether it is or is not an option contract should also be governed by New Jersey law.

THE COURT:  To the extent you're looking at and relying on TILA to say it doesn't apply to these types of contracts, shouldn't I look at the way the term is used in TILA?

MR. GREEN:  If there's a definition of an option contract under TILA, Your Honor, then I believe that would -- not necessarily be controlling but it would be helpful in the Court's analysis.

THE COURT:  But there's not.  Right?

MR. GREEN:  I'm not aware of one --

THE COURT:  So what we --

MR. GREEN:  -- searching in my head --

THE COURT:  -- we have that term used, right, in the commentary.  You called it commentary guidance, I forget -- regulatory statement, I'm sorry.

MR. GREEN:  Yes, Your Honor.

THE COURT:  And that's put out by whom?

MR. GREEN:  That one was put out -- that was regulation -- comments to regulations -- by the CFPB.

THE COURT:  So when they put that out and they used that term, why would I look to what New Jersey law defines is an option contract?

Because that might be very different from, let's say, Pennsylvania law, and interpret that term based on the individual state law as opposed to common law, or something else, if there isn't a definition?

MR. GREEN:  Without federal guidance on what is and isn't an option contract, under the Truth in Lending Act, I think it would be a stretch to look under other federal law or

federal common law when this is an agreement that is, you know, consummated under New Jersey law, Your Honor.

THE COURT:  Okay.  Anything else?

MR. GREEN:  One final point, Your Honor.  It's really cumulative, so please cut me off if --

THE COURT:  It's okay.  Go ahead.

MR. GREEN:  Your Honor, the Truth in Lending Act was simply not designed for products like this.  It was designed for products where the primary purpose of the product was an extension of credit, money that's extended out and then repaid by that borrower back to the creditor.

You can see that within the specific provisions of the Truth in Lending Act.  For instance, one of them -- this is for a residential mortgage loan.  It requires disclosures at origination of the total cost to the borrower, assuming all payments are made and on time and calculated by adding interest and any other finance charge.

Going down the rabbit hole, if this were to be considered a residential mortgage loan -- again, we dispute that heavily -- but if this were to be considered a residential mortgage loan, how in the world could Unlock disclose the finance charge here?

The return on its investment is not defined until a settlement event, it's depending on the appraisal of the property at that time.

*United States District Court*
*District of New Jersey*

And I understand that the plaintiff has argued that it is exceedingly unlikely that the value of the property would decrease or would decrease such that, you know, Unlock would not receive the full amount at any eventual sale of the property.

But that -- whatever its return on investment is, is contingent.  It's certainly not anything that can be defined or disclosed at the origination of a home equity investment contract.

So for the Truth in Lending Act to apply, then every single home equity investment contract, it would be impossible to comply with specific provisions of it.

Periodic statements.  How could a periodic statement be issued on this type of product, Your Honor?  Again, going down the rabbit hole, if this were considered a residential mortgage loan.

It doesn't fit, Your Honor.  And it doesn't fit because what it is that Unlock is receiving is the property and interest in the property.  It is not a repayment, not a repayment with interest, not a repayment with any sort of other finance charge.

It is the property itself, the value of its investment is tied to it; and however unlikely it may be, this was actually one issue that was discussed extensively in the *Foster* decision.

Even if -- and there are similar evidence that was presented there, in the bay area, I think since 2010 that there was -- property values had only increased, and I forget the exact language from the Court, Your Honor; but basically it said it was inevitable.

I believe the Court still found the distinction of tying someone's interest to the value of the property, they found that distinction to be enough to take that transaction outside the Truth in Lending Act; Among other factors in that *Foster* opinion, Your Honor.

For that reason and for the -- looking at the scope of the Truth in Lending Act and its provisions overall, we respectfully submit that it is not a residential mortgage loan and not subject to the Truth in Lending Act.

THE COURT:  All right.  Let me hear from Plaintiff.  I may have more questions.  Go ahead, Counsel.

MR. SCOTT-RAILTON:  Good afternoon, Your Honor.

Congress enacted TILA to cover a wide range of transactions including more traditional loans but also things like pawn shops, as well as more accessible type loans like shared appreciation reverse mortgages.

Congress also understood that, from time in memorial, lenders have tried to hide loans behind evermore complex and clever transaction structures.  So Congress used a broad term, "Credit", and it defined it broadly as "the right to defer

payment of debt". Debt is a payment obligation.

So to be credit under TILA, you just need a future payment obligation. And, this transaction meets that definition.

Unlock gave Ms. Roberts an advance. And in exchange, it got a deferred payment obligation. In 10 years or less, as Your Honor pointed out, Unlock must be paid at settlement, payment of 70 percent of the value of the property; or at the very least, the initial advance plus 18 percent compound interest.

Ms. Roberts must either pay that in cash directly to Unlock or sell her home and pay Unlock from the proceeds. There's no difference in substance between her paying with a check from the proceeds versus the escrow agent --

THE COURT: Really, she has the option at any time to give them a check. It doesn't have to come from a third party like Counsel was arguing.

It could, if either she had no money or she chose to simply say, You'll get your interest when we go to closing next month, let's say. But she could also say, Here, I'm giving you your check, and she could go to closing and collect all the proceeds. Right?

MR. SCOTT-RAILTON: Exactly.

THE COURT: Okay.

MR. SCOTT-RAILTON: In that sense, it just functions

like any secured debt; either the debtor pays directly in cash or the lender gets paid out of the collateral.  And that's what's happening here.

If Ms. Roberts can't pay them directly in cash, then they will force the sale and they'll collect the proceeds from the sale.

And if that were enough to evade TILA, then any payday lender in the country could say, at the beginning of the month, I'll give you $1,000 at the end of month, you give me a thousand back or you have to sell your home and I get a thousand dollars from the proceeds or I get 50 percent of your home.  And under that reading, they would be categorically exempt from TILA.

On top of that, as Your Honor was pointing out, Unlock's future payment was secured by a mortgage, which is a classic feature of a debt.

The mortgage says it's a financing statement, which is securing a debt.  It refers to Ms. Roberts as the debtor.  And it expressly says that it serves, "To secure owner's payment to the mortgagee of the settlement payment".

THE COURT:  Those are documents prepared by the defendant.  Right?

MR. SCOTT-RAILTON:  Those are documents prepared by the defendant.

THE COURT:  Those are the labels that the defendant

chose to use?

MR. SCOTT-RAILTON:  Correct.  In other words, it secures the settlement payment, a future payment obligation, which is a debt.

Now, Unlock says that there are features of its product that make it not debt; but those are all features of debt that are already covered by TILA.  So TILA covers payment obligations where the specific sum owed will vary over time.

There's variable rate mortgages where the interest rate will vary along with the market.  There's shared appreciation mortgages where the amount paid will vary with the value of the home.

We cite those briefs.  Some of those are 15 U.S.C. 1602(cc)(2), and it includes payment obligations where there's some risk that the lender won't be made paid back in full, so take non-recourse obligations.  There, the lender could only be paid back out of the value of the collateral, which would be the home.  So if the home tanks in value, the lender risks not being paid back.

THE COURT:  Couldn't you say about any debt that -- if you could say that simply because someone could disclaim and choose not to exercise its contractual rights that, therefore, it's not subject to the statute, you could make that argument for virtually anything.

I mean, I could have a traditional mortgage on your

house, and you not pay, and I could just choose to sit back and do nothing.

A lot of lenders, for example, during COVID did exactly that.  Right?  They chose not to foreclose on people. They chose to perhaps do nothing or negotiate other payment terms; but certainly, they made that unilateral decision. Nobody is going to say that because they had the right to do that, that therefore it's not a mortgage.

And it seems to me if that was the argument then nothing -- that argument would succeed for every contract that someone said, as a plaintiff, this is a mortgage.  Because you can always say, I'm not going to exercise that.

MR. SCOTT-RAILTON:  A lender could always say, I'm not going to choose to have you pay me back.

THE COURT:  Right.

MR. SCOTT-RAILTON:  Here, I will say there's an added wrinkle, which is, as we allege in the complaint, Unlock then securitizes these mortgages and sells them off to investors.

I'm actually not sure that Unlock could, even if it wanted to, say we're not going to collect our money at all.

THE COURT:  Okay.  The situation, I guess, would be in some way if the property drops so much it wasn't worth their money, for example, to sue the estate in a contractual -- you know, people make those business decisions all the time.

I don't know what it would've been.  I haven't done

*United States District Court*
*District of New Jersey*

the math in my head.  Conceptually I could say maybe that could occur; but other than that, I can't really think of a situation.

Every person even outside of the mortgage context always has the right to not exercise their right to recoup whatever it is they pledged.  Right?

MR. SCOTT-RAILTON:  Right.  If that were characterized as an option, then you just blow a hole in the statute; because again, every lender -- mortgage lenders, payday lenders -- could say right in their contract, you know, we may exercise our right to collect repayment.

And then they would be in Court and they would say, Look, there's this contingency which is our own unilateral decision --

THE COURT:  I'm sure that no lender would ever agree to a provision that says, I may pay you back.  Right?  I may pay you this month, I may not.

MR. SCOTT-RAILTON:  Yes.  As to the Third Circuit's discussion in *Merck*, again, as Your Honor pointed out -- I think if anything, TILA is going to be broader than the Third Circuit's discussion in *Merck* because of the principle of liberal construction and because I think, as the Third Circuit has described it, they're not going to allow stratagem to sort of evade the substance of a statute.

THE COURT:  I don't think you have the same

unequivocal balance of power that you have with someone who is looking at their house being foreclosed on as opposed to the corporate entities that were involved with that transaction.

MR. SCOTT-RAILTON:  Exactly.

THE COURT:  Albeit different context, I understand. But I have to look at the reasoning behind, and then take it for what it's worth.

Maybe if it was the reverse, if that was a TILA case and we were here arguing about a tax issue, I might be saying, Yeah, we don't have those same issues here, we have two companies.

MR. SCOTT-RAILTON:  Right.  We have two sophisticated parties.  There's no indication, as there is in this case, that she was -- you know, needed money desperately right away. That's exactly what sort of lending laws exist to protect.

We cited these Supreme Court decisions, some from 200 years ago, that say, again, if there's no more familiar principle then you have to interpret these laws to not allow sort of evasions to allow lenders to sort of take advantage of the necessitous borrower.

So I think, again, when you look at the TILA principles, sort of the age old principles, you get to the same place; which is, We're going to take a closer look at this and we're going to look at the substance not the form.

And so, they get the check from the title agent.

There's this moment in escrow where they sort of nominally become co-owners.  Those can't be enough to get you out of TILA and otherwise, you know, the statute would sort of -- itself.

One thing -- I think the definition of debt requires a future payment obligation.  Any debt could potentially go unpaid, non-recours debts can go unpaid if the collateral drops in value.

Debt itself, just as a dictionary definition, doesn't require absolute repayment of the principal.  It requires a future payment obligation.  So you wouldn't need, I think, to get into that question.  And that's what the Ninth Circuit in *Olson* did.

If you thought that there was this requirement of, you know, under all hazards as a practical matter, a factual matter, they were going to get repaid their initial payment, here you have that, and we've alleged that.

We cite government data from the Federal Reserve backing that up.  It's similar in that sense to *Merck* where *Merck* pointed out that, in a recent financial crisis, the lender wouldn't have lost money.  I think that's exactly the case here.

They had not, until now, raised a factual dispute about that.  This is their motion.  If they wanted to come forward with evidence, they're a sophisticated company, they have all the internal projections and documents, et cetera.

If, you know, they do now want to raise this factual dispute about it, I think what Your Honor could do, given the framework the Third Circuit has established for the standard for evaluating motions to compel, Your Honor could either say they forfeited any factual dispute because they never raised it; or that, you know, they're now raising this factual dispute, you could deny the motion to compel without prejudice, and then say, we'll give you time for a discovery.

We would likely serve discovery demands on them, because they're the ones with all of the information about how their product works.

THE COURT:  But the defendant, as a moving party, has the obligation to show, if they think there's a disputed issue of fact that warrants discovery and defendant's argue that in their papers that discovery was necessary, it seems to me that I have to assume that the facts alleged in the complaint are true on a motion to dismiss; that, if the defendant wanted to submit something -- and quite frankly, I don't know what public records might exist but there might be information in the public records, I don't know.

But the defendant hasn't argued that, that I recall, that this should be governed under the Rule 56 approach as opposed to a 12(b)(6) approach.

MR. SCOTT-RAILTON:  I'll let them answer that question because I want to make sure -- the Third Circuit has sometimes

been a little finicky, for lack of a better word, about when there should be discovery on motions to compel arbitration.

I think they may have a throwaway line in a footnote saying, you know, if this Court thinks there's any ambiguity, then there shouldn't be discovery.

They haven't said what it is.  They haven't said why they couldn't provide the discovery on, you know, is there this repayment requirement or not.

I think they may have mentioned that they want -- they would want discovery on whether it's a consumer obligation or not.  That's something they haven't given any reason for there to be a dispute --

THE COURT:  I think it's a legal argument, it's not really a factual issue.  I mean, how is it not consumer?

MR. SCOTT-RAILTON:  I don't know.  She took this out -- and this is undisputed -- because she was facing imminent foreclosure of her home.  She was having trouble making ends meet and paying her property taxes.  That's also undisputed.  I don't know what that would be except a transaction primarily for consumer purpose.

If they do want to argue that there's discovery they need from us, they could try to make that argument.  And then, if this Court thought that were the path of caution, you could deny without prejudice and they could have this sort of limited discovery.

I would imagine after that, they probably wouldn't want to renew their motion because I think the discovery would just show what is already evident, which is it is a consumer obligation.

THE COURT:  Okay.

MR. SCOTT-RAILTON:  As to Your Honor's question about whether it's an option and the -- the option guidance, our first line here, as we put in our brief, is this is agency commentary.  As they said it's not even a formal regulation, especially given what the Supreme Court has said more recently about deference to agencies.

I think that's unlikely to govern if this is a debt within the plain meaning of TILA, it's a debt.  But even if you were to look at it, I mean, there are examples, and we cite them in the brief, whether it's *Merck*, whether it's *Olson*, whether it's New Jersey courts, pointing out that options can be used and are often used to hide debts.

They set up a future payment obligation.  They monkey around with the inputs.  And then, they insure that what you get is a future payment.

And so, it can't be that this guidance says, As long as you label it an option or your option is just to seek the payment, then off you go, you're out of TILA.

As Your Honor was also pointing out, and I felt the discussion in the Massachusetts Court's decision was

instructive on this.

An option usually looks like, I pay you $100 for you to keep open an offer for me to buy your home for $100,000, and it's an irrevocable offer during that period of time.  But at that second moment, I'm paying the option payment --

THE COURT:  That gets to my question which is, there's usually a separate consideration whether Courts actually use that term, I think there are, and I think that the *Foster* Court talked a little bit about it irrespective of its discussion. Because it wouldn't make sense otherwise.

The whole point of the option is, I'm paying you something extra, whether it's a right of first refusal or something else, I get something in exchange extra than what I might otherwise pay.  And there's nothing here that does that.

MR. SCOTT-RAILTON:  No.  There's just an advance payment and then a subsequent payment to Unlock.  And you know, when we're doing substance over form, that's a debt.  It's an advance and a future payment obligation.

And so, there isn't even any -- this is unlike some other cases.  There isn't even any nominal second payment that they're making to Ms. Roberts.

THE COURT:  There are cases where you say for a dollar.  Right?

MR. SCOTT-RAILTON:  Right.

THE COURT:  -- where there are cases where you have to

have additional consideration, it's like for a dollar, for $100, whatever it is. And then we can all say that wasn't real consideration. But, it is. Right? Here, there's just nothing.

MR. SCOTT-RAILTON: Here, there's nothing. Again, the way they've described their option is just the option to call in the payment. That's not how an option contract works.

I think that would be true -- New Jersey law would actually, if the Court looked -- would be instructive. There's the -- I think it's the *Zaman v Felton* case, where it is an option. And the Court says, We're looking at this, this is a mortgage loan.

So I think whether it's federal law, common law, New Jersey law, you get to the same place. It's substance over form. And the substance of this thing is not an option.

As to the decision in *Foster*, you know, that's an unpublished District Court opinion that I think now is inconsistent with something the Ninth Circuit has held.

Even if you look at it, it is a different product. The Court understood that product to be one where, if the home didn't go up in value, the lender got nothing. And that's really different from this product.

The home could dramatically lose in value, and they're still getting paid. They're still getting repaid with excessive interest.

THE COURT: That's based on how the return is calculated or defined?

MR. SCOTT-RAILTON: Exactly. When you do 44 percent for 70 percent, I mean, you are building in an enormous cushion to make sure that you're going to get your money back.

THE COURT: Right. You have a built in 30-something percent swing.

MR. SCOTT-RAILTON: Yes. Once you've done that with a residence in New Jersey, you have ensured that you are going to get your money back.

So if that were, as a practical matter, a requirement, we think as long as there's a future payment obligation, that's debt; but if there was some extra requirement on top of that for, you know, absolute repayment, then that would also be met here. We've alleged that but we've also backed that up with evidence.

THE COURT: Okay.

MR. SCOTT-RAILTON: The last thing I'll say is that there are also obligations under TILA where payment can come in the form of equity in the home or shared appreciation in the home.

So, I think their argument is categorically if there's any moment where the payment is styled as equity, then you're totally outside of TILA. That wouldn't be consistent with the kinds of things that TILA covers.

But I think the more fundamental point is what Your Honor pointed out which is --

THE COURT:  What about the defendant's arguments about, Well, this really is just not ever what was, you know, sort of contemplated; because how would we send a periodic payment notice, how would we -- all of what you heard him rattle off.  Can you respond to that?

MR. SCOTT-RAILTON:  Yes.  Again, I find it a little puzzling, because TILA covers a wide range of products.

TILA covers mortgages with variable interest rates where, you know, the interest rate could go up and down and you don't know that, at time one.

So for example, for certain kinds of high cost mortgages -- this is at 15 U.S.C. 1602(bb)(1)(iii), the statute says, okay, if the interest rate can go up and down, go with the maximum that it can hit.  Which, here, it would be 18 percent so --

THE COURT:  You could at least calculate a range. Even if you didn't know the specific amount, you could calculate a high or a low.

MR. SCOTT-RAILTON:  You can calculate -- you could go with a maximum, you could calculate a high or low.  TILA covers shared appreciation mortgages; where again, it's going to depend on the nature of the market.

And so, there are all, sort of, interlocking and

complex disclosure mechanisms; but the idea that something that has a variable return at time one sort of categorically can't fall under TILA.  I think it would just create this huge loophole in the statute.

I don't know exactly what periodic statements he's pointing to.  There are balloon payment loans that, of course, are going to be covered under TILA.  Reverse mortgages are balloon payment loans.  Many loans could be balloon payment loans.

So the mere fact that there's not periodic payments but there's one big final repayment, that doesn't seem like that would get you out from under the statute --

THE COURT:  It's interesting that you raise that.  Do you think that the mechanism of payment under this agreement is sort of similar to a balloon?

MR. SCOTT-RAILTON:  I think it's very much like a balloon.  I mean it's -- you're not paying anything.  I think this is how it's sold to people.  You don't have -- this isn't debt, there's no monthly payments.  It's just, you know, math, math, math.  At the end of this term, we will be sharing in your home with you.

THE COURT:  And you have the issue, as a consumer, whether you're going to satisfy that, let's say, when the balloon lapses; or whether you're going to then say, okay, I don't have the money, I'm going to sell the house or whatever

else the balloon may allow because I can't satisfy it.

For example, somebody who wants to -- let's say you purchased a house two years ago when the interest rates were really high.  You might do a balloon but you might know you're going to refinance when the rates come back down lower, because maybe that's the best you could get.

I don't know if it economically makes sense, I'm just -- stream of consciousness.  And, you know you're going to refinance.  And you do it, and nobody ever questions whether that's really a mortgage or not.  We do it all the time.

MR. SCOTT-RAILTON:  Right.  I mean -- and balloon payments, I think, are especially dangerous; because I mean, you're trading off of someone who needs money now is not going to be thinking as much about exactly what's going to be happening 10 years down the road; whereas periodic payments make more sense to people.

In that sense, that feature of the contract makes it more dangerous.

The other thing that makes it particularly dangerous is, with a lot of mortgages, your regular forward mortgage, you're buying the home and, over time, you're gaining equity in the home and paying it usually out of your income; whereas here, you're going to be losing a huge amount of the value of your home.  And Unlock, I think, thinks that in many cases, you'll be forced to sell your home to pay it.

That's a really dangerous form of lending; because instead of building up, sort of, home equity in a financial anchor, you're essentially going to be going back to way worse from where you started.

You'll have sold your home.  They'll have gotten a huge amount of money from it.  You, the homeowner, will have paid all of the transaction costs which would be quite large for an expensive home.

And then, you'll be trying to get a home -- in this case, for Ms. Roberts and her kid -- that's much smaller or in a more dangerous neighborhood because you've lost all of that value from your financial anchor.

THE COURT:  I mean from the consumer standpoint, would any reasonable consumer think that a lender would give them over $100,000, and then not exercise their right to seek some sort of repayment?

I have to look at this from the consumer standpoint, at least if I'm looking at it from a TILA perspective.  Right?

MR. SCOTT-RAILTON:  I think that's right.  And I think, you know, consumers -- in this case we say Ms. Roberts, she thought she was getting a loan.  She just thought that it was not this, sort of, horrible hidden balloon loan.

THE COURT:  Do you agree that, if I were to find that it's a residential mortgage covered under TILA, I don't need to reach -- I certainly don't need to reach your unconscionability

and other arguments, but that I don't need to address, at this stage, whether it's a reverse mortgage or a high cost mortgage --

MR. SCOTT-RAILTON:  Yeah, absolutely.

THE COURT:  For purposes of whether or not TILA applies, I understand it could apply under various -- or this loan could fit, under your theory, under various categories; but if I simply find it to be under TILA, that prevents arbitration, motion done.  Right?

MR. SCOTT-RAILTON:  That is right.  Unless there were any factual disputes, then it would be -- either way, it would be denied just with or without prejudice.

THE COURT:  Okay.  Anything else you want to argue, Counsel?

MR. SCOTT-RAILTON:  I believe that's everything. Thank you, Your Honor.

THE COURT:  Okay.  Counsel, I have a couple questions for you.  One being, I went back and looked at your moving brief, you don't in anywhere argue that discovery is needed for any issues and you argue that the 12(b)(6) standard is what applies.  Right?

MR. GREEN:  Your Honor, we do mention, I believe it was in the -- I believe it was in the brief, I could look through it, that should the Court disagree that the substance -- should the Court find that the substance of this does

resemble a residential mortgage loan -- and Mr. Scott-Railton did identify this as well -- that there would need to be some discovery on the issue of whether this is a consumer transaction or not.

The amount that was needed to redeem her property was less than half of the amount that she was given in an investment payment from Unlock.  So that means that over 50 percent of the transaction went somewhere else.

THE COURT:  I guess I'm confused because I did not appreciate that there was an argument, I did not see it, and I just re-read these, that somehow this was to be decided or should be decided under a 56 standard and not a 12(b)(6) standard.  What are the factual disputes?

MR. GREEN:  Basically, Your Honor, whether this would be a consumer transaction, assuming that the Court disagrees with our argument about this being structured not as a residential mortgage loan.

THE COURT:  Aren't you assuming it's a consumer transaction for the purposes of your argument?

MR. GREEN:  No, Your Honor.

THE COURT:  Okay.  Can you point me to where you have that in your brief?  I just looked.  You don't address this standard until the very end of your brief, I think it's Page 35.

You talk about it on Page 33 and really 34, In

determining whether an arbitration exists, you must decide whether it's a 12(b)(6) or a Rule 56.

And then, you go on and you say -- they talk about FAA.  And then, on Page 36, you go on and talk about the agreement being clear and that it falls within the scope.  And on Page 37, you make the same arguments.

I don't see anywhere in your moving brief where you argue there's a factual dispute that precludes me deciding whether or not it should be compelled for arbitration under 12(b)(6).  That's new to me.

MR. GREEN:  If you could give me a moment, Your Honor.

THE COURT:  Sure.  I think this is no different, for example, in the personal jurisdiction context, you can't just say if the Court disagrees with me then I want discovery.

That's not how it works.  You have to identify -- here, the burden would be on the plaintiff, usually, because it's the defendant saying you have no jurisdiction over me.

The standard requires the plaintiff identify what are the issues we need discovery about.

That's nowhere in your moving brief.  Your moving brief is, Decide this.

To the extent -- and I can pull out your reply brief again.  You can't raise a new issue in your reply brief.  I don't see anywhere in your moving brief that you say there are factual disputes, and that's how I should decide it.

Now, ironically, often sometimes in employment cases, for example, it's the plaintiff who's arguing there are factual disputes; because the plaintiff says, I don't ever recall signing it.  The Third Circuit has said that's not really a factual dispute, that doesn't count.

But there are four different versions of it, I don't remember which one I signed, and they're all different. Sometimes I need some discovery as to which version was in effect at which time.  None of those issues, you argued in your moving brief.

As far as I'm concerned, this is a 12(b)(6) motion. You've not identified in your moving brief any disputed issues of fact or issues that require discovery.

MR. GREEN:  Your Honor, in footnote four on Page 12 --

THE COURT:  Of your moving brief?

MR. GREEN:  Yes, Your Honor.

THE COURT:  Okay.

MR. GREEN:  We, too, discuss that this is a disagreement over the substance of a contract and that if the Court -- we profess that it is unambiguous; but if the Court does find any ambiguity, that Unlock does respectfully request the opportunity to conduct limited discovery as the -- before the Court, it would be insufficient to adjudicate that issue.

THE COURT:  But the issue that you're talking about in footnote four is not in general, and it's not the issue that

we're really talking about.

It's whether or not it was a residential mortgage loan.  You don't mention about any -- that's just the overall legal issue.  Right?  What are the facts?

You have to set forth what are the facts.  And unlike a plaintiff who generally doesn't have all of the facts and says, I need discovery, you're the defendant.  You wrote the contracts.  You offered the product.

What discovery could you possibly need?

MR. GREEN:  Your Honor, frankly, the use of the -- over 50 percent of the funds; because our argument would be that that would no longer -- if that was used for business purposes, for instance --

THE COURT:  Did any facts suggest that that's the case?

MR. GREEN:  Other than the fact that she identified that I believe it was $54,000 was needed to redeem the property and that she was given $111,000 more than that, there are no facts alleged as to the use of the remaining funds.

THE COURT:  That's purely speculative.  I don't know what she did.  Maybe she had other consumer debt she had to pay off, credit cards, I don't know.

You can't come in and say, Because we want to know what she did with it, we need discovery, we found her LinkedIn profile and she operates her own business and we think she

actually used this to run her business, we have, you know -- I don't know, something that would indicate that. You can't just come in and say, "I think".

In a tiny little footnote you reference discovery, but it's not even about the issue we're talking about. It's just that if I find that it's ambiguous as to its terms. I'm not saying it's ambiguous. I'm looking at this. I don't see how your client doesn't pay.

I think it's completely unrealistic to say that your client would never exercise its right to recoup something. So you have to identify what is -- it's not whether or not I find it to be ambiguous.

If you're arguing that there's a need for discovery, then tell me what it is and show me in your papers where you articulate what discovery you need, because I don't see it. That's saying, Judge, if you don't agree with us and you think we need discovery; I'm saying I don't think it's legally ambiguous.

MR. GREEN: Your Honor, you mention facts that, quite frankly, I don't think are relevant to -- Your Honor, a lot of what's been discussed up here has not been a set forth standard that's been presented in any court before.

We're talking -- the discussions that have happened have been, this becomes subject to TILA because of how the markets perform in the area. And that's potentially a factual

discovery.

There's nothing that's ever said that before.  There's nothing that said that that's actually a factual dispute that we need to engage in.  And certainly, it is not something that we found in any case before it.

There's no case that's ever found a product -- a home equity investment product subject to a Truth in Lending Act, none.

THE COURT:  That doesn't mean you get discovery.  So what?

MR. GREEN:  I understand, Your Honor.  But when the standard by which that we are identifying what is and is not a residential mortgage loan is unclear, then exactly what we need factual discovery on -- for instance, you asked me whether Unlock has ever walked away from an agreement or not.

I don't know that off the top of my head; but if that's a fact that's relevant for this Court's inquiry, I don't see any legal standard by which that would be one.  And it wasn't one that I could have expected before today.

THE COURT:  Well, if you look -- first of all, I think I kind of joked but I'm actually pretty serious.

I think I could take judicial notice of the fact that a lender who gives someone $115,000 is probably simply not going to walk away.

MR. GREEN:  But "probably" or "simply" is not an

absolute obligation, Your Honor.

THE COURT:  Well, I can say that, as a matter of law, that I interpret the Third Circuit's language to mean if it's elusory and I find this to be exactly that, elusory, under just the concept of it; but if you look at the Third Circuit, specifically how they direct for the Court to decide which is *Guidotti v. Legal Helpers Debt*, 1716 F.3d 764 at Page 776.  I don't know if anybody cited that or not.

But that Court specifically says, Third Circuit, When it's apparent on the face of the complaint and documents relied upon in the complaint that a certain of the parties claims are subject to an enforceable arbitration clause, a Motion to Compel Arbitration should be considered under a 12(b)(6) standard without discovery delay.  But if the complaint and its supporting documents are unclear regarding the agreement to arbitrate -- not an issue here, we all agreed she signed it -- -- or if the plaintiff has responded to a Motion to Compel Arbitration with additional facts sufficient to place the agreement to arbitrate an issue -- plaintiff hasn't done that, plaintiff has put forth no facts that are not in their complaint -- then the parties should be entitled to discovery on the question of the arbitrability before the Court entertains any further briefing and a renewed motion.

I've never had a case where the person moving for -- I don't think I've -- to compel arbitration argues that there

should be discovery; because if you think there should be discovery, what did you file a motion for?

MR. GREEN: Your Honor, we filed a motion based on the language in the agreement, which is indisputably signed.

However, during the course of our discussions here, there's been additional facts that have been discussed; which, if they are relevant to the Court's understanding of whether this is a residential mortgage loan or not, then those are new facts that need to be fleshed out in discovery.

I'm not saying that they are. I don't believe that that's a standard by which the we judge -- we should judge whether this is a residential mortgage loan or not.

And I don't think that whether it is a residential mortgage loan varies based on the -- you know, whether the property values have increased in the area or not.

I don't believe it varies based on whether Unlock actually exercises its option or not.

THE COURT: Okay. So your position is, this is a question of law, that there's no discovery needed. That's how I understood your application.

MR. GREEN: Okay.

THE COURT: To go back to one of the things we talked about in the beginning, and you talk about this is not a specific amount of debt for a specific amount of money with any specific repayment terms and we have to look at how debt is

defined.

Would you agree that this is a liability, that the consumer here, the plaintiff here, is incurring a liability?

MR. GREEN:  No, I do not.

THE COURT:  Why not?

MR. GREEN:  What would she be liable for?  I actually --

THE COURT:  She's liable to satisfy your interest.

MR. GREEN:  Liable --

THE COURT:  She can't walk away from it.  Is she bound by it?

MR. GREEN:  It's an option, Your Honor.  She actually can't control whether Unlock decides to convert to the percentage ownership interest at the end of the term.

THE COURT:  Right.  But she only has an option of whether to give you cash or whether to give you your percentage option.  Right?  She doesn't have an option to do nothing.

MR. GREEN:  She doesn't have an option whether to give it.  It is done at the time of consummation.

And Unlock has the option to convert it to a percentage ownership interest at the end of the 10-year period unless she opts to do something beforehand.

THE COURT:  Regardless, however it's satisfied, she has a liability.

MR. GREEN:  No, Your Honor.

THE COURT:  I don't understand how it's not a liability.  How is it not a liability?

MR. GREEN:  There's nothing she could be sued on.

THE COURT:  What do you mean, "There's nothing she could be sued on"?

You're not requiring her to do anything between now and before any of the four events.  But if one of those four events happens and she doesn't pay, then you can see her.

MR. GREEN:  No, Your Honor.  There's no obligation for her to pay at those events.  There's no obligation for her to pay.

Unlock has the option to take an ownership interest, and just like any other co-owner, just like any other co-owner, can enforce the sale of a property.

THE COURT:  This gets back to, We have the right to but we don't have to.  It's whether or not we elect to.

MR. GREEN:  What was the starting point question again, Your Honor?  I'm sorry.

THE COURT:  If any of those four things happen --

MR. GREEN:  Right.

THE COURT:  -- that triggers a liability.  Like upon her signing this, okay, she doesn't have to pay anything tomorrow or next month, her time of owing you something is due when those four things happen.

MR. GREEN:  If she does nothing, then she pays

nothing.  At the end of the 10-year period, Unlock stands as a co-owner and receives money from the third-party purchaser not from her.

THE COURT:  I understand, but I don't really appreciate that that's a material distinction.  My question is a little different.

No matter what, her property and she, as the owner of the property, are subject to a liability whether you want to call it money or whether you want to call it somebody else owning a percentage of it.  It's a liability, isn't it?

MR. GREEN:  No more than if you owned 50 percent -- is that a liability if you own 50 percent ownership interest in a property with your husband?

THE COURT:  If I'm the other 50 percent owner and that person has the right to perhaps foreclose on me or take a percentage of the proceeds if I decide to sell, my husband doesn't have that right necessarily.  Right?

MR. GREEN:  Under this factual scenario, we could use me instead of you, Your Honor.  The co-owner would have a right to 50 percent --

THE COURT:  That's okay, it's fine.  You're entitled to 50 percent of the proceeds.  A Court could, I guess, under certain circumstances, but he can't, under some contractual obligation, foreclose on me.

MR. GREEN:  He could force a sale.

THE COURT:  He could force a sale perhaps in the context of divorce proceedings and equity laws and things like that, but not under the term of any agreement.

This is under a term of an agreement that gives your client's rights to effect and triggers your client's rights, whether they elect to use them or not, either whether it's sold or whether they foreclose or if she decides to pay.

MR. GREEN:  My client's rights are not an obligation from the other side.  It's not a burden on someone else if my client has a right to do something, a signed right signed as of the beginning of the agreement.

THE COURT:  So a consumer that receives that amount of money up front from you in exchange for 70 percent interest --

MR. GREEN:  After 10 years.

THE COURT:  -- is not a burden.  Is that what you just said, it's not an obligation?

MR. GREEN:  Legal burden, legal obligation, legal liability, Your Honor.  It certainly is a burden.  It's something that was agreed to in the beginning.

THE COURT:  Okay.  Do you think it's a claim --

MR. GREEN:  No.

THE COURT:  -- your client has claim?

MR. GREEN:  No, not against -- not against the owner of the property.

THE COURT:  Okay.  Anything else you want to say?

MR. GREEN:  Your Honor, kind of what I've been hinting at before, maybe I haven't directly said it, I'm having a difficult time discerning if the standards that we have put forth are not the standards by which this product would be evaluated, what are those standards.

You know, we've talked a lot about it's an option contract.  And we've talked about -- and this is in the recent Massachusetts opinion, is it a traditional option, is it a true option.  Those terms are not defined.  What are those terms?

We provide the definition from a New Jersey case defining what an option is, and you say that this fits that definition and we have not really heard a contrary definition of what -- of whether this is an option or not.

I know it's not necessarily controlling, but we've shown commentary from the CFPB that have said option contracts are not included within the scope of what a credit is.

Not to mention, Your Honor, we haven't even discussed an investment plan, an investment plan where they do actually provide some additional discussion as to what an investment plan is.

They said that the parties extending capital to the consumer risk the loss of the capital advanced.

I understand that there can be dispute over whether this was a material risk, the extent of the risk; but there is a risk, even if it's a remote one, that the capital that was

advanced would not be recouped.

That's one of the reasons why the *Foster* decision, one of them, the *Foster* decision found that it was not a loan. This is tied to the value of the property, the value of the property varies, and that fact in and of itself -- you know, because there's no -- if this is a bad housing market, all of a sudden this becomes credit as opposed to not credit.

That distinction doesn't exist.  That standard doesn't exist.  It wouldn't be able to be employed in any effective way.

THE COURT:  No; but my guess would be that your client, in some very sophisticated way which is well beyond my mathematical and analytical capabilities, did some historical research on the properties in the states in which it elects to offer these agreements, and it figures out and can hedge its bets pretty much 99.9 percent of the time it's not going to walk away and lose money.  And they can figure out exactly what the sweet spot is.  They don't just pull 43 percent out of the air.

I mean, this wasn't a loan for $25,000 or $50,000.  It was calculated in some way that your client chose.  It seems to me that that goes with the whole theory that the Third Circuit talked about, which is, You know this is never going to happen. And so, it's really not an option.

And that's a way to get away and say, It's not under

TILA.

MR. GREEN:  Does that make -- Your Honor, there's nothing in the statute, nothing in Regulation C that says that that takes a transaction that's outside of TILA and puts it in TILA.  Only bad investments becomes loans?

What kind of -- what standard is that?  How bad of an investment does it need to be?  That's why I get into the fact of discovery, Your Honor.

THE COURT:  How is this different than a balloon?

MR. GREEN:  How is this different than a balloon?

THE COURT:  Yes.

MR. GREEN:  Because there is no obligation for -- a balloon payment, there's an obligation for the borrower to repay a balloon payment.  It's usually something larger than what the original payment was.

THE COURT:  Let's say at the end of 10 years.  Right?

MR. GREEN:  Sure.

THE COURT:  Here, at the end of 10 years, something has to happen.  She either has to sell or pay you.  Right?

MR. GREEN:  No.  Unlock takes an ownership interest. And as an owner, they can force the sale of a property.  It sits.  It has that ability.  It is in the contract.  Arguably, they would have that ability under equitable principles as well to force the sale of the property.

THE COURT:  Okay.  Anything else, Counsel?

MR. SCOTT-RAILTON:  Just on the -- sorry.

THE COURT:  Let him finish, and then I'll go back to you.

MR. GREEN:  Your Honor, the examples that opposing counsel gave, they all were traditional loans; money goes out, payday lender, $1,000 out, you get -- or whatever amount out, you get $1,000 back.

Even when sums can be -- can vary over time, you pay money, you're owed money back.  That is the point of the transaction.  Non-recourse options.  I mean, it's kind of a roundabout way of saying -- a way of talking about reverse mortgage loans.

A reverse mortgage loan, if you get a reverse mortgage loan for $300,000, you have incurred a debt for $300,000.  The way in which a creditor can collect on that debt is limited.  Non-recourse option, it's only limited to a foreclosure option, notably not an ownership interest option.

Your Honor, those all fall within the definition of a debt, of an extension of credit, of a consumer credit transaction.

This doesn't, because it isn't -- again, Your Honor, I won't go down that road again.  This is sale of an ownership in real property.

THE COURT:  Your argument is because your client could choose at the end of 10 years to sit back and just become a

fractional owner and do nothing else, it's not a mortgage because there's no debt.

MR. GREEN:  Both the investment and the option parts of it, I think are important, Your Honor.

THE COURT:  Okay.  Anything else?

MR. GREEN:  One note on the Ninth Circuit opinion.

You've seen the briefing, Your Honor.  That opinion, it was unreported.  It was withdrawn.  It's of no force and effect.  It really doesn't help them at all because it wasn't under the Truth in Lending Act.

In fact, the motion for a hearing -- asked for the Court to apply Washington law similarly to the Truth in Lending Act.  The Ninth Circuit didn't do that.

One aspect to the Ninth Circuit in that opinion, which was withdrawn, did note that it believed that the home equity investment product was a reverse mortgage loan.

One aspect of that, that -- two aspects of that opinion that kind of take it out of being a relevant source of consideration here, Your Honor, is the application of state law, state law in Washington as we discussed in our response, Your Honor, I won't rehash the specific reasons, is different in the Truth in Lending Act.

Additionally, that product, there was -- and the Court noted this.  It wasn't a lengthy opinion, but it noted this as being significant.

A portion of that initial investment payment was secured by -- I think it was the dean of trust, possibly a mortgage -- a portion of that was secured by it.

That was a noteworthy consideration.  It was noteworthy because of the definition of a reverse mortgage, Your Honor.  I know you didn't want me to get into reverse mortgages, but that is something we don't have here.

The investment payment that was provided, there's no portion of that investment payment that is secured by the performance mortgage at issue here.  Your Honor --

THE COURT:  What about the fact that, in your own documents, you refer to her as a debtor?

MR. GREEN:  I believe that was in some of the -- I believe that was in some of the --

THE COURT:  The documents you filed with the Clerk have the heading "Mortgage" on it.  It puts her in the position of debtor.  I highlighted it somewhere.

Document type, mortgage; document charge type, mortgage.  I'm looking at Exhibit B to the Second Amended Complaint.

MR. GREEN:  Sure.

THE COURT:  On the Burlington County document summary sheet mortgage, mortgage, mortgage.

MR. GREEN:  The summary sheet?

THE COURT:  Multiple times.  I'm looking at ECF 79-2.

And then, there was another part where you refer to her as a debtor.

MR. GREEN:  May I reach back to follow along, Your Honor?

THE COURT:  Yes.  It's in there, you can take my word for it.

MR. GREEN:  Of course.

THE COURT:  Plaintiff referred to it.  What am I to make of the fact that you refer to her as a debtor?

MR. GREEN:  Your Honor, first of all, a mortgage is --

THE COURT:  So, we go back to whether or not she incurred a debt.  That's where we ultimately -- you said ultimately, that's what we're looking at.

MR. GREEN:  Yes.

THE COURT:  You only call someone a debtor when they incur a debt.  So, you call her a debtor.  Right?

MR. GREEN:  I have to look at it to see exactly where, Your Honor.

THE COURT:  Can plaintiff's counsel point me to where it is?  I know I saw it.

MR. GREEN:  I just want to lay eyes on it, Your Honor.

THE COURT:  I know.

MR. SCOTT-RAILTON:  It's 79-2, and it's Page 1 of the larger document.  There's that big bold all caps paragraph there at the top.  It's right after the summary sheet.

THE COURT:  Yes.

MR. SCOTT-RAILTON:  And first it says, This performance mortgage is a security agreement and financing statement under the New Jersey UCC.  We point to the statute which indicates that that's security for a debt.

And then later in the second-to-last sentence, it says, The owner/debtor.

THE COURT:  I knew I saw it.  Thank you.

Who types that language?  That's your language.  Right?  It follows with the performance mortgage.

It's labeled Page 1 of 22 and it says, Attention County Clerk, this performance mortgage is a security agreement, et cetera.

This says to me that your client prepared it.  And it says at the top, Prepared by, recording requested by Unlock Partnership Solutions AO1, Inc., which says to me that your client drafted that, which calls her the owner/debtor.

MR. GREEN:  Your Honor, that was prepared likely on their behalf not necessarily by their own personnel.

THE COURT:  Okay.

MR. GREEN:  However, this does reference a New Jersey statute, you know, whatever was stated in there to potentially -- for recording purposes, to comply with New Jersey statute, doesn't change the substance of what this is.

THE COURT:  But she can't be a debtor for one purpose

and not for the other.  Right?

MR. GREEN:  She's not a debtor.  Your Honor, it is our position that she is not a debtor.  There is no debt that she owes right now.  There's no debt that she owed when she signed the agreement.  And if she does -- if nothing else happens at the end of the 10 years, there won't be a debt that she owes then.

THE COURT:  Thank you, Counsel.  Anything else, briefly, Plaintiff?

MR. SCOTT-RAILTON:  Just two points, but one on discovery.

I wanted to point Your Honor, in case it's useful, to a recent decision by the Third Circuit that I think just elaborates a little bit on *Guidotti*.  It's a 2025 decision called *Cornelius v. CVS Pharmacy*.  It's at 133 F.4th 240, is the cite.

And it just sets out when and sort of under what circumstances discovery is appropriate.  So I think that could be helpful because it fleshes out a little bit what *Guidotti* said.

I think this Court could certainly hold that they forfeited their request.  It's buried in a footnote in the opening brief.  It doesn't even say what they would ask for.  They request about discovery into the consumer nature that shows up in the reply briefs, so could be --

THE COURT:  I'm not persuaded.  It all starts with the contingency of, if I think it's ambiguous.  I'm sitting here, I don't really think it's very ambiguous.

It's not whether I think discovery is necessary, it's whether the parties can show me enough that there's some kind of facts that would make a difference.  I'm not hearing that from the defendant.

It's unusual to hear that from the moving party, it's usually from the opposing party.  So the whole factual premise of it doesn't quite make sense to me.

MR. SCOTT-RAILTON:  It doesn't make sense.  And I don't think it was the proper way to request that discovery.

I will say again just -- if this Court does think belt and suspenders would be appropriate, you could deny without prejudice.  They can send us a request about the consumer nature of the obligation.  I'm sure our client will explain she was using it to cover a variety of household expenses.

They could then try to renew on just that ground; I think they likely wouldn't, given what would come out.  But if that would be the path of prudence, Your Honor could always do that.

THE COURT:  Thank you.  Anything else?

MR. SCOTT-RAILTON:  No, Your Honor.  I think that's it.  I think Your Honor has covered the payment obligation question.  The co-ownership, it really is just a mechanism to

get settlement payment.  That's what it exists for.

And again, it would just completely allow circumvention of TILA if you could say, Well, at the moment the payment comes due, we become co-owners either in escrow or for this brief moment in time; and so, we get the check instead of you getting it and paying it to us.  But in substance, it's just a secured debt; either she pays or they get paid out of the collateral.

The last thing I'll say that *Olson*, the opinion was not vacated.  And I think even the dissent that they cite makes that clear.

There was a request by the parties to dismiss the appeal because we settled the case.  I was counsel in the case.  And so, no mandate issued from the Ninth Circuit, but that doesn't make the opinion --

THE COURT:  That's interesting.  I really never appreciated it until just recently with what's going on with our U.S. Attorney in this District, because the Third Circuit issued an opinion but not yet a mandate.

We were all discussing amongst ourselves what happens in the interim time period when you have something decided like the Acting U.S. Attorney was unlawfully appointed.

We haven't gotten a mandate yet.  What does that mean for a criminal defendant who is appearing before me today with documents signed by Acting U.S. Attorney?

This is a little bit different in that there was no mandate that issued, which makes -- my understanding of a mandate is legally enforceable, the parties have to follow.

Most people follow what the Court says in an opinion before the mandate comes out.  I've had cases where I don't get the mandate for three months.

And I think, did I get reversed or something, why am I reading this again, and I realize I've already read it.  I don't know that it has anything to do on what the substance of what the Court said.  To me, it has to do with the timing of, you know, you don't want a mandate because you've reached a settlement.

I don't know that most parties are, quite frankly, sophisticated enough to request that because I don't really know that a lot of people appreciate the difference between a Court's opinion and a mandate.  With that, I understand that that was the procedural history and I note it for what it was.

MR. SCOTT-RAILTON:  Okay.  And then the last thing I'll say, one other, I think, important point in the mortgage that Your Honor was looking at 79-2.

In addition to that language which I think -- those aren't stray references.  They're trying to create a mortgage to enforce a future payment obligation, so they're using the language necessary for that to protect themselves.  It's just when they want to evade TILA in court, they say that's not what

it is.

If you look at Page 2 of the mortgage -- actually Page 4, it just says "expressly" under "conditions to grant".  The mortgage exists "to secure owner's payment to mortgagee of the settlement payment".  That's a settlement payment that's set at 70 percent, way higher than 44 percent.

So, yes, it is guaranteeing that they will get their advance back.  And the mortgage is securing that.

THE COURT:  Thank you, Counsel.  I will issue an opinion before the end of the month.  You'll have a decision.

Thank you.  We're adjourned.

MR. SCOTT-RAILTON:  Thank you, Your Honor.

THE COURT:  Have a good night.  Thank you very much.

THE COURTROOM DEPUTY:  All rise.

(Proceedings concluded at 4:43 p.m.)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/S/ Meta Goddard, RMR, CRR, CCR-NJ
Official Court Reporter


12/16/2025
Date

United States District Court
District of New Jersey